INTERIM HEALTHCARE, INC, Catamaran Acquisition Corp. and Cornerstone Equity Investors, IV, L.P., Plaintiffs,

v.

SPHERION CORPORATION, Defendant.

C.A. No. 00C–09–180–JRS.

Superior Court of Delaware, New Castle County.

Submitted: July 20, 2004.
Decided: Feb. 4, 2005.

Sean J. Bellew, Cozen O'Connor, Wilmington, DE; Robert W. Hayes, Sarah E.

**516**

Davies and Mary Craine Lombardo, Cozen O'Connor, Philadelphia, PA, for Plaintiffs.

Allen M. Terrell, Jr. and Alyssa M. Schwartz, Richards, Layton & Finger, Wilmington, DE, for Defendant.

SLIGHTS, Judge.

### TABLE OF CONTENTS *

I. .................................................................................................. 518

 A. The Parties ..................................................................................... 518

 B. The Medicare Cost Reimbursement Program ........................................... 519

 C. Cost Reports ................................................................................... 520
 1. The Regulation of Cost Reports ...................................................... 521
 2. Interim's Cost Reports ................................................................. 522
 a. The Three Component A & G Methodology ........................................ 523
 b. The Allocation of Capital Costs ................................................... 525
 c. Regional Vice President and Branch Manager Salaries ...................... 526

 D. Interim's Pre–Sale Discussions With Its Fiscal Intermediaries .............. 526

 E. Catamaran Acquires Interim at Auction ................................................ 529
 1. The Timing of the Sale ................................................................ 529
 2. The Financial Statements .............................................................. 529
 a. The Audited Historical Financial Statements ................................. 529
 b. The *Pro Forma* Financial Statements .......................................... 530
 c. The Medicare Reserves ............................................................ 531
 d. The Descriptive Memorandum .................................................... 532
 3. Cornerstone's Due Diligence .......................................................... 532
 4. Cornerstone's Final Bid ................................................................ 534
 5. The Restated Stock Purchase Agreement ........................................ 534
 a. The Medicare Provisions ........................................................... 536
 b. The Financial Statements Provision ............................................. 537
 c. The Pending or Threatened Litigation or Liabilities Provisions ......... 537
 d. The Indemnification Provisions ................................................. 538

 F. Interim's Pre–Sale Liabilities ............................................................ 539
 1. The Medicare Adjustments ............................................................ 539
 2. The Black and Burns Franchise Loans .............................................. 541
 3. The Huff Litigation ..................................................................... 542
 4. The Williams Litigation ................................................................ 544
 5. The Therapy Student Claims ......................................................... 544

II. ................................................................................................. 545

 A. Preliminary Findings of Fact and Conclusions of Law ........................... 545
 1. The Burden of Proof .................................................................... 545
 2. The Parol Evidence Rule .............................................................. 546
 3. There is No Evidence of Fraud or Intentional Misrepresentation .......... 547
 4. The Elements of a Breach of Contract Claim .................................... 548
 5. Catamaran Has Standing to Allege a Breach of the Agreement ........... 548
 6. The Contractual Allocation of Risk and Expectancy Damages ............. 549

---

\* The following table of contents is included solely for the purpose of aiding the reader and is not part of the Court's official opinion. Therefore, all publishers should feel comfortable repaginating this table for any subsequent publication.

B. The Medicare Adjustments ......................................... 552
 1. The Parties' Contentions......................................... 552
 2. The Interpretation of the Applicable Provisions of the Agreement ........ 554
 a. Section 3.16 .............................................. 554
 b. Section 3.17 .............................................. 557
 3. The Medicare Experts......................................... 558
 4. The Audit Conclusions of HCFA and the FI are Not Dispositive .......... 560
 5. Cross–Subsidization ......................................... 560
 6. The Three Component A & G Methodology ........................... 561
 7. The Allocation of Capital Costs ................................. 565
 8. The Allowance of Regional Vice–President and Branch Manager Cost ..... 567
 9. The Failure to Adjust Visits to the Provider's Statistical and
 Reimbursement Report......................................... 569
 10. The Miscellaneous Violations of Law .............................. 570
 11. Causation and Damages ......................................... 570

C. The Interim Financial Statements ..................................... 571
 1. The Parties' Contentions......................................... 571
 2. The Adequacy of Interim's Reserves ............................... 572

D. The Remaining Section 10.1 Indemnification Claims....................... 576
 1. The Burns and Black Franchise Loans ............................. 576
 2. The Huff Litigation ............................................. 578
 3. The Williams Litigation......................................... 579
 4. Plaintiffs Are Not Entitled To Indemnification For Any Damages
 Indemnifiable Under Section 10.1 ................................. 580

E. The Therapy Student Claims......................................... 580
 1. The Definition of Therapy Student In the Agreement.................... 581
 2. The Therapy Student Reserve ..................................... 582
 3. Notice of Therapy Student Claims ................................. 583
 4. Indemnification for the Therapy Student Claims ....................... 584

F. Plaintiffs Are Not Entitled to Expectancy Damages....................... 585

III. ............................................................. 585

This lawsuit involves claims arising from alleged breaches of an intensely negotiated stock purchase agreement for the sale of Interim Healthcare, Inc. ("Interim") by defendant, Spherion Corporation ("Spherion"), to plaintiffs, Catamaran Acquisition Corp. ("Catamaran") and Cornerstone Equity Investors, IV L.P. ("Cornerstone") (the transaction will be referred to hereinafter as "the Sale"). The plaintiffs, Interim (as acquired),[1] Catamaran and Cornerstone, allege that Spherion breached several representations and warranties in the Agreement by failing adequately to disclose numerous pre-Sale liabilities of Interim and by misrepresenting the financial condition of Interim in the financial statements supplied to the plaintiffs during due diligence. Plaintiffs seek damages under the indemnification provisions of the Agreement and also seek expectancy/benefit-of-the-bargain damages for the difference between what they paid for In-

1. References to "Interim" prior to the Sale shall be to the division of Spherion that provided healthcare services; references to "Interim" after the sale shall be to the entity acquired by Catamaran. Where necessary, the Court will indicate parenthetically to which Interim entity it is referring. The Court's reference to "plaintiffs" shall be to all plaintiffs unless otherwise indicated.

terim and the actual value of Interim at the time of the Sale.

After a three week bench trial and post-trial submissions by the parties, this is the Court's findings of fact and conclusion of law. In short, the Court has found in favor of the plaintiffs on Counts I and II of their Amended Complaint and awards damages to plaintiffs in the amount of $1,070,719.47. The Court has found in favor of Spherion on Counts III of the Amended Complaint, Count I of the Court of Chancery Complaint (previously transferred to this Court), and on plaintiffs' claim for expectancy damages.

This Opinion, necessarily lengthy given the size of the trial record and the complexity of the claims, is organized as follows: Part One describes the parties, the background facts and the Court's findings of fact where the parties disagree. Part Two summarizes the claims and defenses and sets forth the Court's analyses and conclusions of law. Finally, Part Three summarizes the Court's conclusions and directions for the entry of the appropriate verdict and judgment on the docket.

## I.

### A. The Parties

Prior to September 26, 1997, Spherion (formerly known as Interim Services, Inc.), a Delaware corporation, operated two principal divisions, a commercial staffing division and a healthcare division. The healthcare division initially focused on providing temporary nurses to hospitals.[2] Eventually, the healthcare segment of Spherion's business grew with its entry into the home healthcare, physical therapy, and other health-related markets.[3] By the time Spherion sold its healthcare business in 1997, Interim had become the second largest independent home healthcare company in the United States.[4] As of December 27, 1996, Interim "operated a network of 391 home care offices in 45 states and 4 Canadian provinces."[5]

Of Interim's 391 home care offices, 285 of them were operated by Interim franchisees.[6] The remaining home care offices were owned by Spherion and operated by Interim directly. The majority of Interim's revenues (approximately 75%) were derived from reimbursements for services from private payers (individual patients and private health insurers). The remaining approximately 25% of Interim's revenues were derived from Medicare program reimbursements.[7]

Cornerstone is a private equity firm based in New York.[8] Over its twenty year history, Cornerstone has focused its investment activities in four basic areas: technology, retail, consumer business services and healthcare.[9] Cornerstone's investors (approximately 30 in number) are primarily state pension funds and large corporate pension funds.[10] Cornerstone

---

2. D.I. 109, at 3–5; D.I. 100, at ¶¶ 33–36. ("D.I. ——" shall refer to the applicable docket item in the Superior Court docket; "PX ——" shall refer to the applicable plaintiffs' exhibit; and "DX ——" shall refer to the applicable defense exhibit. All references to the parties' Pretrial Stipulation, D.I. 100, shall be to the paragraphs of the stipulated statement of facts contained therein unless otherwise indicated.)

3. D.I. 109, at 3–5; D.I. 100, at ¶¶ 33–36.

4. PX 123, at Sph 012139.

5. *Id.*

6. D.I. 100, at ¶ 37.

7. DX 29.

8. D.I. 114, at 30.

9. *Id.* at 36.

10. *Id.* at 37.

formed Catamaran in 1997 as the vehicle through which it would acquire Interim.[11]

## B. The Medicare Cost Reimbursement Program

As indicated, a significant percentage of Interim's revenues were derived from Medicare reimbursements. It is not surprising, then, that this segment of Interim's operation was a focal point of the parties' discussion prior to the Sale. Given the intense regulatory environment in which the Medicare program operates, it is also not surprising that the Medicare aspects of Interim's operations has become a focal point of the parties' dispute after the Sale and a key aspect of this litigation. The Medicare program, and Interim's interaction with it, both are quite complicated. The Court will address the background of this aspect of the case in detail in light of its importance to the plaintiffs' summital claim for relief.

Medicare is a federally funded program created in 1966 by the Social Security Act, 42 U.S.C. § 1395 (the "Medicare statute"), to provide healthcare coverage for a designated population, including the elderly and disabled.[12] At the time of the events giving rise to this controversy, the Medicare program was administered by the Health Care Financing Administration of the Department of Health and Human Services

("HCFA").[13] The Medicare program is comprised of two parts: "Part A" provides coverage for in-patient hospital and post-hospital care, home health services and hospice care; "Part B" is a voluntary supplemental health insurance program that provides coverage for services rendered by physicians and other out-patient healthcare providers.[14] Skilled-intermittent nursing, physical therapy and home health aid services rendered by a home health provider to Medicare program beneficiaries are recognized by Medicare in Part A as "covered services."[15] Other services, such as regular "private duty" nursing care, are not covered by Medicare.[16]

Prior to a restructuring of Medicare reimbursement in October, 2000, home healthcare providers were reimbursed for covered services on a per-visit, retroactive cost basis.[17] Under this system, Medicare reimburses providers only for the allowable costs of providing the covered services they render to Medicare beneficiaries.[18] Providers are not entitled to make a profit on billings to Medicare by inflating costs or by improperly shifting non-Medicare costs to the Medicare program.[19] In determining reimbursable costs, Medicare takes into account both the provider's direct and indirect costs to provide services to Medicare beneficiaries.[20] The intent of the reimbursement scheme is to ensure

11. D.I. 100, at ¶ 91.

12. *Id.* at ¶ 1.

13. *Id.* at ¶¶ 2–3. HCFA is now known as the Centers for Medicare and Medicaid Services ("CMS"). *Id.* at ¶ 3.

14. *Id.* at ¶ 4. *See also* 42 U.S.C. §§ 1395c, 1395j.

15. *Id.* at ¶¶ 6–7; DX 87, at 6.

16. D.I. 100, at ¶¶ 6–7.

17. DX 87, at 6. On October 1, 2000, Medicare began to reimburse Part A providers through

a "prospective payment system" which reimburses provider costs "based on a predetermined rate" rather than a "retrospective" calculation "based on [previously-filed] cost reports." FARROW, ET AL., *HEALTH LAW* § 13–10 (West 1995). *See also* D.I. 119, at 35–37.

18. D.I. 100, at ¶ 7. *See* 42 U.S.C. § 1395f(b)(1)(A).

19. D.I. 100, at ¶¶ 6–7.

20. 42 U.S.C. § 1395x(v)(1)(A)(i); 42 C.F.R. § 413.9(b).

that the cost of delivering covered services to Medicare beneficiaries is not born by the provider's non-Medicare patients and, likewise, that the cost of providing services to the provider's non-Medicare patients is not born by Medicare beneficiaries.[21]

Under the retroactive cost reimbursement system, the provider bills the Medicare program as it delivers services to program beneficiaries. Medicare, in turn, pays the provider either on a "claim-by-claim" basis or on the basis of estimated lump-sum, bi-weekly payments known as periodic interim payments ("PIP").[22] Such payments are estimates of the costs of delivering services and supplies to program beneficiaries based on past performance. At the end of the program year (usually the provider's fiscal year), the provider prepares and submits to Medicare a year-end "cost report" in which it calculates the costs it incurred to provide services to Medicare beneficiaries during the fiscal year for which the cost report is being submitted.[23] To the extent the actual costs vary from the estimated costs for which the provider already received PIPs, an adjustment occurs and the provider either pays back to Medicare any excess reimbursement or receives from Medicare any reimbursement to which it is owed.[24]

The Medicare statute authorizes HCFA to delegate to insurance companies and other private parties the responsibility for processing billings from healthcare providers and for verifying that such requests for reimbursement are consistent with the Medicare statute and the rules and regulations interpreting the statute. These entities, known as "Fiscal Intermediaries" ("FI"), are assigned to the healthcare providers by HCFA and are the first point of contact for the providers when interacting with the Medicare program.[25] With respect to home healthcare companies, the FI specifically is charged with responsibility for enforcing the Medicare principles of retroactive costs by, among other measures, scrutinizing requests for PIP and scrutinizing the year-end cost reports submitted by the providers.[26]

## C. Cost Reports

The process by which a provider seeks reimbursement from Medicare Part A, at first glance, appears quite simple. First, the provider must identify the costs, both direct and indirect, associated with providing reimbursable services to all of its patients, both Medicare beneficiaries and non-Medicare beneficiaries alike.[27] Once

---

21. D.I. 100, at ¶ 8. *See also* 42 U.S.C. § 1395x(v)(1)(A)(defining "reasonable cost" of services as the "cost actually incurred" and stating that the cost "shall be determined in accordance with regulations establishing the method or methods to be used...").

22. DX 87, at 7.

23. *See* 42 C.F.R. § 413.24(f). The provider also submits interim cost reports during the course of the year in order to receive its PIP. The year-end cost reports are reconciled with the interim cost reports and a determination is made as to whether the provider requested too much or too little reimbursement during the course of the year. D.I. 100, at ¶ 23.

24. *Id.* at ¶¶ 23–27. Upon review of the cost report, the FI furnishes to the provider a Notice of Program Reimbursement ("NPR") in which the FI gives notice to the provider of the total amount of reimbursement due, including any adjustments that have been made (with explanations and citations to applicable authority). *See* 42 C.F.R. § 405.1983(a)(1)(b).

25. 42 U.S.C. § 1395h.

26. *Id.*

27. A "direct cost" would include such items as the salary of the care provider and the cost of medical equipment used in the provision of care. "Indirect costs" would include such items as office overhead and other adminis-

the provider has identified the costs associated with providing reimbursable services, the provider must then divide that number by the number of covered services provided during the fiscal year. This process yields a "cost per visit" or "cost per service." [28] That number is then multiplied by the number of services rendered to Medicare beneficiaries during the fiscal year. This number yields the total Medicare reimbursement for that year.[29]

The allocation of the provider's direct costs is relatively straightforward. By way of example, if a nurse is providing both reimbursable intermittent nursing care, and non-reimbursable long-term "private duty" care, the direct cost of her salary would be allocated to Medicare by determining the extent to which she provided reimbursable services, and allocating that portion of her salary as a direct cost to be reimbursed by Medicare.[30] Indirect costs in the "chain provider" [31] context, on the other hand, present a range of more complicated issues, from identifying reimbursable indirect costs,[32] to determining in

what manner they may be allocated as between healthcare and non-healthcare businesses, and as between Medicare and non-Medicare services.[33] It is this aspect of Interim's cost reports that is primarily at issue here.

### 1. The Regulation of Cost Reports

The regulation of the home health industry's participation in Medicare and, particularly, the submission of cost reports, is executed through a complex scheme that begins with the Medicare statute itself. From there, the provider looks to regulations promulgated by HCFA, a provider manual published by HCFA (the Provider Reimbursement Manual or "PRM"), regular bulletins from HCFA called "Transmittals" that attempt to clarify or update the regulations or the PRM, and more informal communications or directives from the FI.[34] Unfortunately, these links of authority from which the provider may seek guidance do not always make a perfect chain. In some instances, the links offer vague

---

trative expenses that are supportive of, but not directly related to, patient care. D.I. 100, at ¶¶ 16–17.

**28.** As indicated, not all medical services are reimbursed by Medicare. For instance, Medicare will not reimburse for home nursing services provided on a sustained, "private duty" basis. For reimbursement purposes, then, such services must be segregated from the reimbursable intermittent nursing services in order to reach an "average cost per visit." *Id.*

**29.** *Id.* at ¶ 22.

**30.** *See generally Id.* at ¶ 18.

**31.** A "chain provider" is a provider with multiple facilities in multiple locations. *Id.* at ¶ 16.

**32.** Certain "indirect" costs may not be submitted to Medicare for reimbursement. For

instance, Medicare will not reimburse providers for costs associated with "marketing," defined generally as activities intended to increase utilization of the provider's Medicare services. *Id.* at ¶¶ 17–18.

**33.** Interim's cost allocation was made more complex by the nature of its operations. Not only did Interim operate multiple locations, it also offered a wide spectrum of services, some of which were reimbursable by Medicare and others of which were not. Moreover, Interim treated both private-pay patients as well as Medicare beneficiaries. Finally, Interim was a division of a company that offered both healthcare services and non-healthcare temporary staffing services. This dynamic created a particularly complicated regulatory environment in which Spherion was expected to allocate its costs for purposes of seeking Medicare reimbursement.

**34.** D.I. 106, at 207–08; DX 119, at 48–49.

guidance,[35] and at other times contradict one another, leaving the provider to make its best guess as to proper procedure.[36]

With respect to cost reports specifically, the Medicare statute offers little, if any, direct guidance. It simply directs that the provider shall be entitled to the payment of the lesser of its reasonable and customary charges, the costs it incurred to provide the service, or established cost limits.[37] The Medicare statute also generally prohibits cost reimbursement methodologies that will result in "cross-subsidization"—any process that would enable the provider improperly to recoup from Medicare its non-Medicare related costs.[38] Beyond this, the provider must turn to secondary authorities for direction.

HCFA's regulations offer slightly more definitive guidance, but are by no means step-by-step instructions.[39] The PRM and, occasionally, HCFA's Transmittals address in some more detail the manner in which a provider should allocate costs for purposes of preparing cost reports and seeking reimbursement.[40] And finally, the FIs themselves frequently offer their own interpretation of the applicable authority, which interpretations may vary from year to year and from FI to FI.[41]

Providers submit their cost reports to their FI on forms supplied by HCFA.[42] The FI reviews the cost reports and notifies the provider if it owes the Medicare program for overpayments it received during the year or if Medicare owes the provider because the provider was not paid enough in the PIPs.[43] If the provider disagrees with the adjustments made by the FI, the provider may appeal the findings to HCFA's Provider Reimbursement Review Board ("PRRB") and, if appropriate, to an Administrative Law Judge and up the appellate chain from there.[44]

### 2. Interim's Cost Reports

Like all chain providers, Interim was required to file two types of cost reports with HCFA: (1) separate cost reports on behalf of the providers at each branch location from which it provided services; and (2) a single cost report on behalf of the Spherion home office where the operations of each branch provider were coordinated. With respect to the home office cost reports, Interim was required to allocate corporate overhead first as between the healthcare business and the non-healthcare business of Spherion, and then as among its various providers. HCFA requires the provider equitably to allocate corporate costs between healthcare and non-health-

---

35. *See e.g.* PX 334 at § 2150.2A ("Home office costs directly related to those services performed for individual providers which relate to patient care, plus *an appropriate* share of indirect costs ... are allowable *to the extent they are reasonable.*") (emphasis supplied).

36. *Compare* PX 69 (Transmittal 2), PX 70 (Transmittal 3) with DX 263 (Transmittal 4). *See also* DX 65 (FI acknowledges "inconsistencies in written and verbal direction from HCFA."); D.I. 118, at 68–69, 72 ("We were getting conflicting information from the [FI] ...; "... talking directly to HCFA [we were] hearing one thing, but then in writing it says another. So we just felt it was—we were getting conflicting information. So we were sticking with what we felt was right.").

37. *See* 42 U.S.C. § 1395f(b)(1)(A).

38. *Id.*

39. *See e.g.,* 42 C.F.R. § 413.24(d)(1) (generally describing the "step-down method" of cost allocation).

40. *See* D.I. 100, at ¶ 20.

41. D.I. 119, at 31–34.

42. PX 739, at 3; DX 87, at 9.

43. D.I. 119, at 50–53; D.I. 100, at ¶¶ 26–28.

44. *See generally* DX 87, at 7, 12–14.

care businesses to ensure that the Medicare program does not subsidize the non-healthcare business by providing reimbursement for non-healthcare costs.[45] Once the home office costs were allocated properly to the providers, Interim then could report such costs in the individual provider cost reports and at that level seek reimbursement for all reimbursable costs.[46]

### a. The Three Component A & G Methodology

To allocate costs properly at the provider level, Interim, like all chain providers, had to devise an appropriate methodology to allocate operational costs in a manner that reflected those costs that were reimbursable and those that were not. The distinction between reimbursable and non-reimbursable costs at the home office level was made for the chain providers on Interim's home office cost report. All home healthcare providers are required by regulation to undertake this process, known as "cost finding," by employing a "step down cost finding methodology."[47]

In 1991, Interim began to utilize a "step down" cost allocation methodology referred to as "the three component administrative and general ("three component A & G") methodology."[48] Under the three component A & G methodology, Interim

first had to identify its "cost centers," i.e., organizational units within Interim that were operated for the benefit of the institution as a whole.[49] Interim then allocated its costs using a three-step process. First, Interim would allocate the costs of its "servicing center"(home office) down to "operating centers" that were located off site from the home office and included Medicare Billing, Medicare Compliance and a Processing Center (payroll, etc.) at one location, Quality Assurance, Commercial Operational Support and Franchise Operational Support at another location, and Regional Field Offices at various locations. The combined servicing center and operational center costs would then be allocated from the operating centers down to the providers using the three component A & G methodology.[50]

In the second step of its cost allocation, Interim identified three "A & G components" to which it could allocate its home office costs: (1) reimbursable or intermittent A & G (A & G related to Medicare-type services); (2) non-reimbursable A & G (A & G related to non-Medicare activities); and (3) shared A & G (A & G that benefited all cost centers).[51] "Shared A & G" included any A & G generated as a result of activities that supported both intermittent and non-intermittent services. Interim interpreted the guidance from HCFA as directing that it allocate A & G

---

**45.** D.I. 100, at ¶ 19.

**46.** *Id.* at ¶ 16. Stated differently, in order to pass operational costs on to Medicare, Interim would move its home office costs down to each provider. The provider, in turn, would add the home office costs to its own costs to reach its total reimbursable costs. *See* D.I. 121, at 6.

**47.** *See* 42 C.F.R. § 413.24(d). "Under the cost finding process, data from the accounts ordinarily maintained by a provider is recast in order to ascertain the costs of the type of services rendered. This is done by allocating

direct costs and prorating indirect costs." DX 117, at 7 (citing 42 C.F.R. § 413.24(b)(1)).

**48.** D.I. 100, at ¶¶ 20–21, 44. "A & G" stands for administrative and general costs incurred at both the home office and provider levels.

**49.** D.I. 100, at ¶ 20. "Cost centers" would include such "organizational units" as the accounting, legal, billing and human resource departments within Spherion. *See* PX 733.

**50.** D.I. 110, at 91–108. *See also* PX 733.

**51.** D.I. 100, at ¶¶ 44–46.

to shared A & G whenever it arose even "slightly" from both intermittent and non-intermittent activities.[52] By regulation, the costs of non-revenue producing centers must be allocated to the cost centers they serve by using an "allocation statistic" designed fairly to reflect the extent to which each cost center uses the services rendered by the cost center being allocated.[53]

In the final step of the process, Interim "closed out" or apportioned its three component A & G cost centers on the cost report.[54] By regulation, all costs of the non-revenue producing centers are allocated to the centers that receive their services, regardless of whether these centers themselves produce revenues.[55] And, by regulation, "[t]he cost of the non-revenue-producing center serving the greatest number of other centers, while receiving benefit from the least number of centers, is apportioned first." [56] Once a center's costs are apportioned, the center is "closed" and no further costs are apportioned to it.[57] When Interim first began to employ the three component A & G methodology, it allocated (or "sequenced") its shared A & G first using a "net accumulated cost" statistic. Under this methodology, Interim allocated shared costs to all relevant cost centers, including the other componentized A & G cost centers.[58] The 100% reimbursable costs were allocated directly to intermittent operational costs for which full reimbursement was sought; the 100% non reimbursable costs were al-

---

52. *See* PX 689, at 8; D.I. 101, at 26–28.

53. 42 C.F.R. § 413.24. Prior to adopting the three component A & G methodology, Spherion utilized an allocation statistic for indirect costs that was the product of the ratio between the direct costs incurred by the departments providing "Medicare-like services" and those providing "non-Medicare-like services." For example, if each division generated fifty percent of the total direct costs the provider incurred, fifty percent of the apportioned home office and provider indirect costs would be allocated to each department. In essence, then, all costs were allocated to a "shared bucket" from which only some of the costs were reimbursable. D.I. 101, at 16–17. Under the three component A & G methodology, however, the allocated home office costs would be segregated into three components (or "buckets"), as outlined above, including a 100% reimbursable "bucket." There appears to be no dispute that the three component A & G methodology, given Spherion's particular circumstances, yielded a greater level of reimbursement from Medicare than its prior methodology.

54. D.I. 101, at 16–17.

55. 42 C.F.R. § 413.24(d)(1).

56. *Id.*

57. *Id.*

58. PX 733; DX 177, at 4. The following example illustrates the use of the "net cost" statistic in the three component A & G methodology: if 50% of the Medicare certified provider's total direct costs were intermittent (reimbursable) operational costs and 50% were non-intermittent (non-reimbursable) operational costs, then shared A & G would be split 50/50 between reimbursable and non-reimbursable operational costs, i.e., 50% of shared A & G would be included in the amount sought from HCFA for reimbursement. D.I. 101, at 20. The "net cost" statistic is typically distinguished from the "total accumulated costs" statistic, which is a percentage of reimbursable operational costs including 100% reimbursable A & G. *Id.* at 21. As a general rule, shared A & G would allocate at a higher rate to reimbursable costs using a "total accumulated costs" statistic because Medicare-like services tended to consume more resources (including indirect costs) than non-Medicare like services, a phenomenon not adequately captured by a comparison of direct costs for intermittent and non-intermittent services. *Id.* at 22. By using a "net cost" statistic, and allocating shared A & G first, Interim could allocate a portion of the shared A & G to the 100% reimbursable A & G before allocating it separately to the provider, along with direct costs, for reimbursement. *Id.* at 23–24.

located to non-intermittent operational costs for which no reimbursement was sought.[59]

The Medicare regulations require a provider to obtain the approval of the FI before implementing a sophisticated allocation methodology (such as the three component A & G methodology), and Interim believed it had obtained such approval for its allocation methodology, including the sequencing and the allocation statistic, beginning in 1992.[60] As discussed below, Interim adjusted its sequencing and allocation statistic in 1996 after its FI expressed concern that Interim's sequencing was leading to inequitable reimbursement results.

### b. The Allocation of Capital Costs

Among the indirect costs allocated from the home office to the chain providers are capital costs, e.g., moveable equipment depreciation, building depreciation, etc. Generally, the allowable capital costs of the chain organization's home office are allocated among the chain's facilities, first by allocating all costs directly attributable to particular facilities in the chain to those facilities; then, by allocating costs on a functional basis where possible; and, finally, by allocating all "pooled" or residual costs among healthcare facilities in the chain on the basis of either relative inpatient days or total costs if the chain consists only of healthcare facilities, or among healthcare facilities and the organization's other entities on an approved basis if the chain contains other than healthcare facilities.[61]

Interim elected to allocate its home office capital costs on a "functional basis" utilizing the square footage of its various facilities as its allocation statistic.[62] Although HCFA did not direct providers to utilize a particular statistic for allocating capital costs, it did suggest that a functional allocation statistic (such as square footage) should be utilized only if it was reasonably related to the "services received by the entities in the chain."[63] To the extent a functional statistic could not be identified, the provider was directed to allocate capital costs on the basis of total costs.[64]

It appears from the record that for the time relevant to this inquiry (1994–96), Interim allocated its capital costs as follows: (1) it allocated the costs of the capital equipment physically located within each cost center directly to that cost center; (2) it then reallocated the costs of the home office Medicare operational cost centers back up to the home office administrative departments; (3) it then allocated the capital costs of the administrative departments along with the reallocated Medicare operational indirect costs back down to some, but not all, of the home office de-

---

59. *See* PX 733.

60. *See* D.I. 101, at 70; D.I. 100, at ¶ 47; PX 675. The FI and the provider typically negotiate the use of a particular methodology of cost allocation because each chain provider presents its own unique corporate or operational structure that must be taken into consideration when devising an appropriate reimbursement scheme. *See* DX 87, at 18; DX 264; DX 265; D.I. 110, at 115.

61. *See* PX 334—PRM, Part I, at § 2150.3; 42 C.F.R. § 413.53(a)(3).

62. Specifically, Interim created a square footage allocation statistic for the following "operating centers": the Medicare operations (maintained in a separate building across the street from the home office), the Quality Assurance Operations, and the Commercial and Franchise Support Operations. It did not create a square footage allocation statistic for the Processing Center or the Regional Field Offices. D.I. 101, at 30–31.

63. PX 334, at § 2150.3 C.

64. *See* PX 334, at § 2150.3C, D.

partments; and (5) finally, it allocated these costs to the provider based on a square footage statistic.[65]

#### c. Regional Vice President and Branch Manager Salaries

Among the "field office" costs allocated to the providers were the salaries and related costs for regional vice presidents (four in number) and regional branch managers (more than 100 in number).[66] In order properly to allocate these costs to the providers so that reimbursement could be sought from Medicare, Interim first had to determine whether the costs were allowable. Medicare will not pay for costs related to marketing or advertising. It will, however, pay for costs associated with "appris[ing] [physicians, hospitals, public health agencies, nurse associations, etc.,] of the availability of the provider's covered services...."[67] Interim sought reimbursement from Medicare for the costs associated with its regional vice presidents and branch managers to the extent it determined they were not engaged in non-allowable marketing activities.[68]

#### D. Interim's Pre–Sale Discussions With Its Fiscal Intermediaries

Interim's cost allocation methodologies changed as the nature and extent of its Medicare operations changed. In the early part of 1991, Interim sought and received from its FI, Aetna Life Insurance Company ("Aetna"), approval to implement a three component A & G methodology.[69] Interim utilized the three component A & G methodology in its costs reports for fiscal years 1992 and 1993.[70] Interim's 1992 cost reports were fully audited by Aetna and no major issues were detected.[71]

In early 1994, Interim sought to confirm that Aetna continued to approve of Interim's three component A & G methodology.[72] Aetna responded: "You requested a letter authorizing approval of a three component A & G allocation method. We have reviewed this allocation method at the agency level and did not have any problems or exceptions with it."[73]

In early 1995, Aetna expressed concerns regarding the manner in which Interim sequenced its three component A & G components. Representatives from Interim met with Aetna in March, 1995 to discuss the issue.[74] Although it is unclear whether Aetna's concerns arose from its inability to process the sequencing methodology utilized by Interim with Aetna's then current software system, or from some other more substantive problem, it is

---

**65.** D.I. 101, at 29–42. Interim allocated capital costs from the home office servicing center down to the five operating centers identified above based on the percentage the square footage of each operating center occupied in relation to the total square footage of all five operating centers. *Id.* at 31. The net result of its capital cost allocation was that approximately 4% of Medicare 1 servicing center salaries were allocated to the medicare operating center while 40% of the capital costs were allocated to the same operating center. *Id.* at 38. *See also Id.* at 43–51 & PX 677 (According to Interim's FI, 7% of pooled costs allocated to Medicare/reimbursable versus 42% of capital costs.).

**66.** D.I. 119, at 117, 128.

**67.** DX 87, at 42–43.

**68.** D.I. 123, at 56–62.

**69.** DX 264; DX 265.

**70.** DX 110.

**71.** *Id.*

**72.** *Id.*

**73.** DX 31.

**74.** DX 19; PX 20; D.I. 101, at 72–73; DX 169, Ex. G.

clear that concerns were expressed and directions were given to Interim at the March, 1995 meeting.[75] Specifically, Aetna directed Interim to close out "shared A & G" last. Aetna also advised Interim that one A & G could not be allocated to another A & G.[76] Aetna reiterated this direction by letter dated June 7, 1995.[77]

Later in 1995, Aetna advised Interim that the 1994 home office cost report had been selected for a field audit.[78] On November 7, 1995, Interim attended a meeting with Aetna to address Aetna's concerns prior to the commencement of the field audit.[79] Shortly after this meeting, Aetna provided Interim with a memorandum from HCFA which confirmed that providers utilizing a three component A & G cost allocation methodology should close out shared A & G last in the sequence.[80]

The field audit of the 1994 home office cost report ultimately was cancelled by Aetna because it lacked the resources to conduct the audit.[81] Aetna advised Interim that the audit probably would not be rescheduled, but that Interim should ex-

pect a field audit of its 1995 home office cost report.[82] A desk review of the 1994 home office cost report resulted in Aetna issuing NPR's to Interim reflecting downward adjustments of reimbursement totaling $821,475.[83] Interim timely appealed the adjustments to the PRRB shortly thereafter.[84]

In August, 1995, in the midst of its discussions with Aetna regarding the sequencing of A & G and other issues, Interim made a formal request to the Regional Administrator of HCFA to remove Aetna as Interim's FI.[85] HCFA rejected Interim's request and supported Aetna's conclusions regarding the impropriety of Interim's cost finding methodologies.[86] Throughout this time frame, Interim continued to receive advice from its outside legal counsel encouraging Interim to stay the course and make its case for its three component A & G methodology.[87]

HCFA formally weighed in on the sequencing question when it issued Trans-

75. PX 20.

76. *Id.* at 4.

77. PX 21.

78. PX 47; D.I. 100, at ¶ 56.

79. *Id.* at ¶ 57.

80. *Id.* at ¶ 58.

81. PX 62.

82. *Id.* Curiously, Interim's 1995 cost report, utilizing a slightly different methodology with the same net result, was never formally challenged by the FI. *See* DX 87, at 37 (Interim sequenced its shared A & G last but utilized a "total accumulated cost" statistic).

83. D.I. 100, ¶ 61. A "field audit" is an intensive audit conducted by the FI at the provider's offices and in the field. D.I. 100, at ¶ 29. A "desk review" is a less intensive review of

the provider's cost report conducted by the FI at its own office. D.I. 119, at 50–51.

84. D.I. 100, at ¶ 62.

85. PX 41. While Spherion acknowledges that the request to change FI was made as Interim was contesting Aetna's position regarding Interim's three component A & G methodology, Spherion contends that the request also was motivated by Aetna's lack of experience in dealing with chain providers. D.I. 141, at 12; DX 69 ("Our method of cost reporting appears to be the same as ... other chains. By moving to [another FI] we would be measured against what is 'normal and customary' with other chains rather than the random stream of consciousness from our current FI."). It seems likely that both factors motivated Spherion to seek a change in FI.

86. PX 51.

87. *See, e.g.,* DX 9, Attach. A, at 2; DX 215.

mittal 2 on May 1, 1996.[88] Transmittal 2 was effective for cost reporting periods ending on or after September 30, 1996, and expressly stated that providers utilizing the three component A & G methodology must allocate shared A & G last in the sequence.[89] Interim complied with Transmittal 2 but changed its allocation statistic to "total accumulated cost." By utilizing this allocation statistic, Interim was able to maintain the same level of reimbursement it was receiving when it allocated its shared A & G first.[90]

Aetna responded in July, 1996 by admonishing Interim for using an improper allocation statistic and warning that if Interim did not comply with "published guidelines," Aetna may not allow Interim to continue to utilize the three component A & G methodology.[91] If Interim's three component A & G methodology was disallowed, then Aetna would "collapse" the A & G—a process that would result in an allocation of operational costs on the basis of Interim's old method, i.e., on the basis of the relationship between the direct costs of Medicare and non-Medicare operations.[92] The practical effect of a collapse of A & G is that all A & G is placed in the "shared bucket."[93] Interim estimated that a collapse of its A & G would decrease its Medicare reimbursement for home office costs by $3.4 million per year.[94] Throughout this time frame, Interim continued its direct communications with HCFA, through counsel, in an effort to convince HCFA to revisit the sequencing issue.[95]

In January, 1997, HCFA issued Transmittal 3 which mandated that providers utilize net cost, rather than net accumulated cost, as the allocation statistic when allocating costs under the three component A & G methodology.[96] Transmittal 3 also provided: "[FI's should] not make adjustments for alternative A & G fragmentation methodologies employed for cost reporting periods beginning prior to January 1, 1997, which may have been allowed for those periods."[97] Interim took some comfort in Transmittal 3. Even though HCFA was now directing providers to utilize a net cost statistic, it appeared to be offering grandfather grace to providers that were utilizing a methodology that had been approved by the FI prior to January, 1997.[98] Interim believed that its three component A & G methodology fell into this category.[99]

Finally, on November 1, 1997, in a tacit admission that it had been sending conflicting messages to providers in Transmittals 2 and 3, HCFA issued Transmittal 4 in which it attempted to offer definitive guidance to providers by reconciling its conflicting instructions with the applicable regulations.[100] In Transmittal 4, HCFA clarified its position on sequencing and specified that shared A & G should be

---

88. PX 69.

89. *Id.*

90. D.I. 101, at 21–24.

91. PX 81.

92. *See* D.I. 106, at 47.

93. D.I. 101, at 80.

94. *See* PX 22.

95. *See e.g.* DX 210.

96. PX 70.

97. *Id.* at 2.

98. DX 117, at 5.

99. DX 31.

100. DX 87, Ex. 5 (stating that Transmittal 4 was intended to clarify "longstanding HCFA policy contained in 42 C.F.R.

sequenced first and allocated to the other componentized A & G cost centers, i.e., providers should utilize a net accumulated cost statistic.[101] HCFA declined, however, to give Transmittal 4 retroactive application; according to HCFA, it applied only to cost reports filed in 1997 or thereafter.[102]

In late October 1996, Interim learned that Aetna would no longer serve as its FI.[103] Interim's new FI, Palmetto Government Benefits Administrators ("PGBA"), assumed Aetna's responsibilities sometime between April and June, 1997.[104] PGBA made it clear that it intended to maintain as much of Aetna's audit/reimbursement staff as possible, and that it did not intend to implement many changes in "the way things operate." [105] The change in FI occurred during Interim's 1996 fiscal year. Interim knew, therefore, that it would be submitting its 1996 year-end cost reports to PGBA for review.

### E. Catamaran Acquires Interim at Auction

#### 1. The Timing of the Sale

Spherion first considered the possibility of selling its healthcare division in the Fall of 1995.[106] Plaintiffs contend that the decision to sell Interim was motivated by Interim's ongoing difficulties with Aetna.[107] The preponderance of the evidence, how-ever, establishes that Spherion was motivated to sell Interim for reasons separate and apart from the reimbursement issues it was discussing with the FI. Specifically, Spherion determined that its expanded healthcare business was no longer readily compatible with its commercial staffing business and that Interim required more resources than Spherion was willing to dedicate to it, particularly given the intense regulatory environment in which it was required to operate.[108]

Although Spherion first contemplated a sale of Interim in 1995, the Sale was not consummated until two years later. In the meantime, Spherion completed a major acquisition in connection with its commercial staffing business, and completed a second public stock offering in late August of 1996. Spherion decided a month or two later to go forward with the Sale of Interim.[109]

#### 2. The Financial Statements

##### a. The Audited Historical Financial Statements

After Spherion decided to sell the Interim healthcare division, it began the process of preparing historical financial statements to reflect the operations of Interim as a stand-alone business.[110] While Spherion did maintain "divisional profit and loss

---

§ 413.24(d)(1)...."). *See also* D.I. 119, at 63–64, 73–74.

101. DX 87, at Ex. 5.

102. D.I. 101, at 92–95.

103. D.I. 100, at ¶ 69.

104. PX 91.

105. *Id.*

106. D.I. 109, at 19–20.

107. D.I. 136, at 13–14.

108. *See* D.I. 109, at 19–21. *See also* D.I. 137, Evans Dep., at 51–52 ("the [Spherion] board [decided] to divest itself of healthcare so it could focus, the company could focus, on what we felt were its core competencies which was the commercial staffing business."). The Court has found no direct evidence to support plaintiffs' contention that Spherion decided to sell Interim as a way out of its regulatory battle with Aetna (and later PGBA).

109. *See* D.I. 109, at 20–21, 226–27; D.I. 137, Evans Dep., at 54.

110. D.I. 116, at 92–94.

statements" for Interim, these statements were incomplete in that they did not reflect certain home office expenses, interest income or allocated overhead, all of which a potential buyer would expect to see in the mix of information needed properly to evaluate Interim as a stand-alone company.[111] Accordingly, Spherion tasked Paul Haggard, Spherion's Vice President for Financial Affairs and Controller, with the responsibility of preparing a set of historical financial statements for Interim that could be supplied to potential buyers.[112]

Haggard prepared the historical financial statements by taking "the total company, Spherion, and divid[ing] it into the two divisions, the commercial division and the healthcare division, so that the sum of the two divisions equaled the total. It was a bifurcation of the company on a historical basis."[113] The historical financial statements were intended to "reflect the results of operations, financial position, changes in [Spherion] investment and cash flows of the businesses [that will comprise Interim when sold] . . . as if [Interim] were [sic] a separate entity for all periods presented."[114]

Once completed, Spherion submitted Interim's historical financial statements to its outside accountants for a complete audit. Deloitte and Touche ("D & T") had been acting as Spherion's auditor since at least 1994.[115] During the audit process, D & T "looked at every account, every balance sheet and profit and loss account and re-analyzed them."[116] It also reviewed Interim's cost reports, including the 1996 cost report.[117] The D & T audit team consisted of as many as nine people, some of whom were intimately familiar with Interim because they would spend upwards of three quarters of the year resident at Spherion reviewing information relevant to the annual audits and/or meeting with Interim management.[118] As part of its audit team, D & T included an in-house "Medicare specialist" to review the cost reports and cost reporting methodologies.[119] Although the audit was complete, given the nature of the estimates and allocations that were utilized to reflect the newly bifurcated healthcare business, D & T cautioned the consumer of the financial statements that the information contained therein may not provide a valid basis to measure future performance.[120]

### b. The *Pro Forma* Financial Statements

In addition to the historical financial statements, Haggard also prepared *pro forma* historical and projected financial statements by taking the historical financial statements and adjusting them to account for expenses that would be created

---

111. *Id.* at 90–91.

112. D.I. 109, at 228–29.

113. *Id.*

114. DX 9, at 7.

115. D.I. 137, Gordon Dep. at 26.

116. *Id.* at 34.

117. *Id.* at 37.

118. *Id.* at 138–39.

119. *Id.* at 39, 43, 136–37.

120. *See* D.I. 109, at 229–31. *See also* DX 9, at 5 ("Principally due to the use of estimates and allocations, the financial information included herein may not necessarily reflect the financial position and results of operations of the Company [Interim] in the future or what the financial position and results of operation of the Company would have been had it been a separate stand-alone entity during the periods presented. Management does not consider it practicable to estimate what the results of operation would have been had the Company operated as a separate, stand-alone entity.").

as a result of the bifurcation of the company.[121] The purpose of the *pro forma* financial statements was to provide an estimate of what Interim would look like going forward as a stand-alone company.[122] While the historical financial statements were audited by D & T, the *pro forma* historical and projected financial statements were not audited.[123] As explained by Spherion's then Chief Financial Officer, Roy Krause:

> Q. And why would they [the *pro forma* financial statements] not be audited by Deloitte and Touche?
>
> A. There was no attempt to estimate every particular revenue or expense account that could be adjusted under the new leadership or the new ownership. We did not know who would buy the company, whether it was a hospital, a home-health agency, or an individual venture capital company. So, we disclosed the items that we believed on an expense-account basis that they [potential acquirers] need to understand and, then, we also disclosed that we didn't affect revenue or any of the other items, because it was impossible to determine the impact of operations. We didn't know who was going to buy it.
>
> So we could audit the historical because that was a bifurcation of the company and the sum of the parts had to equal the total. But to try to adjust it further was—we considered to be impractical, and we disclosed that it was impractical.[124]

Indeed, the *pro forma* financial statements themselves provided the following disclaimer:

> The *pro forma* financial statements show the adjustments to the historical financial statements to reflect the operating expenses of the company as if it was a stand alone organization. This presentation does not reflect the actual performance of the Company as a stand alone organization, since management may have run the company differently if it was not a division of [Spherion]. The basis for this presentation is the audited financial statements inclusive of incremental operating expenses. Therefore, sales, revenues and direct costs remain unchanged from the audited historical statements.[125]

#### c. The Medicare Reserves

Spherion's financial statements included reserves for Medicare cost report adjustments.[126] Spherion historically maintained reserves for cost report adjustments in the range of $600,000 per year.[127] In 1996, it appeared that Interim would set its reserves in a range consistent with its past practice.[128] In November, 1996, however, Haggard directed that reserves be reduced by $300,000.[129] In December, 1996, Medicare reserves were reduced by another $250,000.[130] These adjustments (or "reversals") and others left Medicare reserves as reflected on Interim's 1996 income statement at $15,000.[131]

**121.** D.I. 109, at 229.

**122.** *Id.* at 229–31.

**123.** *Id.*

**124.** *Id.* at 231.

**125.** PX 123, at 51.

**126.** *See e.g.* PX 740, at 17.

**127.** *Id.*

**128.** PX 102.

**129.** PX 98; D.I. 137, Haggard Dep., at 156.

**130.** PX 98; D.I. 137, Haggard Dep., at 160.

**131.** PX 101; PX 102; DX 39; D.I. 109, at 192–193; D.I. 118, at 10.

The reserves reflected on the balance sheet—the cumulative reserves—showed a different picture by year-end 1996. As of December 27, 1996, Spherion carried $707,795 in Medicare reserves on its balance sheet.[132] As of the time of the Sale in 1997, Interim's Medicare reserves were set at $3,088,129.[133] The significant jump in Medicare reserves from year-end 1996 to September 26, 1997 was the product, *inter alia,* of Interim's determination at the time it filed its 1996 year-end cost report that its interim cost reports had understated Medicare costs by approximately $3,000,000.[134]

### d. The Descriptive Memorandum

Spherion engaged Alex.Brown to serve as the investment banker for the Sale.[135] After considering various options, Alex. Brown recommended that Spherion sell Interim at auction.[136] Spherion did not ask Alex.Brown to value Interim; it was content to allow the auction process to set the price.[137]

Spherion and Alex.Brown prepared a Descriptive Memorandum in April, 1997 for circulation to prospective bidders.[138]

Alex.Brown had selected a range of potential bidders (approximately 20), including private equity firms (like Cornerstone), home health competitors, hospitals and nursing homes.[139] In the introduction to the Descriptive Memorandum, Alex.Brown explained that the purpose of the document was "to assist [potential bidders] in deciding whether to proceed further in the investigation of a possible acquisition." [140] Alex.Brown made it clear that the Descriptive Memorandum did "not purport to contain all of the information that a potential acquirer may desire." [141] Among the information contained as schedules to the Descriptive Memorandum were Interim's actual historical financial statements for the fiscal years 1994–96, a summary of *pro forma* adjustments, and the *pro forma* historical and projected financial statements for the fiscal years 1994–2001.[142]

### 3. Cornerstone's Due Diligence

Cornerstone first expressed interest in bidding for Interim in April, 1997.[143] Cornerstone proposed "an aggregate all-cash purchase price to acquire Interim in the range of $120–$150 million." [144] The ex-

---

**132.** DX 39; DX 56. Interim's balance sheet reflects the cumulative financial condition of all of the company's operations, while the income statement reflects adjustments made on a monthly basis and, for Spherion, only certain expenses were booked on the Medicare reserve "expense account." D.I. 109, at 191–92. Stated differently, on the income statement, Interim treated Medicare reserves as "an expense item that [Interim] hadn't paid yet." *Id.* The "expense" item would be reflected as an increase in the cumulative Medicare reserve carried on the balance sheet. *See e.g.* DX39; DX 56.

**133.** DX 57; DX 122, at 40; D.I. 109, at 202–08.

**134.** D.I. 118, at 26–27, 32–33.

**135.** D.I. 109, at 22.

**136.** *Id.* at 24.

**137.** D.I. 116, at 4.

**138.** DX 72; D.I. 109, at 25–26.

**139.** D.I. 109, at 26.

**140.** DX 72, at SPH 012134.

**141.** *Id.*

**142.** *Id.* at SPH 012136.

**143.** DX 71.

**144.** *Id.* The parties dispute the means or methodology by which Cornerstone calculated its bid for Interim. Plaintiffs maintain that Cornerstone employed a straight-forward valuation based upon a fixed multiple of income before interest, taxes, depreciation and amortization ("EBITDA"). PX 613; D.I. 114, at

pression of interest was conditioned upon "further due diligence and the receipt of additional information," including "meeting with management, ... comprehensive legal due diligence (including regulatory and environmental due diligence to the degree necessary), a thorough review of the Company's historic, current and projected financial performance, ... [and] reference calls with customers *and payers.*"[145]

Cornerstone's due diligence was extensive and continued over a period of several months.[146] While the due diligence covered a number of issues,[147] the primary focus was on Interim's financial performance and its Medicare operations.[148] With respect to Medicare operations, and particularly reimbursement issues, Cornerstone involved one of its partners with healthcare experience, Martha Robinson, in the due diligence process.[149] Cornerstone also engaged outside experts. First, it engaged Ernst & Young ("E & Y") as a consultant to review Interim's financial

statements.[150] E & Y was selected because of its particular expertise in the healthcare industry.[151] Cornerstone also engaged Judy Bishop of Bishop Consulting ("Judy Bishop") to review Interim's Medicare reimbursements and cost reporting methodology.[152]

Spherion developed a "data room" in which it maintained extensive documentary information regarding Interim's operations.[153] Included among the information contained in the data room were Interim's last three finalized cost reports, NPRs for 1994 and 1995 (including adjustments made by the FI with explanations), and related material correspondence with the FI.[154] Spherion provided members of the Interim management team to "chaperone" the Cornerstone representatives while in the data room and to answer any questions they might have.[155] Robert Getz, a principal of Cornerstone, explained the process as follows: the Cornerstone representatives would "submit a request for a specific

72–75, 144–47. Spherion will not admit that Cornerstone employed this methodology and, in any event, Spherion maintains that it certainly was never advised by Cornerstone of what methodology, if any, it was utilizing to set its bids for Interim. D.I. 116, at 4–5. According to Spherion, this was a pure auction; there was no floor or ceiling set by the seller. It was up to the marketplace to set the final price for Interim. *Id.* To the extent a final resolution of this dispute is required to resolve any of plaintiffs' claims—unlikely given the Court's other factual conclusions—the Court concludes that both parties' contentions can be reconciled quite easily with the facts. It is likely that Cornerstone did utilize a multiple of EBITDA to determine what it was willing to pay for Interim. It is also likely that Spherion did not know or even care by what means the bidders set their bids, particularly given the wide range of potential bidders that might surface for Interim. D.I. 109, at 231.

**145.** *Id.* (emphasis supplied). It does not appear from the record that Cornerstone ever placed a "reference call" to Aetna, HCFA or

any other "payer" affiliated with the Medicare program.

**146.** D.I. 114, at 51; D.I. 120, at 76; PX 136, at SPH032501.

**147.** *See e.g.* DX 71.

**148.** D.I. 117, at 34–38.

**149.** D.I. 114, at 92–93, 112; D.I. 120, at 83–84, 94–95.

**150.** D.I. 120, at 49–50.

**151.** *Id.*

**152.** PX 134; D.I. 114, at 111; D.I. 123, at 24–25.

**153.** *See* PX 125; D.I. 114, at 92.

**154.** D.I. 118, at 42–44. *See also* D.I. 109, at 33; PX 125 (cost reports, NPRs and correspondence in the data room).

**155.** D.I. 114, at 93–94.

document or documents and, then, they would be brought to [the Cornerstone representatives] to the extent that they were available."[156]

Cornerstone's expert consultants provided positive feedback on Interim. For its part, E & Y concluded that "there were very few significant audit adjustments made by the FIs [with respect to Interim's cost reports]."[157] Mr. Getz summarized his impression of the E & Y report as follows:

> [O]verall, the report represented a net positive, because, again, it indicated that the company was relatively doing things in a conservative fashion, particularly when it came to Medicare. So while there might have been specific issues raised here in terms of number of visits that seemed a little off kilter, overall the perception was, based on this two-page summary, that we were getting positive feedback from E & Y from their brief review.[158]

Judy Bishop likewise was both "impressed" with the opportunity an Interim acquisition would present for Cornerstone and satisfied that "there should not be any major changes required in Interim's current cost reporting."[159] Significantly, it appears that both E & Y and Judy Bishop were aware of Interim's ongoing discussions with Aetna regarding the three component A & G methodology and Aetna's challenges to the 1994 cost report.[160]

#### 4. Cornerstone's Final Bid

Cornerstone communicated its offer to acquire Interim by letter dated June 24, 1997. In its letter, Cornerstone stated:

> [Cornerstone] has performed extensive business due diligence on [Interim] during the last 55 days, having met with the management team on five separate occasions and we are comfortable with the information that we have learned. In addition to our own examination, [Cornerstone] has had the benefit of examination of [Interim] by its attorney and consultants. At this point, we have completed substantially all of our due diligence and we are prepared to move swiftly to a definitive agreement. [Cornerstone] has been waiting to review Interim's audited financial statements, which we received yesterday (previous financials were marked "Draft.") Our accountants at E & Y can quickly perform confirmatory due diligence on the audit work papers and year-to-date financials.[161]

Cornerstone's final bid was $134 million,[162] and the auction gavel fell at this price.[163]

#### 5. The Restated Stock Purchase Agreement

The parties negotiated the terms of a definitive agreement for the sale of Inter-

---

**156.** *Id.* at 93.

**157.** DX 75.

**158.** D.I. 114, at 137.

**159.** DX 76. *See also* DX 75 (the E & Y report also suggested that Interim was a good deal: "In general, the cost reports appear conservative, given that the percentage of reimbursed Medicare costs to total expenses is typically lower than Medicare utilization based on visits. This indicates there may be opportunity *to increase* reimbursement by refining the cost

allocation methodologies used.")(emphasis supplied).

**160.** PX 125, at SPH 011901–02.

**161.** PX 136.

**162.** PX 136. The initial "final bid" was $128 million, but Cornerstone increased the bid to $134 million to secure the right to negotiate exclusively with Spherion. D.I. 100, at ¶¶ 86–88.

**163.** D.I. 109, at 41–42.

im from June 24, 1997 through September 26, 1997.[164] The first Stock Purchase Agreement was dated June 29, 1997.[165] Prior to closing, however, Interim discovered a potential Medicare fraud and abuse issue at its El Paso, Texas and Hollywood, Florida branches.[166] The closing was delayed and additional provisions were added to the Stock Purchase Agreement to address the newly discovered potential liability, and also to "firm up" the provisions of the parties' agreement relating to fraud and abuse liability.[167]

The Restated Stock Purchase Agreement By and Among Interim Services, Inc., Catamaran Acquisition Corp., and Cornerstone Equity Investors, IV, L.P. ("the Agreement") comprises 51 pages.[168] As indicated by its title, the parties to the Agreement are Interim Services, Inc. (now known as Spherion) listed as "Seller," Catamaran listed as "Buyer," and Cornerstone.[169] According to its terms, Cornerstone was a party to the Agreement solely for the purpose of allowing Spherion to recover liquidated damages from Cornerstone in the event of a Buyer's default.[170]

As to be expected, the parties exchanged numerous representations and warranties in connection with the transaction. They also provided for indemnification in the event of breach. The parties negotiated five separate "Representations and Warranties of Seller" that address specifically Medicare issues and Medicare-related liabilities.[171] And each of these representations and warranties is tied to an indemnification obligation which, subject to certain limitations, provides the Buyer with indemnity protection in the event it is later required to pay "any [d]amages that are caused by or arise out of ... any breach by Seller of any of its covenants or agreements under [the] Agreement...."[172]

In addition to Medicare issues, plaintiffs sought and obtained representations and warranties that the historical consolidated financial statements for Interim supplied to Cornerstone were prepared in accordance with generally accepted accounting principles ("GAAP"), and that they "present[ed] fairly in all material respects the consolidated financial position and results of operations of [Interim] ... as of and for the periods indicated ... and are consistent with the books and records of [Interim] for such periods."[173] Plaintiffs also obtained representations and warranties that Spherion had disclosed all pending and threatened litigation involving Inter-

164. *See* PX 136; PX 172. Plaintiffs assert that "Spherion insisted ... that [the] negotiations be completed on an expedited basis." D.I. 136, at 15. *See also* D.I. 114, at 162–63 (Mr. Getz suggests that negotiations were hurried). To the extent plaintiffs are attempting to suggest that they were rushed into the deal, the suggestion is at odds with Cornerstone's offer letter in which it states: "we are prepared to move swiftly to a definitive agreement." PX 136, at SPH 032501.

165. D.I. 100, at ¶ 90.

166. *Id.* at ¶ 92.

167. PX 172, at § 3.16 (added after the El Paso investigation); D.I. 109, at 50–56, 73; D.I. 114, at 204–05; D.I. 117, at 94–96.

168. PX 172.

169. *Id.* As will become apparent below, the identity of the parties to the Agreement is particularly important given Spherion's argument that Cornerstone lacks contractual standing to raise claims for damages under the Agreement.

170. *Id.* at § 11.5.

171. *Id.* at §§ 3.14–3.18.

172. *Id.* at § 10.1(a).

173. *Id.* at § 3.7.

im,[174] and that Interim did not have any liability ("accrued, absolute, contingent or otherwise") that would have a "material adverse effect" on Interim that was not either disclosed in the Agreement, or the schedules to the Agreement, or adequately reflected and reserved against in the financial statements.[175]

Based on developments that occurred after the Sale, plaintiffs now allege that Spherion has breached numerous representations and warranties regarding Medicare operations and liabilities, the accuracy of the financial statements and pending or threatened litigation and/or liabilities. The specific provisions of the Agreement implicated by plaintiffs' claims are set forth below.

### a. The Medicare Provisions

Spherion represented and warranted that it had not received "Notice" of any problems with its cost reports, that it had not intentionally filed cost reports without a reasonable basis and that its cost reports were filed in compliance with applicable laws. The specific provisions of the Agreement governing Medicare filings provide, in pertinent part, as follows:

3.16 *Medicare/Medicaid Notices.*

(a) Except as set forth in Schedule 3.16(a),[176](i) [Interim] is [not] appealing any notices of program reimbursement, and no notices have been issued regard-

ing any disputes related to [Interim] cost reports from

Governmental Entities [177] responsible for administering the Medicare program for Seller's three (3) most recent fiscal years.[178]

(b) Except as set forth on Schedule 3.16(b), with respect to [Interim], no member of the Seller Group, current or former employees of any member of the Seller Group, or entities or individuals (other than Franchisees) with whom a member of the Seller Group has contracted to provide services have intentionally filed a false claim, or filed a claim without a reasonable basis therefore, with HCFA, its fiscal intermediaries or any state agency, or other third-party payer, or violated the so-called "Medicare Fraud and Abuse" Laws contained in Section 1128(B) of the Social Security Act or any similar laws addressing fraud and abuse in government healthcare programs.[179]

Section 3.17 addresses Spherion's compliance with applicable "Laws" in the filing of its cost reports and provides, in pertinent part:

3.17 *Government Filings.*

Except as set forth in Schedule 3.17, [all] cost reports and other filings are complete and in compliance in all material respects with applicable Laws.[180]

---

**174.** *Id.* at § 3.20.

**175.** *Id.* at § 3.29.

**176.** Schedule 3.16(a) disclosed the appeal of the NPR's issued after the desk review of the 1994 cost report. PX 174, at SPH 030337.

**177.** "Governmental Entity" is defined in the Agreement to include "instrumentalities of any country or political subdivision thereof." PX 172, § 1.35. The parties do not appear to contest that HCFA would fall within the definition of "Governmental Entities." *See* D.I.

136, at 31; D.I. 141, at 51–53. They do, however, dispute whether a FI is a "Governmental Entity" for purposes of this provision of the Agreement.

**178.** PX 172, at § 3.16(a)(i).

**179.** *Id.* at § 3.16(b).

**180.** *Id.* at § 3.17. "Laws" is defined at Section 1.62 to mean "any federal, state, local or foreign law, statute, ordinance, rule, regulation, permit, order, judgment or decree."

## b. The Financial Statements Provision

The Agreement provides with respect to the audited historical financial statements that they are accurate and have been prepared in accordance with GAAP:

### 3.7 *Financial Statements.*

Schedule 3.7 sets forth: (i) The audited consolidated financial statements for the fiscal years of [Interim] ended on December 30, 1994, December 29, 1995 and December 27, 1996 and (ii) The unaudited consolidated balance sheet, income statement, and statement of cash flows, as of and for the period ended March 28, 1997 (collectively, "the Healthcare Financial Statements"). The Healthcare Financial Statements have been prepared in accordance with GAAP applied on a consistent basis throughout the periods covered thereby and present fairly in all material respects the consolidated financial position and results of operations of [Interim] operated by the Seller Group as of and for the periods indicated (subject, in the case of unaudited statements to normal year-end audit adjustments, matters that would be disclosed in the notes thereto and to any other adjustments described therein) and are consistent with the books and records of [Interim] for such periods. The Healthcare Financial Statements have been prepared from the separate records maintained by [Interim] and may not necessarily be indicative of the conditions that would have existed or the results of operations if [Interim] had been operated as an unaffiliated company. Portions of certain income and expenses represent allocations made from corporate headquarters items applicable to [Interim] as a whole.[181]

## c. The Pending or Threatened Litigation or Liabilities Provisions

The Agreement provides that Spherion has disclosed threatened or pending litigation and all pending or contingent liabilities:

### 3.20 *Litigation*

Except as set forth in Schedule 3.20, there is no claim, action, suit, litigation, proceeding, or arbitration, at Law or in equity (collectively, "Actions"), pending, or to the Knowledge of the Seller Executives, after consultation with the Healthcare Executives, threatened against Seller related to the Healthcare Business, any of the Transferred Entities or arising from any actions by current or former employees of any member of the Seller Group directly related to the matters described in Section 3.16(b) regarding Medicare and Medicaid fraud or abuse that would have a Material Adverse Effect, and to the Knowledge of the Seller Executives, after consultation with the Healthcare Executives, there are no facts presently existing that would lead to any such Action.[182]

### 3.29 *Undisclosed Liabilities.*

The Transferred Entities do not have any liability, whether accrued, absolute, contingent or otherwise, that would have a Material Adverse Effect, other than liabilities (a) reflected or reserved against in [Interim's] financial statements (or in the notes thereto), (b) disclosed in this Agreement, including the

---

181. *Id.* at § 3.7. The "Seller Group" is defined at Section 1.85 to mean "seller, its wholly-owned subsidiaries other than the transferred entities and, prior to the respective Closings, the Transferred Entities." The

"Transferred Entities" include Interim, an affiliate of Interim, and all subsidiaries of Interim. *Id.* at §§ 1.100, 1.101 and 1.103.

182. *Id.* at § 3.20.

Schedules, (c) that are fully covered by enforceable insurance, indemnification, contribution or comparable arrangements, (d) under this Agreement or any other Transaction Document or (e) liabilities incurred or arising in the ordinary course of business of the Transferred Entities since December 27, 1996.[183]

#### d. The Indemnification Provisions

The parties addressed the Seller's indemnification obligation by including a general indemnification commitment at Section 10.1 and a more specific indemnification commitment at Section 10.4. The parties also negotiated certain limitations to their respective indemnification obligations including deductibles, caps, notice requirements and time limitations. The general Seller's indemnification provision provides, in pertinent part:

**10.1** *Indemnification by Seller*

(a) Subject to the terms and limitations of this Section 10, Seller shall indemnify Buyer Indemnitees against any Damages that are caused by or arise out of (i) any breach by Seller of any of its covenants or agreements under this Agreement or any of the other Transaction Documents (ii) any inaccuracy in any representation or breach of any warranty of Seller set forth in Section 3, except to the extent provided in Section 10.3(c) or, (iii) any of the Excluded Liabilities.

(b) The representations and warranties of Seller set forth in Section 3 shall survive the Closing. The representations and warranties set forth in Section 3.3, 3.4, 3.5, 3.7 and subsequent Sections of Section 3 shall expire and be of no further force and effect eighteen months after the Closing Date, except ... (ii) claims that Buyer has previously asserted against Seller in writing, setting forth with reasonable specificity the nature of such claims.[184]

The general indemnification obligation set forth in Section 10.1 is subject to the limitations set forth in Section 10.3:

**10.3** *Limitations.*

(a) Buyer Indemnitees may not assert any claim for indemnification under Section 10.1(a)(ii) or 10.1(a)(iii)(a "Buyer's claim") unless and until: (i) such Buyer's Claim (or a series of related Buyer's Claims) gives rise to Damages (excluding Litigation Expenses for purposes of this threshold only) in excess of $10,000 and (ii) the aggregate amount of such Buyer's Claims shall exceed $2,000,000 and then only with respect to the excess of such aggregate Buyer's Claims over $2,000,000. Notwithstanding the foregoing, in no event shall Seller's liability under and with respect to this Agreement, the Other Transaction Documents, the Transactions or any claims associated herewith arising under Section 10.1(a)(ii) or 10.1(a)(iii) (whether in contract, tort or otherwise, but not including any claim for willful misconduct or willful fraud) exceed an aggregate amount equal to $25,000,000. The limitations set forth in this Section 10.3(a) shall not apply to ... any Section 3.16 damages ..., which shall be governed by Section 10.4 below.[185]

---

**183.** *Id.* at § 3.29. "Material Adverse Change" or "Material Adverse Effect" is defined in the Agreement to mean "any change or effect that, individually or in aggregate, is materially adverse to the financial condition, business or results of operations of [Interim] taken as a whole." *Id.* at § 1.67.

**184.** *Id.* at § 10.1.

**185.** *Id.* at § 10.3.

The Agreement's special indemnification provision provides as follows:

**10.4 *Special Indemnity.***

The limitations and thresholds set forth in Section 10.3 shall not apply to the following Special Indemnity matters:

(a) Seller shall indemnify Buyer Group with respect to damages resulting from (i) the failure to collect all notes receivable from the Therapy Students,[186] to the extent that such failure to collect exceeds the amount specifically reserved therefore as of the Closing Date on the books and records of the Healthcare Business, as set forth on Schedule 10.4(a); (ii) claims by Therapy Students against the Seller Group with respect to obligations of Seller or the Transferred Entities under those certain contract concerning the education of the Therapy Students ... (collectively, the "Specified Damages"). Seller and Buyer shall each pay 50% of all Specified Damages; provided, however, (I) Buyer shall pay the first $100,000 of Specified Damages and (II) Seller's liability for Specified Damages shall not exceed $2,000,000. Any payments made by Buyer pursuant to this Section 10.4(a) shall be included for purposes of determining the threshold set forth in Section 10.3(a)(ii). Any payments made by Seller pursuant to this Section 10.4(a) shall be included for purposes of calculating the $25,000,000 maximum set forth in Section 10.3(a).

(b) Notwithstanding any provision contained herein to the contrary, Seller shall indemnify Buyer Group with respect to Section 3.16 Damages ...; provided, however, that Buyer shall pay 50% of any such Section 3.16 Damages ... up to an aggregate maximum of $500,000, and, provided further that Buyer shall not be liable for Section 3.16 Damages ... in excess of $250,000.... Any payments made by Seller pursuant to this Section 10.4(b) shall not be included for purposes of calculating the $25,000,000 maximum set forth in Section 10.3(a) and such $25,000,000 maximum shall not be applicable to any Section 3.16 damages.... [187]

**F. Interim's Pre–Sale Liabilities**

Shortly after the closing, plaintiffs discovered that Interim was exposed to potential or actual liabilities that they believed were covered by the Seller's representations and warranties and the corresponding indemnity obligations in the Agreement. Some of the liabilities were unanticipated; some, plaintiffs argued, should have been anticipated and disclosed in the Agreement; and others were anticipated and specifically addressed in the Agreement.

**1. The Medicare Adjustments**

Within months after the Sale, HCFA, through PGBA, initiated an audit of Interim's 1996 home office cost report.[188] The

186. As explained in detail below, the reference to "Therapy Students" is to a failed foreign exchange program for physical therapy students sponsored by Interim before the Sale that resulted in substantial losses to Interim.

187. *Id.* at § 10.4.

188. D.I. 100, at ¶ 99. It appears that the PGBA audit may have been initiated at the direction of HCFA as part of a nationwide effort "to conduct comprehensive audits of

the cost reports submitted by a sample number of home health agencies whose cost reporting periods ended on or after October 1, 1996 through September 30, 1997 (the federal government's fiscal year) ... to serve as the primary data source in developing the cost basis for a new prospective pay system for home health agencies." DX 87, at 22. *See also* F.N. 17, *infra.* HCFA did not provide any advance notice to the home health industry that it intended to initiate this nationwide audit. *Id.*

audit was expanded to include certain provider cost reports in the summer of 1998, and expanded even further to include additional provider cost reports in September, 1998.[189] The first adjustments proposed by PGBA disallowed all of the expenses of numerous Interim employees on the ground that their job descriptions included non-allowable marketing activities. PGBA then issued NPRs that proposed to collapse the three A & G components utilized by the providers. PGBA also proposed to reallocate home office capital costs on the basis of "total cost," as opposed to the "square footage" statistic utilized by Interim.[190]

PGBA immediately began to withhold payments to Interim in order to recoup the amounts specified in the NPRs.[191] PGBA also expanded the audit to include Interim's 1997 cost reports and thereafter began to propose adjustments similar to those made to the 1996 cost reports.[192] If all of the adjustments proposed by PGBA for the 1996 and 1997 cost report years were applied to all Interim providers, Interim would have faced a Medicare liability of approximately $38–40 million.[193]

Interim immediately tendered the defense of the claims to Spherion pursuant to the Agreement, but Spherion elected, as it was entitled to do under the Agreement, to allow Interim to defend the claims since Spherion no longer possessed the expertise in Medicare reimbursement to address

the adjustments effectively.[194] Interim engaged its long-time healthcare attorneys, Pyles, Powers, Sutter and Verville, P.C., as well as healthcare consultants, Thomas Curtis, CPA, and Eric Yospe, to assist in its audit defense.[195]

Over the course of the next two years, Interim, with the assistance of its attorneys and consultants, submitted several position papers to PGBA,[196] had numerous telephone conferences with PGBA's auditors, and met directly with HCFA representatives.[197] At Interim's request, PGBA conducted field audits at Interim's provider locations in order to review personnel files and interview employees to determine whether certain employees were involved in non-allowable marketing activities.[198] As a result of these meetings, Interim persuaded PGBA to reverse several of the proposed adjustments relating to disallowed salaries and benefits.[199] PGBA held firm, however, with respect to its disallowance of all of the regional vice president's salaries and twenty-five percent of the branch manager's salaries.[200] PGBA also refused to reverse its adjustments regarding the three component A & G methodology for the 1996 and 1997 cost reports or the adjustments relating to the allocation of capital costs.[201]

After receiving PGBA's final position, Interim began to present its case directly to HCFA.[202] Ultimately, HCFA reversed

---

189. D.I. 100, at ¶¶ 100–01.

190. *Id.* at ¶¶ 102–06.

191. *Id.* at ¶ 118.

192. *Id.* at ¶ 114.

193. D.I. 115, at 23.

194. *See* PX 172, at § 1.97.

195. D.I. 100, at ¶¶ 109, 110.

196. *See e.g.* DX 260.

197. D.I. 100, at ¶ 111.

198. *Id.* at ¶ 113.

199. *Id.* at ¶ 115.

200. *Id.* at ¶ 116.

201. *Id.*

202. *Id.* at ¶ 117.

PGBA's decision to collapse the three component A & G for the 1996 and 1997 cost reports.[203] HCFA did not, however, reverse the adjustments regarding the sequencing of A & G or the capital cost allocation. Nor did HCFA reverse the adjustments to disallow regional vice president and branch manager salaries.[204]

After receiving HCFA's final position, Interim filed multiple appeals to the PRRB regarding all issues implicated by the NPRs issued by PGBA.[205] The settlement discussions with HCFA continued, however, and on July 27, 2001, Interim entered into a global settlement agreement with HCFA's successor, CMS, pursuant to which Interim paid CMS an additional $4.2 million (over and above the approximately $1 million already withheld by PGBA) in settlement of all outstanding NPR's and/or adjustments to its cost reports for fiscal years 1994 through 1999.[206] Spherion consented to the settlement by letter dated October 9, 2001.[207]

## 2. The Black and Burns Franchise Loans

Interim maintained a variety of franchise loan programs to provide funding to franchisees either to create or expand their franchises.[208] The franchise loans generally were secured by the franchisee's accounts receivable and other franchise assets, including Interim's ability, in the event of a default, to reassume territorial rights to the market area contractually held by the franchisee.[209] The loans also were collateralized in most instances by a personal guarantee of the franchise owner.[210] Interim monitored the loans and required franchisees periodically to provide their financial statements so that Interim could compare the loan to the franchisee's financial performance.[211] Interim also monitored the value of collateral that it received from franchisees.[212] At the time of the Sale, Interim's financial statements reflected loans receivable due from franchisees of approximately $14,750,000.[213] These loans were transferred by Spherion to Interim (as acquired) as part of the Sale.[214]

Among the loans in Interim's franchise loan portfolio were loans to the franchise owned by Mary Black (the "Black franchise") and loans to the franchise owned by Jean and David Burns (the "Burns franchise"). The Black franchise entered into a revolving loan agreement with Interim in July, 1995 for a total loan amount of $120,000.[215] By August 31, 1997, however, the Black franchise owed Interim $281,650 on its loan. It paid Interim $90,850 on the loan in 1997. Throughout 1997, the attorney for the Black franchise advised Spherion that the Black franchise was having financial difficulties.[216] After the Sale, when the Black franchise continued to default on its loan payments, Inter-

---

203. *Id.*

204. *Id.* at ¶ 116.

205. *Id.* at ¶ 119.

206. *Id.* at ¶¶ 120–21.

207. *Id.* at ¶ 122.

208. *Id.* at ¶ 157.

209. *Id.* at ¶ 158.

210. D.I. 137, Livonius Dep., at 125.

211. D.I. 100, at ¶ 159.

212. *Id.* at ¶ 160.

213. *Id.* at ¶ 161.

214. PX 174, at Sch. 1.38.

215. PX 34; PX 35; PX 36; PX 37; PX 38. *See also* D.I. 100, at ¶ 163.

216. *Id.* at ¶ ¶ 164–67.

im sued Mary Black and the Black franchise seeking to recover the principal amount of the loan and all accrued interest.[217] Ultimately, Interim obtained a default judgment for the total uncollectible debt for the Black franchise in the amount of $268,400.[218] The Black franchise filed for bankruptcy protection shortly thereafter.[219]

The Burns franchise had an outstanding loan balance of $230,000 as of December 27, 1996.[220] This amount was the product of two loans extended to the Burns franchise, the first in October, 1994, and the second in October, 1996.[221] In July, 1997, Spherion negotiated a payment plan with the Burns franchise for overdue accounts receivable.[222] This agreement was renegotiated in September, 1997 after the outstanding accounts receivable still had not been paid in full.[223] The renegotiated agreement was prompted by the Burns franchise advising Spherion that it "was having difficulty with a cash flow shortage." [224] On September 22, 1997, the Burns franchise provided further information regarding its financial situation and advised Spherion that it was losing $40,000 each month.[225]

After the Sale, Interim commenced collection actions to recover the outstanding Burns franchise loan balance.[226] In response, the Burns franchise declared bankruptcy in February, 1998.[227] At the time of the bankruptcy, the Burns franchise owed Interim $230,000.[228] Interim then pursued Jean and David Burns personally on their financial guarantees and ultimately settled that claim with Spherion's consent.[229] Interim incurred $28,788.47 in legal expenses and costs in its effort to collect the outstanding Burns franchise loan balances.[230]

### 3. The Huff Litigation

In June, 1996, Interim was sued by the parents of Joseph Huff, an infant treated by a nurse employed by an Interim franchise in Portsmith, Ohio, who alleged that the nurse's medical negligence caused significant brain damage to their infant son ("*Huff I*").[231] The defendants in *Huff I* were, *inter alia*, Interim and Interim Home Solutions ("IHS"), an Illinois general partnership in which Interim was a general partner.[232] Spherion's insurance carrier assumed the defense of the case.[233]

In late 1996, prior to the Sale, the parties in *Huff I* began settlement negotiations that culminated in the settlement and voluntary dismissal of *Huff I* in 1998.[234] A full and final release was not executed

**217.** *Id.* at ¶ 168.

**218.** *Id.* at ¶¶ 169–71.

**219.** *Id.* at ¶ 170.

**220.** *Id.* at ¶ 173.

**221.** PX 84; D.I. 100, at ¶¶ 173–74.

**222.** PX 152.

**223.** PX 166.

**224.** PX 731.

**225.** PX 171; D.I. 100, at ¶ 175.

**226.** *Id.* at ¶ 176.

**227.** *Id.* at ¶ 177.

**228.** *Id.* at ¶ 178.

**229.** PX 719; PX 721.

**230.** D.I. 100, at ¶ 176.

**231.** *Id.* at ¶¶ 122, 136–37.

**232.** PX 77; D.I. 100, at ¶ 138.

**233.** *Id.* at ¶ 139.

**234.** DX 297; D.I. 100, at ¶ 141.

until June, 2000.[235] In exchange for the payment of $50,000 by Spherion's insurance carrier, Mr. and Mrs. Huff released Interim, its franchisee, Appalachian Healthcare, Inc., and their agents and employees (including the nurse who rendered the care to Joseph Huff).[236] They did not, however, release claims against IHS.[237]

In the midst of the discussions regarding the release language in connection with the settlement of *Huff I*, Mr. and Mrs. Huff initiated a second lawsuit in federal court against several defendants, including IHS ("*Huff II*").[238] In *Huff II*, plaintiffs alleged that pharmacists were negligent in their preparation of intravenous medication for Joseph Huff, thereby causing the neurological deficits that were at issue in *Huff I*.[239] Plaintiffs alleged that IHS was jointly and severally liable with the other named defendants for Joseph Huff's brain injury and claimed more than $15 million in compensatory damages and $25 million in punitive damages.[240] IHS forwarded the complaint in *Huff II* to Spherion which, in turn, referred the matter to its insurance carrier to defend.[241] The carrier, AIG, denied coverage.[242]

As indicated, Interim, along with Home Solutions Systems, Corporation ("HSSC"), were the general partners of IHS.[243] The primary defendant in *Huff II* was Home Solutions Equity Corporation ("HSEC"), an affiliate of HSSC.[244] According to a management agreement between IHS and HSSC, liability insurance related to the preparation of intravenous solutions was to be procured by HSSC.[245] Shortly after *Huff II* was commenced, however, Spherion learned that HSSC had not obtained such coverage.[246]

By letter dated July 21, 2000, Interim requested that Spherion pursue insurance coverage for *Huff II*.[247] Spherion declined on the grounds that no "Interim entity" was a party to the litigation, and that Spherion was not obligated to provide insurance coverage for IHS.[248] Spherion allowed that Interim could undertake an action against AIG for coverage "at [its] own risk and expense."[249] Interim did just that and, after incurring $91,180.26 in legal fees, Interim successfully prevailed upon AIG to provide coverage for *Huff II*.[250] As part of the settlement with AIG, Interim was reimbursed some of its legal fees, but $41,180.26 remained unreimbursed.[251] AIG ultimately funded the settlement of *Huff II*.[252]

Spherion did not disclose *Huff I* to the plaintiffs prior to the Sale because it believed that the lawsuit represented an "Ex-

235. DX 295; D.I. 100, at ¶ 141.

236. DX 295.

237. D.I. 100, at ¶¶ 141–44.

238. PX 219.

239. *Id.*

240. *Id.;* D.I. 100, at ¶ 145.

241. D.I. 100, at ¶ 147.

242. PX 276.

243. D.I. 100, at ¶ 138.

244. *Id.* at ¶ 143; PX 219.

245. D.I. 109, at 92–93.

246. *Id.*

247. D.I. 115, at 80; DX 99.

248. DX 99.

249. *Id.*

250. D.I. 100, at ¶¶ 150–51; D.I. 115, at 79–81.

251. D.I. 115, at 78–80; PX 330.

252. D.I. 115, at 78; D.I. 100, at ¶ 151.

cluded Liability" under the Agreement (it was a claim against Interim for which it maintained liability insurance).[253] When Interim made a demand for indemnification under the Agreement for the expenses related to securing coverage in *Huff II*, Spherion rejected that claim on the ground that *Huff II* was post-closing litigation that did not involve a "Transferred Entity" under the Agreement against which an indemnification claim could be made.[254]

#### 4. The Williams Litigation

Nancy Williams owned an Interim franchise in a territory immediately adjacent to an Interim company-owned branch office.[255] Spherion's Chief Operating Officer, Robert Livonius, testified that Ms. Williams threatened to sue Spherion "many times" prior to the Sale for alleged "territorial infringement."[256] It is undisputed that Spherion never disclosed these threats to plaintiffs. After the Sale, Interim terminated Williams' franchise for failure to pay royalties.[257] Williams' franchise then sued Interim claiming, *inter alia,* that Interim had interfered with the franchise's prospective economic advantage by engaging in territorial infringement.[258]

Interim prevailed on several of the claims raised by the Williams franchise on summary judgment.[259] The summary judgment was upheld on appeal.[260] Inter-

im then settled the remaining claims with Ms. Williams for $100,000.[261] The parties have stipulated that the fees and costs incurred by Interim (as required) to defend the Williams litigation were $290,717.25.[262]

#### 5. The Therapy Student Claims

Prior to the Sale, Spherion disclosed to plaintiffs that Interim faced potential liability arising from a failed foreign exchange program it had sponsored on behalf of American students who wished to study physical therapy abroad (the "Therapy Student program").[263] Interim had recruited these students to participate in a joint program it formed with several physical therapy schools in the Netherlands and had agreed to fund a portion of the tuition in exchange for the student's commitment to work a minimum of two years for Interim after graduation.[264] The Therapy Student program ended abruptly when the students learned that the schools in the Netherlands were not properly accredited making it difficult, if not impossible, for the Therapy Students to be licensed in most American jurisdictions.[265] Many of the Therapy Students asserted claims against Interim alleging that Interim had misled them about the accreditation of the Netherlands schools and had breached ex-

**253.** D.I. 109, at 90–91; PX 172, at § 1.30.

**254.** D.I. 109, at 91–93; PX 172, at § 1.101.

**255.** D.I. 100, at ¶ 152.

**256.** D.I. 137, Livonius Dep., at 115. *See also* PX 142; PX 144.

**257.** D.I. 100, at ¶ 153; PX 220; D.I. 115, at 74.

**258.** PX 223; D.I. 115, at 74–75, 76.

**259.** PX 690.

**260.** PX 691; D.I. 115, at 76.

**261.** PX 312; D.I. 115, at 77.

**262.** PX 335.

**263.** In 1994, Interim acquired certain assets known as Therapy Staff Services ("TSS"). PX 735; D.I. 115, at 38, 40. Among the assets purchased was the Therapy Student program initiated by TSS to train American physical therapy students abroad. *Id.* at 39–40.

**264.** D.I. 100, at ¶¶ 123–124; PX 704; PX 705.

**265.** D.I. 100, at ¶ 125.

press contractual provisions regarding the Therapy Student program.[266]

In addition to tuition assistance, Interim also provided low interest loans to many of the Therapy Students to cover incidental expenses while they participated in the program. When the students realized that the program was a failure, many of them defaulted on the loans.[267] Consequently, in addition to facing potential damages for the legal claims brought by the Therapy Students, Interim also received several requests for forgiveness of the Therapy Student loans.[268]

Interim had begun the process of settling certain Therapy Student claims prior to the Sale. It also had agreed to forgive certain Therapy Student loan obligations in exchange for a release of claims.[269] Because it was clear that Interim would not resolve all of these claims prior to the closing, the parties agreed specifically to address the claims in the Agreement at § 10.4.[270] At the time of closing, Spherion carried reserves of $578,463 to address Therapy Student loans. In addition, Spherion disclosed two separate Therapy Student lawsuits (one of which was a multi-plaintiff lawsuit) on the Schedules to the Agreement.[271]

After the Closing, Interim provided notice to Spherion regarding additional Therapy Student claims and demanded indemnification under the Agreement. Spherion rejected many of these claims on the grounds that certain of the claimants were not "Therapy Students" as defined in the Agreement, Interim had not provided ade-

quate notice of the claims, or the claims were otherwise barred by the limitations set forth in the Agreement.[272]

## II.

### A. Preliminary Findings of Fact and Conclusions of Law

Before the Court addresses specifically each of the plaintiffs' claims, it is appropriate first to identify certain legal principals and predicate factual determinations that will guide the Court's analysis throughout the balance of this opinion. They will be stated in general terms here and reiterated, when necessary, in the Court's discussion of the specific claims.

### 1. The Burden of Proof

█ The Court begins with the fundamental observation that plaintiffs bear the burden of proving their claims by a preponderance of the evidence. In this regard, the Court must be mindful that if the evidence presented by the parties during trial is inconsistent, and the opposing weight of the evidence is evenly balanced, then "the party seeking to present a preponderance of the evidence has failed to meet its burden." [273] When balancing the evidence, the Court has applied "the customary Delaware standard to the trial testimony:"

> I must judge the believability of each witness and determine the weight to be given to all trial testimony. I considered each witness's means of knowledge; strength of memory and opportu-

**266.** *Id.* at ¶¶ 126–128.

**267.** *Id.* at ¶ 129.

**268.** *Id.* at ¶ 130.

**269.** *Id* at ¶ 131.

**270.** *Id.* at ¶ 132; PX 172, at § 10.4.

**271.** D.I. 100, at ¶¶ 133–34; PX 174, at Sch. 3.20.

**272.** D.I. 115, at 55–58.

**273.** *Eskridge v. Voshell*, 593 A.2d 589 (Del. 1991) (ORDER), *citing Guthridge v. Pen–Mod, Inc.*, 239 A.2d 709, 713 (Del.Super.1967).

nity for observation; the reasonableness or unreasonableness of the testimony; the motives actuating the witness; the fact, if it was a fact, the testimony was contradicted; any bias, prejudice or interest, manner or demeanor upon the witness stand; and all other facts and circumstances shown by the evidence which affect the believability of the testimony. After finding some testimony conflicting by reason of inconsistencies, I have reconciled the testimony, as reasonably as possible, so as to make one harmonious story of it all. To the extent I could not do this, I gave credit to that portion of testimony which, in my judgment, was most worthy of credit and disregarded any portion of the testimony which, in my judgment, was unworthy of credit.[274]

## 2. The Parol Evidence Rule

■ The Court next takes this opportunity to restate a legal conclusion it reached prior to trial and reaffirmed during the trial: the Agreement at issue here is clear and unambiguous; the Court will not consider parol evidence when construing it.[275] In this regard, the Court notes that, at various times in this litigation, the parties have concurred with the Court's characterization of the Agreement as "unambiguous."[276] At other times during the litigation, however, when it suited them, the parties have suggested that the Agreement was ambiguous and that parol evidence was needed to interpret it.[277] Suffice it to say, a contract is either ambiguous or it is not ambiguous. The proper interpretation of a contract does not depend upon the parties' perceived need to present parol evidence when the contract, as written, does not support their position.

■ The parol evidence rule provides that "[w]hen two parties have made a contract and have expressed it in a writing to which they have both assented as to the complete and accurate integration of that contract, evidence ... of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing."[278] To ensure compliance with the parol evidence rule, the Court first must determine whether the terms of the contract it has been asked to construe clearly state the parties' agreement.[279] In this regard, the Court must be mindful that the contract is not rendered ambiguous simply because the parties disagree as to the meaning of its terms.[280]

---

274. *Dionisi v. DeCampli*, 1995 WL 398536, at *1, 1995 Del. Ch. Lexis 88, at *2–3.

275. *See Interim Healthcare, Inc. v. Spherion, Corp.*, C.A. No. 00C–09–180, Slights, J. (Del.Super.Nov. 21, 2003)(Mem. Op. at 20–21); D.I. 101, at 2–7.

276. *See e.g.* D.I. 75, at 24 (Plaintiffs' Opening Brief in Support of Their Motion for Partial Summary Judgment: "the proper construction of an unambiguous contract is 'purely a question of law' and may be resolved on summary judgment."); D.I. 85, at 28 (Spherion's Opening Brief in Support of Its Motion for Partial Summary Judgment: "notwithstanding the clear language of the parties' Agreement. . . .").

277. *See e.g.* D.I. 120, at 13 (plaintiffs' counsel argues that portions of the Agreement are ambiguous and acknowledges that plaintiffs have · changed their position on this issue); D.I. 109, at 51–52 (defense counsel asks witness to interpret the Agreement).

278. 26 Corbin on Contracts § 573 (1960).

279. *Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1, 13 (Del.Ch.2003) (*citing In re Explorer Pipeline Co.*, 781 A.2d 705, 713 (Del.Ch. 2001)).

280. *See Rhone–Poulenc Basic Chem. Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del.1992)("A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction.").

"Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[281] Upon concluding that the contract clearly and unambiguously reflects the parties' intent, the Court's interpretation of the contract must be confined to the document's "four corners."[282] The Court will interpret the contract's terms according to the meaning that would be ascribed to them by a reasonable third party.[283]

■ Having concluded that the Agreement is clear and unambiguous, the Court will not consider extrinsic evidence to construe it.

### 3. There is No Evidence of Fraud or Intentional Misrepresentation

The Court feels obliged at this point to state its view of what this case is *not* about. Throughout the pretrial proceedings, at times during the trial, and again in the post-trial briefing, plaintiffs repeatedly have attempted to characterize Spherion's alleged wrongful conduct as either intentional or fraudulent. Here again, plaintiffs' position has evolved as this litigation has progressed. When plaintiffs sought to amend their complaint to include the equitable claims of reformation and rescission, they claimed they were without a legal remedy because the facts did not support a claim for fraud.[284] Plaintiffs now apparently perceive some advantage to characterizing Spherion's conduct as intentional and/or fraudulent. They have suggested that Spherion intentionally withheld information from Cornerstone during due diligence, intentionally misled HCFA in the cost reports submitted on behalf of Interim, and intentionally misled Spherion's own auditor during the preparation of Interim's audited financial statements. They also suggest that Spherion executives intentionally destroyed damaging financial information "in a show of corporate arrogance which recent events have shown to be all too common."[285]

Notwithstanding their hyperbolic declarations, the fact remains that plaintiffs have not pled fraud or intentional misconduct and, instead, have maintained in this litigation when it suited them that they were aware of no facts upon which such a claim could be based.[286] Their strategy apparently changed as the case moved closer to trial. Nevertheless, despite apparent best efforts, plaintiffs failed to present any facts at trial that would support a claim for fraud or intentional misconduct. Consequently, the Court will not consider a claim of fraud, nor will it consider plaintiffs' breach of warranty claims (or any other claim) in the context of, or against the backdrop of, fraud. The evidence sim-

---

281. *Id.* (citation omitted).

282. *See O'Brien v. Progressive Northern, Ins. Co.*, 785 A.2d 281, 288–89 (Del.2001).

283. *Comrie*, 837 A.2d at 13 (citations omitted).

284. *See* D.I. 13, at 15–16; D.I. 14, at 3, n. 5. Indeed, plaintiffs withdrew their fraud claim in this Court as a predicate to their argument that the entire case should be transferred to the Court of Chancery. *Accord E.I. duPont De Nemours & Co. v. HEM Research, Inc.*, 1989 WL 122053, at *4 n. 12, 1989 Del. Ch. Lexis 132, at *14 n. 12 ("It should be noted that in cases involving a prayer for rescission based upon a claim of innocent misrepresentation, the equity court has exclusive jurisdiction.").

285. D.I. 136, at 2.

286. *See Interim Healthcare Inc. v. Spherion*, 2003 Del. Ch. Lexis 130, at * 30–31 (discussing the procedural history of the case as it relates to plaintiffs' position regarding Spherion's alleged fraud and explaining why the Court would not consider the claim).

ply does not support the fraud-related "conspiracy theories" peppered throughout plaintiffs' trial presentation and post-trial arguments. This is a breach of warranty case and nothing more or less than that.

### 4. The Elements of a Breach of Contract Claim

Under Delaware law, the elements of a breach of contract claim are: (1) a contractual obligation; (2) a breach of that obligation; and (3) resulting damages.[287] "Reliance is not an element of [a] claim for indemnification [arising from a breach of contract]."[288] Having concluded that this is a breach of warranty case, the Court will consider the evidence of record to determine whether the plaintiffs have met their burden of proof on each of the foregoing elements. The Court will not, however, require the plaintiffs to prove that they were justified in relying upon Spherion's representations and warranties as set forth in the Agreement. No such reasonable reliance is required to make a *prima facie* claim for breach. It follows, then, that the extent or quality of plaintiffs' due diligence is not relevant to the determination of whether Spherion breached its representations and warranties in the Agreement. To the extent Spherion warranted a fact or circumstance to be true in the Agreement, plaintiffs were entitled to rely upon the accuracy of the representation irregardless of what their due diligence may have or should have revealed. In this regard, Spherion accepted the risk of loss to the full extent of its indemnification commitments in the event its covenants were breached.

### 5. Catamaran Has Standing to Allege a Breach of the Agreement

Spherion contends that Cornerstone may not seek damages because Cornerstone is a party to the Agreement only for the purpose of allowing Spherion to recover liquidated damages against Cornerstone if the Buyer breaches certain provisions of the Agreement.[289] Spherion points to the fact that Catamaran is the only "Buyer" identified in the Agreement.[290] And, Spherion continues, the Seller's warranties set forth in Section 3 of the Agreement are given only to the "Buyer."[291] Thus, concludes Spherion, "Cornerstone cannot independently recover for any breach based on representations and warranties in a contract to which it is not a party."[292]

The plaintiffs acknowledge that they are not seeking to recover breach damages on behalf of Cornerstone.[293] Their references to "Cornerstone" in the briefing were intended to include both Cornerstone and Catamaran collectively, as explained at the outset of their Opening Brief.[294] Catamaran, as a named party to this lawsuit and a party to the Agreement to whom representations and warranties were made, has standing to plead a breach of warranty claim and any other claims that may properly arise from a breach of the Agreement, including expectancy or benefit-of-the-bargain damages, if appropriate.

**287.** *H–M Wexford, LLC v. Encorp, Inc.*, 832 A.2d 129, 144 (Del.Ch.2003).

**288.** *Gloucester Holding Corp. v. U.S. Tape & Sticky Products, LLC*, 832 A.2d 116, 127 (Del. Ch.2003).

**289.** PX 172, at § 11.5.

**290.** *Id.* at § 1.6.

**291.** D.I. 141, at 94.

**292.** *Id.*

**293.** D.I. 145, at 27.

**294.** D.I. 136, at 1.

### 6. The Contractual Allocation of Risk and Expectancy Damages

██ Plaintiffs' showcase claim is that they were denied the benefit of their bargain with Spherion: they purchased a company that Spherion represented was worth approximately $134 million when, in fact, it was worth only $90 million.[295] Based on these facts, plaintiffs seek to invoke what is perhaps the most basic tenet of contract law: a party that breaches a contract must place the non-breaching party back to the position he would have enjoyed had there been no breach.[296] Thus, according to the plaintiffs, Spherion must fulfill the plaintiffs' expectancy by making up the approximately $26 million shortfall. While the plaintiffs' expectancy argument has curb appeal, it does not withstand closer inspection.

The Court first considers whether the plaintiffs' expectancy damages claim is legally viable in the context of this highly negotiated contract between two sophisticated parties. Clearly, the Agreement does not expressly contemplate expectancy damages; they are nowhere mentioned or even insinuated in the contract. The sole remedy for breach identified in the Agreement is indemnification, both for the Seller (in the event of a Buyer's breach) and the Buyer (in the event of a Seller's breach). The indemnification provisions are quite specific in both their scope and application. According to Spherion, they provide the parties with their exclusive remedy in the event of a breach of the Agreement. The Court disagrees.

██ "Although the parties may, in their contract, specify a remedy for a breach, that specification does not exclude other legally recognized remedies. An agreement to limit remedies must be clearly expressed in the contract."[297] Here, although the Agreement does not specifically provide for expectancy damages, it also does not specifically exclude them. Accordingly, if other remedies (including expectancy damages) are factually viable, then they are legally viable as well.[298]

Turning, then, to the factual *bona fides* of expectancy damages in this case, as a fact finder, the Court must admit to some knee-jerk reluctance to embrace the claim given the generous pre-Sale due diligence afforded to the plaintiffs and the purity of the auction process leading up to the Sale. The Court's first impression has only been reinforced by further consideration of the claim.

At its essence, plaintiffs' claim appears to rest on the circular proposition that Interim was worth $134 million because that is what the plaintiffs paid for it. While that logic may apply to a commodity the total value of which can be realized

---

295. Plaintiffs presented a more "conservative" claim for expectancy damages at trial based on an analysis of Interim's *pro forma* financial statements with adjustments to account for proper cost reporting methodologies. *See* D.I. 121, at 55–60; PX 739. According to this damages model, plaintiffs were denied the benefit-of-their-bargain in the amount of $25,485,600. *See* D.I. 136, at 79.

296. *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del.2001).

297. 17A Am.Jur. 2d *Contracts* § 709 (2004). *See also Oliver B. Cannon & Son, Inc. v. Dorr–* *Oliver, Inc.*, 336 A.2d 211, 214 (Del. 1975)("[T]he contractual remedy cannot be read as exclusive of all other remedies since it lacks the requisite expression of exclusivity.") (citations omitted).

298. This does not necessarily hold true for the equitable remedies plaintiffs have sought in the companion Court of Chancery litigation. *See Elysian Fed. Savings Bank v. Sullivan*, 1990 Del. Ch. Lexis 30 (holding that plaintiffs must elect between breach damages and rescission).

immediately through use or sale—a barrel of oil, for example—it does not hold true in the sale of a going concern. In a free market economy, all businesses operate under the constant risk of declining profits caused by an infinite panoply of market factors. The emergence of a superior competing product, an adverse regulatory ruling, and the unexpected insolvency of a major customer are but a few examples. Market risks also work in the opposite direction; the insolvency of, or a regulatory ruling against a major competitor, for example, may provide windfall profits. The presence of these market factors—more prevalent in some industries (like healthcare) than others—must be taken into consideration when attempting to measure a firm's value. Even then, the process is by no means an "exact science." [299]

In this case, the occurrence of a foreseeable risk factor, an adverse regulatory ruling, soon after the plaintiffs acquired Interim does not necessarily mean that the plaintiffs received less than what they paid for. If Spherion could have in some way entirely eliminated the risk of an adverse audit, the parties' Agreement would reflect this protection and the price for Interim most certainly would have been higher. The representations and warranties in the Agreement, however, reflect that the parties were fully aware that a Medicare audit could occur and that Spherion would bear the risk of that loss only in certain circumstances, e.g., if Spherion failed to file its cost reports in a manner consistent with its Medicare representations and warranties.[300] The expectations of both parties, therefore, were shaped by the risks of which they were aware, and the allocation of those risks as expressed in their Agreement.[301]

Professor Williston exposes the factual weakness in plaintiffs' expectancy argument in his explanation of the theoretical basis of the remedy:

> The theory underlying [expectancy damages] is as simple as it is significant: A promissee enters into a particular outcome and believes that the best possible outcome, under the circumstances, will be achieved by contracting with this particular promisor. When the promisor *fails to perform as promised,* the prom-

---

**299.** *See Cooper v. Pabst Brewing Co.,* 1993 WL 208763 at *9, 1993 Del. Ch. Lexis 9, at *23 ("Ordinarily, the value of any commodity in a competitive market is what a willing buyer would pay a willing seller for that commodity...."); *Northern Trust Co. v. C.I.R.,* 87 T.C. 349, 380, 1986 WL 22171 (1986) ("[A] sound valuation will be based upon all the relevant facts, but the elements of common sense, informed judgments and reasonableness must enter into the process of weighing those facts and determining their aggregate significance. Indeed, we have repeatedly recognized that stock valuation is not an exact science, but rather is inherently imprecise and capable of resolution only by a Solomon-like pronouncement."); *Messing v. Commissioner,* 48 T.C. 502, 512, 1967 WL 960 (1967) ("Too often in valuation disputes the parties have convinced themselves of the unalterable correctness of their positions and have consequently failed successfully to conclude settlement negotiations—a process clearly more conducive to the proper disposition of disputes such as this. The result is an overzealous effort, during the course of the ensuing litigation, to infuse a talismanic precision into an issue which should frankly be recognized as inherently imprecise and capable of resolution only by a Solomon-like pronouncement.").

**300.** PX 172, at § 3.17.

**301.** Although not relevant to the breach of warranty claim, plaintiffs' due diligence, including their discovery of information regarding past audits of Interim cost reports, Interim's current cost reporting methodologies, and the FI's expressed concerns regarding those methodologies, all are relevant in determining the scope of plaintiffs' reasonable expectations.

issee becomes entitled to damages designed to compensate him or her for the harm caused by the breach. That harm, in turn, is the loss suffered by the promissee when the promisor *failed to perform his or her promise*—in other words, the value to the promissee of the promise that was broken.[302]

Although plaintiffs purport to link their claim for expectancy damages to alleged breaches of the Agreement,[303] much of their argument suggests that Spherion in all instances must bear the risk of loss in this transaction.[304] All things being equal, if the Agreement did not contain a contractual allocation of risk, the plaintiffs' argument might be received more favorably. But, in the shadow of the parties' highly negotiated Agreement, after thorough due diligence, the plaintiffs sound much like an experienced gambler asking the pit boss to allow him to take his losing bet off the table after the roulette wheel has stopped spinning. Plaintiffs had ample opportunity to negotiate for a specific representation and warranty regarding the value of the company they were acquiring. No such warranty was given, however. To the contrary, Spherion constructed the Sale of Interim as an auction, prepared *pro forma* financial statements peppered with disclaimers, and opened Interim's doors to Cornerstone for due diligence. Under these circumstances, plaintiffs' reasonable expectancy must be tied to and limited by the express promises made to them in the Agreement.[305]

The cases that the parties belabor involve either the pure economic loss doctrine or estimating stock price in an appraisal action and, as such, are off point.[306] More relevant is the long line of cases in which buyers, like the plaintiffs here, seek to escape written warranties and disclaimers in favor of common law remedies that

---

**302.** 24 WILLISTON ON CONTRACTS, § 64:2, at 23–34 (2002) (emphasis supplied). *See also* Holmes, *The Common Law & Other Writings*, at 297–303 (Legal Classics Library 1982) (Justice Holmes discusses the nature of contractual promises generally, and notes that he views the contract "as the taking of a risk" tied to the specific nature and extent of the promises contained in the agreement).

**303.** D.I. 136, at 59 (referring to alleged breaches of Sections 3.7, 3.16 and 3.17 of the Agreement).

**304.** *See Id.* at 60–61.

**305.** Even assuming *arguendo* that the plaintiffs miscalculated and improperly discounted the regulatory risks when formulating their $134 million offer, absent some type of fraud not present here, the miscalculation is their own fault. This was not a cloak-and-dagger transaction presented in a rushed take-it-or-leave-it fashion; it was a multi-party auction that incorporated a substantial due diligence process. Delaware courts do not rescue disappointed buyers from circumstances that could have been guarded against through normal due diligence and negotiated contractual protections. *See VGS, Inc. v. Castiel*, 2004 WL 876032 at *6 (Del.Ch. Apr. 22, 2004) (finding that a sophisticated investor's failure to recognize the importance of a contract that was made available during due diligence diminished the plaintiffs' fraud and breach of contract claim); *Debakey Corp. v. Raytheon Service Co.*, 2000 WL 1273317 at *26–*28 (Del.Ch. Aug. 25, 2000) (finding that a sophisticated party's failure to conduct adequate due diligence or to procure express warranties for facts that it supposedly relied upon in entering a transaction made it impossible to prove justifiable reliance. Instead, this behavior indicated that the sophisticated party made a business decision it was willing to accept in order to complete the deal quickly and cheaply, a decision the Court would not second-guess.). Put another way, if plaintiffs failed properly to account for risks ascertainable through due diligence, and to protect against them in the Agreement, then their $134 expectation was not reasonable and, therefore, it is not compensable.

**306.** *See e.g. Danforth v. Acorn Structures, Inc.*, 608 A.2d 1194 (Del.1992); *Duncan v. Theratx, Inc.*, 775 A.2d 1019 (Del.2001).

assume the absence of bargained for allocations of risk. Most common among these are disputes over the sale of goods involving the Uniform Commercial Code. For example, in upholding a contractual allocation of risk in *Employers Ins. Of Wausau v. Suwannee River Spa Lines, Inc.*,[307] the Fifth Circuit noted,

> We will not disturb the agreed upon allocation of risks simply because the worst of those risks has materialized. While this result may seem harsh, it is clear that two sophisticated commercial actors such as [plaintiff] and [defendant] could have allocated the risk of damage stemming from a guarantee deficiency differently… [Defendant] and [plaintiff] are "commercial giants" of equal bargaining power. Their lengthy negotiations produced a detailed contract of nearly 100 pages in length. We will not rewrite this contract to substantially alter the allocation of risks to which the parties have consented.

Here, plaintiffs made a business decision to allocate the risk of loss as between Buyer and Seller by including highly negotiated representation and warranty provisions in the Agreement. These representations and warranties were integral to the transaction and were reflected in the purchase price paid for Interim. The contractual allocation of risk was etched in stone when the parties included an integration clause, in which they acknowledged that the Agreement, including the express warranties, represented the sole and complete understanding of the parties.[308] The plaintiffs' calculated risk did not pan out, and now they seek to escape the express lan-

guage of the Agreement in favor of more liberal common law platitudes. The Court is not persuaded. In the absence of proof by a preponderance of the evidence that Spherion breached a promise expressed in the Agreement in a manner that materially affected the value of Interim at the time of the Sale, the Court will not award expectancy damages. As discussed below, no such breach occurred here.

## B. The Medicare Adjustments

### 1. The Parties' Contentions

The plaintiffs contend that the post-Sale audit of Interim's cost reports uncovered numerous problems which, individually or in total, constitute breaches of Spherion's representations and warranties in the Agreement. Specifically, the plaintiffs have identified two provisions of the Agreement implicated by Spherion's alleged improper cost reporting methodologies: Section 3.16 and Section 3.17. As to Section 3.16(a), plaintiffs point to Spherion's representation that "no *notices* have been issued regarding any disputes related to [Interim] cost reports from Governmental Entities responsible for administering the Medicare program …," and argue that Spherion's failure to disclose Aetna's frequent pre-Sale communications with Interim regarding the deficiencies in their cost reporting methodologies constitutes a breach of this provision.[309] Plaintiffs contend that these communications were "notices" as contemplated in this provision of the Agreement.

With respect to Section 3.16(b), plaintiffs argue that Spherion breached its repre-

---

**307.** 866 F.2d 752, 780 (5th Cir.1989). *See also Progressive International Corp. V. E.I. DuPont De Nemours & Co.*, 2002 WL 1558382 at *8 (Del.Ch. Jul. 9, 2002)(finding that even strict confidentiality requirements that considerably impede due diligence do not make a deal between sophisticated parties uncon-

scionable because they are fully capable of making the business decision to continue the deal or walk away).

**308.** PX 172, at § 15.4.

**309.** *Id.* at § 3.16(a)(emphasis supplied).

sentation that "[Interim has not] intentionally filed a false claim, or filed a claim without a reasonable basis therefore, with HCFA [or] its fiscal intermediaries...." [310] Plaintiffs contend that Interim lacked any reasonable basis to support its implementation of the three component A & G methodology, its allocation for capital costs on the basis of a square footage statistic, its allowance of Regional Vice President and Branch Managers salaries and costs, as well as other allegedly improper claims for reimbursement identified during the course of the PGBA audit.

As to Section 3.17, plaintiffs contend that Interim's cost reports did not comply with "applicable Laws" because the overall reimbursement impact of the cost reports caused "cross-subsidization," a situation where Interim's non-Medicare costs were reimbursed by the Medicare program in violation of the Medicare statute.[311] According to the plaintiffs, Spherion's breach of Section 3.17 is further evidenced by its failure to comply with applicable HCFA regulations, the PRM provisions relating to cost reports, and HCFA's Transmittals 2, 3 and 4.

Spherion denies that it has breached any of the representations and warranties by its Medicare filings. As an initial matter, Spherion disagrees with Interim's interpretation of the relevant provisions of the Agreement. As to 3.16(a), Spherion argues that "notices" in that provision refers specifically to formal "notices of program reimbursement." Spherion alleges that it complied with Section 3.16(a) when it disclosed to plaintiffs all NPRs that it had received from the Medicare program in Schedule 3.16(a) to the Agreement. Spherion also contends that communications from its FI could not

form the basis of a claim of breach since its FI is not a "governmental entity" as contemplated by the Agreement. Thus, according to Spherion, it was not required to disclose any communications from the FI regarding the FI's concerns with its cost reporting methodologies because such communications were neither "notices," nor communications from a "government entity."

Spherion also takes issue with plaintiffs' interpretation of Section 3.16(b). Specifically, Spherion contends that to prove a violation of Section 3.16(b), plaintiffs must prove that Spherion "intentionally ... filed a claim without a reasonable basis therefore with HCFA [or] its fiscal intermediaries...." [312] Since the evidence does not support a claim that Spherion intentionally attempted to mislead HCFA or seek reimbursement to which it was not entitled in its cost reports, Spherion contends that plaintiffs cannot prove a violation of Section 3.16(b). Moreover, even if plaintiffs were not required to prove intentional conduct to prove a violation of Section 3.16(b), Spherion argues that it had a "reasonable basis" for all of its cost reporting methodologies.

Turning to Section 3.17, Spherion contends that its cost reports were filed in compliance with applicable "Laws." According to Spherion, "Laws" includes only Medicare statutes and regulations. It does not include the PRM or HCFA Transmittals. In any event, even if the Court construes "Laws" to mean statutes, regulations, the PRM and Transmittals, Spherion contends that its cost reports complied "in all material respects" with each of these various authorities. Spherion received approval from Aetna of its cost reporting methodologies in 1994 and

310. *Id.* at § 3.16(b).

311. *Id.* at § 3.17.

312. *Id.* at § 3.16(b).

continued to believe that its position with respect to its cost allocation methodologies was correct up to the time it filed its 1996 cost reports. Spherion also contends that plaintiffs' lone Medicare reimbursement expert has not made a credible case that any of Interim's cost reporting methodologies "materially" violated any Law. On the other hand, Spherion's expert forcefully and credibly endorsed the propriety of the cost reports. According to Spherion, this view is corroborated by the experts on both sides of the transaction who reviewed the cost reports prior to the Sale. Simply stated, according to Spherion, plaintiffs have failed to carry their burden of proof on this issue.

## 2. The Interpretation of the Applicable Provisions of the Agreement

### a. Section 3.16

As indicated, the parties disagree as to whether the reference to "Governmental Entities" in Section 3.16(a) includes FIs or is limited to HCFA.[313] "Governmental Entity" is defined in the Agreement as "any court, tribunal, administrative agency or commission or other governmental or regulatory authority ... including but not limited to agencies, departments, boards, commissions or *other instrumentalities* of any country or any political subdivision thereof."[314] Spherion contends that a FI is not a "regulatory authority" as that term is used in Section 1.35. According to Spherion, "an FI is merely a private or-

ganization with which [HCFA] enters into an agreement to communicate with providers and to conduct audits."[315] Plaintiffs counter that FIs have responsibility (by statute) for administering the Medicare program and, as such, the FI is an "instrumentality" of the government.[316] The Court agrees.

Aetna communicated with Interim on HCFA letterhead.[317] The FI was vested with authority to process bills and approve PIPs. And it was vested with authority to audit cost reports in the first instance.[318] Under these circumstances, the Court is satisfied that Aetna (and later PGBA) were "instrumentalities" of the government/HCFA.

The parties also dispute the appropriate interpretation of "notices" as used in Section 3.16(a). Spherion contends that "notices" refers only to NPRs; plaintiffs contend that "notices" would include any communication from HCFA or the FI in which the provider is notified of a problem. It is a maxim of contract interpretation that, where no contrary intention is apparent, "general words used after specific terms are to be confined to things 'ejusdem generis'—of the same kind or class as the things previously specified."[319] *Ejusdem generis* captures the general notion that if parties intended a contractual term to be interpreted in accordance with its general definition, they would not have employed the term in the first instance in the context of a specific usage or term of art.[320]

---

**313.** Again, Section 3.16(a) provides, in pertinent part: "no notices have been issued ... from Governmental Entities...."

**314.** PX 172, at § 1.35 (emphasis supplied).

**315.** D.I. 141, at 53, *citing* 42 U.S.C. § 1395(h); 42 C.F.R. § 421 *et. seq.* (establishing FIs and defining their roles).

**316.** *See* 42 U.S.C. § 1395(h).

**317.** *See e.g.* PX 282; PX 283.

**318.** 42 U.S.C. § 1395(h); 42 C.F.R. § 421.

**319.** 17A Am.Jur 2d *Contracts* § 364 (2d Ed. 2004).

**320.** *See New Castle County v. National Union Fire Ins. Co. of Pittsburgh,* 243 F.3d 744, 751 (3d Cir.2001) (quoting *Donaghy v. State,* 100 A. 696, 707 (Del.1917)).

Applying *ejusdem generis* to Section 3.16(a), the Court concludes that "notices" refers to the prior phrase "notices of program reimbursement." [321] The parties first used "notices" in connection with the term of art—"notices of program reimbursement"—and then referred to "notices" generally. This is precisely when *ejusdem generis* applies. Moreover, the language "... and no notices have been *issued* ..." contemplates a formal process whereby a "Governmental Entity" "issues" a formal notice. NPR's are "issued" by the FI after the FI completes its review of the cost report. Interim disclosed all of the NPR's it had received from Aetna in the Schedules to the Agreement.[322] In doing so, it complied with its obligations under Section 3.16(a).[323]

With respect to Section 3.16(b), the Court's task in interpreting this provision is to determine whether the term "intentionally" modifies only "filed a false claim" or also modifies "filed a claim without a reasonable basis therefore." [324] Not surprisingly, plaintiffs endorse the former construction—one that would not require them to prove intentional misconduct to prove a breach. Spherion endorses the latter construction—one that would require proof that Interim intentionally filed improper cost reports. The Court is persuaded that Spherion's interpretation is most consistent with the Agreement's overall structure and plan, and most re-flective of the parties' intent as expressed in the Agreement.

The Court begins its analysis by reiterating the general rule that "[t]he standard of interpretation of a written instrument, except where it produces an ambiguous result, or is excluded by a rule of law establishing a definitive meaning, is the meaning that would be attached to such instrument by a reasonably intelligent person acquainted with all operative usages and knowing all the circumstances prior to and contemporaneous with the making of the instrument, other than oral statements by the parties of what they intended it to mean." [325] When construing the meaning of contractual terms, the Court will not allow sloppy "grammatical arrangement of the clauses" or "[m]istakes in punctuation" "to vitiate the manifest intent of the parties as gathered from the language of the contract." [326]

At first glance, one readily could interpret Section 3.16(b) as representing that Interim has neither intentionally filed a false claim, nor filed any claim without a reasonable basis therefore. The placement of the adverb "intentionally" only before the phrase "filed a false claim," and the placement of the comma after "false claim," might be read to support this construction. Certainly this is how plaintiffs have read the provision. Yet the Court

321. Again, Section 3.16(a) provides in pertinent part: "[Interim is not] appealing any notices of program reimbursement and no notices have been issued regarding any disputes related to [Interim's] cost reports...."

322. PX 174, at Sch. 3.16(a).

323. The Court also notes that it appears that Interim disclosed at least some of its correspondences with Aetna regarding the NPRs by supplying these documents to plaintiffs in the data room during due diligence. *See* PX 125.

324. Again, Section 3.16(b) provides in pertinent part: "[Interim has not] intentionally filed a false claim, or filed a claim without a reasonable basis therefore, with HCFA [or] its fiscal intermediaries...."

325. 17A Am.Jur. 2d, *Contracts* § 337 (2d. Ed. 2004).

326. *Id.* at §§ 365, 366.

will not allow the imprecise placement of adverbs and commas to alter the otherwise plain meaning of a contractual provision or to frustrate the overall plan or scheme memorialized in the parties' contract. After a careful review of the Agreement, the Court is convinced that Section 3.16(b) was drafted to address conduct that either could give rise to liability arising from fraud and abuse or the intentional submission of improper claims for reimbursement. This conclusion is consistent with the Court's reading of the provision during trial.[327]

When interpreting a contract, the Court must view the document as a whole, giving effect to all of its provisions.[328] "Moreover, the meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's scheme or plan." [329] Section 3.16(b)'s place in the overall scheme or plan of the Agreement can perhaps best be gleaned from the schedule of liabilities listed in Schedule 3.16(b), specifically incorporated by reference in Section 3.16(b). There, Spherion disclosed only the fraud and abuse investigations in which it might be exposed to

Medicare fraud and abuse liability, including the El Paso investigation.[330] Conspicuously absent from this schedule is any reference to the 1994 desk review pursuant to which Aetna alleged, in essence, that Interim had submitted its 1994 cost report without a "reasonable basis" for certain cost allocations.[331] This potential liability was listed in Schedule 3.16(a) and Schedule 3.17.[332]

The structure of the indemnification provisions in Section 10 of the Agreement also support the Court's interpretation of Section 3.16(b). These provisions specifically carve out "Section 3.16 Damages" and exclude them from the limitations that are otherwise in place for indemnification claims arising from improperly filed cost reports.[333] The provisions reflect the parties' recognition after the El Paso and Hollywood, Florida investigations that damages and civil penalties relating to intentional misconduct and fraud and abuse liabilities should not be capped.[334]

Finally, it cannot escape observation that the plaintiffs' interpretation of Section 3.16(b) would allow it to recover unlimited damages based on a lower threshold of proof—"without a reasonable basis"—than the limited damages it would be entitled to

---

**327.** *See* D.I. 114, at 192 (the Court observed during trial: "I believe that 3.16 is really meant to address issues that could give rise to a fraud and abuse liability and, therefore, there were particular indemnity provisions that were required because of the nature of that liability to address specifically those sorts of claims that might arise down the road, as opposed to 3.17, which was a more general government filing provision that could apply to any number of submissions that would be made on behalf of Interim.").

**328.** *See E.I. duPont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del.1985) ("[I]n upholding the intentions of the parties, a court must construe the agreement as a whole giving effect to all provisions therein.") (citations omitted).

**329.** *Id.* (citations omitted).

**330.** PX 174, at SPH 030339.

**331.** *Id.*

**332.** *Id.* at Sch. 3.16(a) and Sch. 3.17.

**333.** *See* PX 172, at §§ 10.1, 10.3(a), 10.4(b).

**334.** As indicated previously, the parties renegotiated the initial purchase agreement after the El Paso and Hollywood, Florida fraud and abuse investigations and agreed to add Section 3.16(b) and the corresponding indemnification provisions. D.I. 100, at ¶¶ 92–93. *See also* D.I. 109, at 73; D.I. 117, at 94–96.

recover upon meeting a higher threshold of proof—"violation of applicable Law"—as established in Section 3.17. This result would also be contrary to the "[A]greement'[s] overall scheme or plan."[335]

Having concluded that Section 3.16(b) relates to intentional misconduct or matters that could give rise to "fraud and abuse" liability, it should come as no surprise that the Court has concluded that plaintiffs have not proven a breach of Section 3.16(b). As the Court already has determined, plaintiffs have not pled or proven that Spherion engaged in fraudulent or intentional misconduct. Moreover, no fraud and abuse investigation was ever initiated against Interim in connection with any of the cost reports at issue in this case.[336] Plaintiffs' remedy for the Medicare adjustments, therefore, if any, must arise from its claim that Spherion breached Section 3.17.

**b. Section 3.17**

The parties' disagreement with respect to the proper interpretation of Section 3.17 centers on the definition of "Law" as set forth in the Agreement. Spherion represented that it submitted its cost reports in compliance with applicable Laws. The Agreement defines "Laws" at Section 1.62:

" 'Laws' means any federal, state, local or foreign law, statute, ordinance, rule, regulation, permit, order, judgment or decree."[337] Plaintiffs argue that "Laws" includes provisions in the PRM and HCFA Transmittals. Spherion contends that "Laws" includes only statutes and regulations.

Spherion correctly notes that there is ample authority for the proposition that the PRM and Transmittals interpret, but do not supercede, the HCFA regulations.[338] "The PRM has been described as 'not binding like law or regulation. Rather, it guides the application of the laws and regulations.' "[339] The FI' s duty is to "consult and assist providers in interpreting and applying the principles of Medicare reimbursement to generate claims for reimbursable costs."[340] The PRM and Transmittals assist the FI to this end.

Thus, there is a recognized distinction between the Medicare statute and regulations on the one hand, and the PRM and Transmittals on the other. Clearly, the statute and regulations have the force of law and the manual and transmittals do not. It is equally clear, however, that the PRM and Transmittals are considered "in-

**335.** *E.I. duPont de Nemours,* 498 A.2d at 1113.

**336.** D.I. 121, at 69.

**337.** PX 172, at § 1.62.

**338.** *See Shalala v. Guernsey Mem'l Hosp.,* 514 U.S. 87, 99, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995)(characterizing the provisions of the PRM as "interpretive rules" and stating that "interpretive rules do not require notice and comment, although ... they also do not have the force and effect of law and are not accorded that weight in the adjudicatory process."); *Ashtabula County Medical Center v. Thompson,* 352 F.3d 1090, 1093 n. 1 (6th Cir.2003) ("[T]he PRM contains the interpretive rules regarding Medicare reimbursement."); *St. Mary's Hosp. of Troy v. Blue Cross & Blue Shield Assoc.,* 788 F.2d 888, 890 (2d.Cir.1986) ("We recognize that we deal here, not with either a statute or with formally promulgated regulations, but with a Manual explicating those regulations. While such interpretive guides are without the force of law, they are entitled to be given weight.") (citations omitted).

**339.** *GCI Health Centers, Inc. v. Thompson,* 209 F.Supp.2d 63, 69 (D.D.C.2002)(quoting *Wilmot Psychiatric v. Shalala,* 11 F.3d 1505, 1507 (9th Cir.1993)).

**340.** *Shalala,* 514 U.S. at 94, 115 S.Ct. 1232 (citing 42 C.F.R. § 413.20(b)).

terpretive rules" in Medicare parlance.[341] And "rules" are encompassed within the Agreement's definition of "Laws."[342]

Spherion contends that the distinction between interpretive and substantive rules is important because interpretive rules cannot supercede the Medicare regulations and are not perceived among the courts or the providers of Medicare services as "laws." Substantive rules, such as regulations, on the other hand, are controlling. While this distinction may have meaning in other contexts, it has no meaning in the operative language chosen by the parties to define their obligations. The Agreement expressly provides that "Laws" includes both "regulations" *and* "rules;" the Agreement is silent as to whether those "rules" must be interpretive or substantive.

 Clearly, the parties were sophisticated scribners and knowledgeable of the healthcare field. They were familiar with the range of written authorities that regulate the healthcare industry. If they had intended to exclude the PRM or Transmittals from "Laws," they could have drafted the Agreement in a manner that it clearly did so. The Agreement as drafted, however, encompasses the PRM and Transmittals. Thus, when determining whether Spherion breached Section 3.17, the Court must consider whether Interim's cost reports as submitted complied "in all material respects" with applicable Medicare statutes, Medicare regulations, provisions of the PRM, and HCFA Transmittals.[343]

### 3. The Medicare Experts

Apparently recognizing the remarkable complexity of the Medicare-related issues, both parties engaged Medicare "reimbursement" experts to address the propriety of Interim's cost reporting methodologies. Not surprisingly, there was little upon which the experts could agree. Given that the plaintiffs' claims regarding the Medicare adjustments, in large part, rise or fall on the testimony of the experts, it is appropriate for the Court to share its observations regarding the credibility of the experts' testimony before addressing the substance of the Medicare-related claims.

Plaintiffs presented the testimony of Thomas Curtis, a certified public accountant with extensive experience as an auditor with Medicare FIs. Mr. Curtis eventually rose to the position of "Audit Manager," in which capacity he supervised approximately thirty field auditors.[344] In 1987, Mr. Curtis started his own consulting company where he continues to provide services to healthcare providers regarding Medicare compliance issues, particularly reimbursement issues.[345] In this capacity, Mr. Curtis has represented several Medicare providers before the PRRB in connection with appeals of cost report adjustments.[346]

In late 1998, Interim's outside legal counsel retained Mr. Curtis on Interim's behalf to assist Interim in its efforts to reverse PGBA's audit adjustments of In-

**341.** *See In re Cardiac Devices Qui Tam Litigation*, 221 F.R.D. 318, 352 (D.Conn.2004).

**342.** PX 172, at § 1.62.

**343.** Of course, when reviewing an agency's decision regarding a provider's compliance with the applicable law, the courts first look to the applicable statute. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Only if the intent of Congress is not clearly expressed in the statute will the Court consider the agency's construction of the statute. *Id.*

**344.** D.I. 106, at 188–91.

**345.** *Id.* at 191–92.

**346.** *Id.* at 194–95.

terim's 1996 and 1997 cost reports.[347] Mr. Curtis served as Interim's principal "outside expert" in all of its subsequent dealings with PBGA and later with HCFA.[348] As Mr. Curtis himself described his role: "My job was to help [Interim] fight through [the audit] adjustments." [349]

Mr. Curtis' first impression upon reviewing the PGBA audit findings was that the audit was "not properly performed...." [350] He characterized PGBA's approach to the three component A & G methodology as "troubling," its collapse of the three component A & G as "flawed," and the audit adjustments as "incorrect on several grounds." [351] During the audit process, Mr. Curtis assisted Interim in preparing for meetings with the FI, the purpose of which was either to obtain a reversal of audit adjustments or, at the very least, a new audit.[352] Position papers were prepared in advance of the meetings setting forth points that Interim or its consultants intended to communicate to the FI during the course of the meeting.[353] The position papers included such statements as: "we acted in good faith with reasonable assurances from Aetna that how we handled Interim Health Care cost reports was appropriate and permissible;" [354] and "our goal today is to show you that we have filed our cost reports based on supportable approved methods." [355] Later, when asked at his deposition in this litigation whether he believed in the posi-

tions Interim was taking with the FI and later with HCFA during the audit adjustment meetings, Mr. Curtis acknowledged that he "[couldn't] imagine ... advocat[ing] a position that [he] didn't think was correct." [356]

At trial, however, Mr. Curtis' views regarding the propriety of Interim's cost reports appeared to change dramatically. Of course, Mr. Curtis' role had changed too. During the audit process, Mr. Curtis was engaged to support Interim in its efforts to secure reversals of the audit adjustments. At trial, Mr. Curtis was engaged by the plaintiffs to be critical of Interim's methodologies in support of the plaintiffs' claims of breach of the Agreement. Thus, when asked at trial, Mr. Curtis opined that Interim's 1996 and 1997 cost reports did not comply with Law and were not otherwise proper.[357] He concluded that Interim had improperly attempted to shift its costs to Medicare in an inequitable manner.[358]

While Mr. Curtis' clients may be comforted by his willingness to advance their positions in accordance with their circumstance, the Court takes little comfort in this approach to forensic analysis as it searches for the truth. Mr. Curtis' conflicting roles, and the disconcerting evolution of his opinions, has limited his usefulness to the fact finder.[359]

**347.** *Id.* at 213–15.

**348.** *Id.*

**349.** *Id.* at 216.

**350.** DX 5.

**351.** *Id.*

**352.** D.I. 121, at 85–86.

**353.** *Id.* at 82.

**354.** DX 169, at 9.

**355.** DX 171, at 4.

**356.** D.I. 111, at 16.

**357.** D.I. 121, at 13.

**358.** *Id.* at 14.

**359.** The Court also considered the opinions of plaintiffs' other expert, John K. Dugan, as they related to the Medicare issues. *See* DX 8. While not affected by the same credibility issues, the Court found the opinions to be less persuasive than those offered by Spherion's expert.

For its part, Spherion engaged William J. Simione, Jr., as its Medicare reimbursement expert. Mr. Simione is a certified public accountant who has been working in the healthcare industry for more than thirty-eight years.[360] His work as a healthcare consultant included work on several national committees that participated in the promulgation of national healthcare legislation.[361] Indeed, Mr. Simione was instrumental in working with HCFA to introduce the step-down cost allocation methodology to the home healthcare industry.[362] Mr. Simione spent between thirteen hundred and fourteen hundred hours reviewing the information relating to Interim's cost report submissions before reaching his opinions.[363] Although there were instances where Mr. Simione appeared to contradict himself,[364] his approach generally was measured, and his ultimate conclusions were not overreaching. In short, Mr. Simione made a credible expert presentation on behalf of Spherion and, in the Court's view, was the most persuasive witness on Medicare reimbursement issues.

The Court's determination that Mr. Simione was the more credible Medicare reimbursement expert does not end the inquiry. As the Court considers each individual claim upon which the experts have opined, the Court must evaluate the experts' conclusions in the context of the entire evidentiary record. Accordingly, the Court will make reference to the competing expert opinions as appropriate when considering each of the individual claims.

## 4. The Audit Conclusions of HCFA and the FI are Not Dispositive

Finally, before addressing the specific Medicare claims, the Court must address a fundamental analytical flaw that flows throughout plaintiffs' arguments regarding the legality of Interim's cost reports. Plaintiffs appear to assume that the cost reports were prepared illegally because PGBA and, to a lesser extent, HCFA said they were prepared illegally during the audit and post-audit meetings. The statements and conclusions of the regulators, however, are not dispositive of the issue. They are, of course, evidence to be considered in the total mix of evidence regarding the propriety of Interim's cost reporting methodologies. At the end of the day, however, the Court must consider the legality of the cost reports as the issue has been presented in this case: the Agreement requires that Interim submit its cost reports "in all material respects in compliance with applicable Laws." This does not mean that Interim must submit its cost reports in a manner that is satisfactory to its FI and HCFA. PGBA's and HCFA's interpretation of the applicable Laws is but one piece of evidence that must be considered along with the other evidence, including the opinions of the experts who have weighed in on the Medicare issues.

## 5. Cross–Subsidization

Plaintiffs allege that Interim's allocation of operational costs resulted in "cross-subsidization" in violation of the Medicare statute.[365] Plaintiffs offer the following example to illustrate the point with respect

---

360. D.I. 119, at 23–24.

361. *Id.*

362. *Id.* at 26.

363. D.I. 130, at 77.

364. *See e.g.* D.I. 130, at 6 (Interim probably should have filed 1996 cost report under protest); *Id.* at 73 (suggesting that Interim did not have to file its cost report under protest).

365. *See* 42 U.S.C. § 1395X (v)(1)(A)("[T]he reasonable cost of any services shall be the cost actually incurred, excluding therefrom

to the allocation of capital costs: even though the President of the company would spend only 7% of his time running the Medicare operations from his desk, Interim would allocate its capital costs in a manner that would indicate that 40% of the President's desk, computer, etc., were used in connection with the Medicare operations.[366]

Plaintiffs' cross-subsidization analysis appears persuasive as far as it goes. The apparent imbalance in the allocation of capital versus other costs certainly merits a closer look. But the criticism ultimately fails because it does not contemplate the fact that the Medicare component of Spherion's business, by its nature, drained more of Spherion's resources than the other two components of the business (non-intermittent healthcare and commercial staffing). As Mr. Simione explained, the skilled intermittent services Interim provided had to be billed on a per visit basis. The manner in which a Medicare bill must be generated is much more highly regulated than the billings related to Spherion's other business segments. A skilled intermittent care provider likely will have several patient encounters and make several Medicare visits during an eight hour shift. The resources needed to generate separate bills for these encounters and visits will far exceed the resources needed to administer the other components of Spherion's business.

In the commercial staffing realm, for instance, an individual likely would be assigned to one client for a full shift and, therefore, only one bill would be required.[367] In the non-intermittent nursing realm, fewer patient encounters and fewer visits generally will occur in a nurse's shift.[368] Under these circumstances, the fact that the allocation of capital costs did not match the allocation of related costs (such as salaries), or did not match the percentage of Medicare revenues to Spherion's total revenue, is not surprising and not necessarily indicative of improper cost reporting. Moreover, given the Court's conclusion that plaintiffs have not proven that Interim's methodologies violated any Law, as discussed below, it follows that they have not proven that Interim failed to allocate the "reasonable cost ... of services ... in accordance with regulations...." [369]

### 6. The Three Component A & G Methodology

Plaintiffs allege that Interim's three component A & G cost allocation methodol-

any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the methods or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies and services....").

366. D.I. 136, at 23; D.I. 130, at 46–48. Plaintiffs also allege that "of the $19.4 million in A & G allocated to Interim in 1996, $19 million, or over 99%, was deemed reimbursable even though Medicare only accounted for about 25% of Interim's healthcare revenues." D.I. 136, at 20. As to this example, Spherion disputes plaintiffs' characterization of the costs allocated to Medicare, and with good reason. A review of the evidence reveals that

Medicare was actually asked to pay only 34% of Interim's allowable Medicare costs of $19.4 million. *See* DX 270, at Sch. G.

367. D.I. 130, at 102–05.

368. *Id.* In addition to the added resources required to generate a bill, the Medicare program also demands additional resources to support and/or justify the bill if later challenged, in the form of document retention and management protocols, regulatory experts and, as evidenced by the events in this case, outside experts and legal assistance. (D.I. 101, at 109–11, discussing documentation issues).

369. *See* 42 U.S.C. § 1395X(v)(1)(A) (the "cross-subsidization" statute).

ogy violated "applicable Laws" because the methodology allowed Interim to pass on more of its operational costs to Medicare than was appropriate in violation of Medicare Law, including HCFA Transmittal 2, Transmittal 3 and, to a lesser extent, Transmittal 4. Having concluded that HCFA Transmittals are "Laws" as that term is used in the Agreement, the Court must consider whether any HCFA Transmittal or other law was violated by Interim's use of its three component A & G methodology.

According to the plaintiffs, Interim violated Transmittals 2 and 3 by sequencing the allocation of its A & G components improperly and by utilizing an improper allocation statistic. In this regard, the parties do not dispute that Transmittal 2 required providers to allocate shared A & G last.[370] Nor do they dispute that Interim complied with this directive in its 1996 cost report.[371] Interim negated the reimbursement impact of Transmittal 2, however, by utilizing a "total accumulated cost" statistic to allocate the A & G cost centers which, in essence, allowed it to readjust the allocation percentage each time it closed out an A & G cost center.[372] The parties appear to agree that the use of this allocation statistic was not contemplated by Transmittal 2.

Transmittal 3 made it clear that HCFA expected that a net cost, rather than a total accumulated cost statistic, would be used when allocating the three A & G components.[373] Transmittal 3, however, also stated:

> [FIs] are **not** to make adjustments for alternative A & G fragmentation methodologies employed for cost reporting periods beginning prior to January 1, 1997, **which may have been allowed** for those periods. [Providers] opting to fragment A & G costs for cost reporting periods beginning on or after January 1, 1997, must seek [FI] approval or re-approval for previously approved alternative A & G fragmentation methodologies ... that do not comport with this Transmittal.[374]

Next in the line of HCFA pronouncements on step down cost allocation was Transmittal 4 which expressly superceded Transmittals 2 and 3 and directed providers once again to close out shared A & G first in the allocation sequence.[375] HCFA explained that the allocation sequence prescribed in Transmittal 4 reflected the need "[f]or greater accuracy when allocating componetized or fragmented A & G service costs," and was consistent with long-standing Medicare regulations.[376]

Not surprisingly, Mr. Simione testified that HCFA's issuance of Transmittals 2, 3 and 4 caused great confusion in the home healthcare industry.[377] Even Aetna ac-

---

**370.** D.I. 100, at ¶ 63.

**371.** *Id.* at ¶ 64.

**372.** *Id.* at ¶ 65.

**373.** PX 70.

**374.** *Id.* (emphasis supplied).

**375.** D.I. 100, at ¶ 71; DX 87, at Ex. 5.

**376.** *See* DX 87, at Ex. 5 (In Transmittal 4, HCFA states that it "clarifies long standing HCFA policy contained in 42 CFR 413.24(d)(1) which states, in part, that 'the

cost of non revenue-producing cost centers serving the greatest number of other centers, while receiving benefits from the least number of centers, is apportioned first.' "). Needless to say, statutory and regulatory provisions trump manual provisions to the extent there is a conflict between the two. *See Shalala v. St. Paul–Ramsey Medical Center,* 50 F.3d 522, 528 (8th Cir.1995); *Daviess County Hosp. v. Bowen,* 811 F.2d 338 (7th Cir.1987).

**377.** D.I. 119, at 63–64 ("HCFA issued this Transmittal Letter [Transmittal 2] and put it as part of the manual instructions and stipulated that the sequence would no longer be

knowledged that HCFA had been sending conflicting signals regarding the appropriate means by which to allocate costs under three component A & G methodology.[378]

While plaintiffs appear to acknowledge that Transmittal 4 superceded Transmittals 2 and 3, they contend that HCFA declined to give Transmittal 4 retroactive effect. Consequently, according to plaintiffs, Interim's 1995 and 1996 cost reports were subject to Transmittals 2 and 3. In addition, plaintiffs contend that Interim did not comply specifically with Transmittal 4 in any event. The Court rejects both arguments.

First, it is not at all clear that Interim was in violation of Transmittals 2 and 3. Transmittal 3 stated that providers could employ cost allocation methodologies for which they had approval prior to January 1, 1997. Interim had received approval for its three component A & G methodology from Aetna in 1994.[379] Plaintiffs concede that Aetna approved of the three component A & G methodology in concept, but dispute whether Aetna was actually aware of either the sequencing of the three component A & G, or the allocation statistic utilized by Interim, at the time it gave its approval in early 1994. Under these circumstances, plaintiffs contend that Transmittal 3's savings provision does not apply to Interim.

In support of their contention that the allocation sequencing was not incorporated in Aetna's January, 1994 approval, plaintiffs cite to the testimony of one of Interim's Medicare managers who indicated that the first time the sequencing was clearly reflected on an Interim cost report was in the fourth quarter of 1994 (several months after Aetna confirmed its approval of the three component A & G methodology).[380] Spherion counters by noting that changes in Interim's computer system in 1994 caused the cost reports to be presented in a slightly different format, but the sequence for allocating A & G remained the same throughout 1991–94. According to Spherion, Aetna's field audit, or even a desk review of Interim's cost reports, would have revealed the details of its methodology.[381] The Court agrees.

the sequence that most of the agencies were using and had approval for and, that is, with A & G share [sic] first, reimbursable second and non-reimbursable third. They were reversing their opinion and saying that 100% reimbursable should come first, 100% non-reimbursable should come second, and shared A & G should come last.... I mean we, in the industry, when this came out, and this was effective for cost reports ... ending on or after September 30, 1996, I mean—in the financial managers work group, we went kind of nuts over this whole situation, because here was HCFA coming into a middle of a fiscal year, and agencies had approval to file under a certain methodology from the fiscal intermediary, and HCFA comes in with this Transmittal saying, well we don't care if you're right in the middle of your fiscal year, this is in May, you have to now if you are a December year-end, you have to now change your methodology within the middle of the year. We took this up with HCFA and we said, you know, you just can't do this. And what happened was they recognized that they made an error.").

378. *See* DX 65.

379. DX 31.

380. D.I. 136, at 11, *citing* D.I. 101, at 28 ("Q: When was the first time, if at all, the actual sequence that you utilized appeared on the cost report? A: I believe it was the December '94 cost report.").

381. DX 9, Attach. H, at 2; DX 218 ("FY 94 ... was the first year that we [Interim] were able to update our year-end cost report software to actually show the three lines of A & G as separate items.... Having been unable to have the software updated, we did an off-line allocation of our intermittent A & G to the disciplines.").

The preponderance of the evidence demonstrates that Aetna was aware of, or should have been aware of, the allocation sequence and statistic utilized by Interim in its 1992 and 1993 cost reports. While the information was more readily discernible in the last interim (periodic) cost report filed by Interim in 1994, it was clearly available to Aetna if it had reviewed the schedules to the cost reports in the course of the desk review (or audit) process in 1992 or 1993. There is absolutely no evidence to support the suggestion that Interim was attempting to hide its sequencing or allocation statistic from Aetna prior to 1994, or the contention that Aetna was not aware of these practices prior to re-affirming its approval of Interim's three component A & G methodology in January, 1994.[382]

In any event, even if Aetna's prior approval does not save Interim from a violation of Transmittals 2 and 3, HCFA's promulgation of Transmittal 4 provided Interim with ample ammunition with which to defend its cost reports. In this regard, the Court notes that HCFA's refusal to apply Transmittal 4 retroactively has been held by the PRRB to be improper.[383] Moreover, the fact that HCFA acknowledged that Transmittal 4 simply reiterated long-standing HCFA policy as reflected in HCFA's regulations suggests quite clearly that Transmittals 2 and 3 are not, in fact, (and never were) "Laws" as that term is used in the Agreement.

That HCFA's flawed perception of its own regulations happened to be prevailing at the time Interim submitted its 1995 and 1996 cost reports is of no moment when determining whether Interim properly represented and warranted that it had submitted its cost reports in compliance with applicable "Laws." The representation and warranty was accurate in so far as Interim, in fact, submitted its cost reports in a manner consistent with "long-standing HCFA policy." [384]

In reaching the conclusion that Interim's three component A & G methodology did not violate applicable Laws, the Court has taken notice of the overwhelming weight of the expert evidence on this issue. Interim's outside healthcare attorneys, the Pyle law firm, and the healthcare experts who reviewed Interim's cost reports during the due diligence leading up to the Sale, all were satisfied that the three component A & G methodology was appropriate.[385] Mr. Simione, Spherion's healthcare consultant in this litigation, and one of the architects of the step-down methodology for reimbursement of home healthcare providers, was unequivocal in his opinion that Interim's three component A & G methodology complied with applicable Laws.[386] Even Mr. Curtis, when he was paid to advocate Interim's position before the FI and HCFA, expressed his view that the FI was employing an unreasonable interpretation of HCFA's requirements relating to step-down methodologies.[387]

Finally, the Court is satisfied that the concerns that caused PGBA to "collapse" the A & G into one cost center were

---

382. *See* DX 9, Attach. H, at 2; DX 62; DX 218.

383. *In Home Health,* PRRB Case No. 95–2210 GE.

384. The Court also refuses to find a breach of Section 3.17 simply because Interim did not comply with the letter of Transmittal 4. The Court is satisfied that Interim complied "in

all material respects" with Transmittal 4 as required by the Agreement. *See* D.I. 101, at 93–95; D.I. 106, at 141–42; DX 87, at 37–38.

385. DX 210; PX 134; DX 75.

386. D.I. 119, at 26; D.I. 130, at 4, 17–19.

387. DX 5.

unfounded. Indeed, HCFA agreed to reverse this adjustment prior to the settlement of all outstanding audit issues.[388] Moreover, no expert has opined that the collapse of the A & G was warranted and, given the Court's conclusion that the three component A & G methodology was proper, the Court can find no reason to disagree with the experts.

In sum, the Court concludes that the plaintiffs have failed to prove by a preponderance of the evidence that Interim's three component A & G cost allocation methodology constituted a material violation of applicable Law.

### 7. The Allocation of Capital Costs

According to plaintiffs, the PRM requires that chain providers allocate home office costs in "a manner reasonably related to the services received by the entities in the chain...."[389] With respect to capital costs, plaintiffs contend that such costs may be allocated on a functional basis only "if there is a correlation of a statistic and a specific function," i.e., a reasonable relationship between the allocation statistic and a department's use of the services provided by the cost center whose costs are being allocated.[390]

Spherion counters that the Medicare regulations are silent as to the use of "square outage" or any other specific statistic when allocating capital costs on a functional basis.[391] Spherion contends that the use of a square footage statistic in its case yielded a substantially more "equitable" allocation of costs than the "total costs" statistic proffered by the plaintiffs (and endorsed by PBGA after the audit).[392] As "equitable" cost allocation is at the heart of Medicare's cost-based reimbursement scheme, Spherion contends that an allocation of capital costs that is "equitable" is, per se, lawful.[393]

The parties appear to agree that neither the Medicare regulations nor the PRM prescribe the use of a particular functional statistic for purposes of allocating home office capital costs. Rather, the theme that surfaces throughout the PRM is that capital costs must be allocated on an "equitable" basis.[394] To establish that Interim

---

**388.** Plaintiffs' argument that Interim's allocation methodology produced an inequitable result irregardless of whether it complied with Transmittal 4 is, in essence, a restatement of the "collapse" adjustment that was ultimately reversed by HCFA. *See* PX 313. The Court cannot conclude on this record that plaintiffs have proven that "inequitable" reimbursement occurred as a result of Interim's cost allocation methodology.

**389.** PX 334, at PRM § 2150.3.

**390.** D.I. 121, at 20–21. HCFA's instruction to home offices is first to allocate those expenses that can be allocated directly and then, as a next step, allocate those costs that cannot be allocated directly on the basis of a functional statistic.

**391.** D.I. 119, at 98.

**392.** *Id.* at 102–03.

**393.** *Id. See generally* 42 C.F.R. § 413.130.

**394.** *See e.g.* PRM, § 3104C ("Cost of home office operations—allocate among the providers the allowable costs not directly allocable on a basis designed to equitably allocate the costs over the chain components or activities receiving the benefits of the costs and in a manner reasonably related to the services received by the entities in the chain."); PRM, § 2150.3 C ("Costs Allocable on a Functional Basis—The allowable home office costs that have not been directly assigned to specific chained components must be allocated among the providers ... on a basis designed to equitably allocate the costs over the chain components or the activities receiving the benefits of the costs."); PRM § 2150.3 D ("Pooled Costs in Home Office—[Pooled] costs may be allocated to the components in the chain on the basis of beds, bed days or other basis, provided the basis used equitably allocates such costs.").

allocated its capital costs in a manner that was not "in compliance in all material respects with applicable Laws," plaintiffs must demonstrate that the use of a square footage statistic yielded an inequitable allocation of capital costs from the home office servicing center to the other components of the Interim chain. Plaintiffs have not carried their burden of proof on this issue.

Plaintiffs contend that square footage was not reasonably related to the costs Interim was attempting to allocate. They contend, therefore, that Interim was obliged to allocate costs on the basis of "total cost." Yet plaintiffs offered absolutely no evidence to suggest that this simplistic method of cost allocation would have yielded a more "equitable" result. In this regard, the Court notes that the PRM does not qualify its use of the term "equitable"—it does not, for instance, state that the cost allocation methodology must be "equitable" only in the eyes of HCFA and/or its FIs. Equity runs both ways; the allocation of costs must be equitable to both parties involved, the provider and the Medicare program.

On this notion of "equitable" cost allocation, the Court found Mr. Simione's testimony particularly persuasive. Mr. Simione opined that allocating capital costs on the basis of square footage was a more "equitable" allocation methodology than allocating on the basis of total costs as suggested by PGBA.[395] Specifically, Mr. Simione testified:

> What they're doing is ... trying to mandate that you go from a more sophisticated approach to the least sophisticated approach, which is pooled cost and using

the least sophisticated statistic for pooled cost being total cost.

> Really what they are saying here is that, and that is the least, what pooled costs say when you have to allocate it on total costs is that because a component or a cost center costs more, it should take down more A & G costs to it, and there's no relationship between those ... they force them into using a statistic that was really unequitable, extremely unequitable.

> * * *

> I'm not saying its [square footage] the most equitable way, but its a lot more equitable than throwing it into total costs.[396]

While it may be true that there is no direct correlation between square footage and the capital costs of the servicing centers, there is likewise no correlation between the amount of time people spent at the home office (servicing center) to support the second-tier cost centers and the total cost statistic used to allocate home office salaries.[397] Nevertheless, Medicare requires salaries to be allocated on the basis of total costs.[398] Thus, Medicare in its own instructions, appears to recognize that there may not always be a correlation between the costs to be allocated and the statistic used for the allocation.

Moreover, the Court notes that other FIs have recommended the use of square footage as an appropriate statistic to allocate capital costs. For instance, Mr. Simione persuasively relied upon a 1992 Case Study prepared by Blue Cross and Blue Shield Association, a HCFA FI, in which Blue Cross provides examples where square footage has been utilized as

---

**395.** D.I. 119, at 102–03, 109.

**396.** *Id.* at 102–03, 109.

**397.** D.I. 130, at 80–82.

**398.** *Id.*

a statistic to allocate capital costs.[399] Square footage is also recognized in the PRM as a legitimate basis to allocate capital-related costs in certain instances.[400] Given that square footage is a statistic that has been endorsed by HCFA and its FI as a means to allocate capital costs, the Court is hard-pressed to conclude that Interim's utilization of this statistic (even if ultimately determined by the FI and HCFA to be improper) violated "applicable Laws" in breach of the Agreement.

Finally, unlike Interim's three component A & G methodology, which plaintiffs contend was not clearly reflected in the Interim costs reports, the use of square footage as a statistic to allocate capital costs without question was reflected in Interim's cost reports going back to at least 1994.[401] The 1994 cost report was the subject of a "desk review" performed by Aetna which resulted in substantial adverse adjustments. Yet the use of square footage as a statistic to allocate capital costs—clearly reflected in Schedule F of the cost report—was not challenged.[402] These same cost reports were reviewed by plaintiffs own healthcare experts during due diligence, and the use of the square footage statistic again was not identified as an

issue for concern.[403] Indeed, E & Y concluded that Interim's cost reports, in general, were "conservative" and that "there may be opportunity *to increase* reimbursement by refining the cost allocation methodologies used." [404] Thus, when the Court weighs the experts' respective views regarding the propriety of Interim's cost reporting methodologies, including the use of the square footage statistic, the Court cannot ignore the fact that three healthcare experts—E & Y, Judy Bishop, and Mr. Simione—have not taken issue with the square footage statistic.[405]

## 8. The Allowance of Regional Vice–President and Branch Manager Costs

Plaintiffs contend that Interim's allowance for regional vice-president and branch manager costs violated applicable Laws because these positions involved a certain level of non-allowable marketing activity.[406] HCFA distinguished between allowable education activities—activities intended to advise providers regarding the availability of services—and non-allowable marketing activities—activities designed to

---

**399.** DX 87, at Ex. 1.

**400.** PRM § 1709; DX 87, at Ex. 10; D.I. 119, at 109–10 ("Capital-related costs, movable equipment, all expenses, i.e., interest, personal property taxes for movable equipment should be allocated to the appropriate cost centers on the basis of square feet of area occupied or dollar value.")

**401.** D.I. 130, at 32–33.

**402.** *Id.*

**403.** DX 75; DX 76.

**404.** DX 75 (emphasis supplied).

**405.** The Court notes that it did not hear from any representatives of PGBA or HCFA during

trial. In any event, the fact that PGBA took issue with Interim's cost reporting methodologies, at the end of the day, carries little weight with the Court given that its initial adjustments, totaling nearly $40 million, were *drastically reduced in the final global settlement* (to approximately $5 million). To reiterate, the fact that PGBA was prosecuting *alleged* improprieties in the cost reporting methodology through the civil administrative process by no means indicates that such improprieties *actually occurred* or that they rose to the level of a violation of Law.

**406.** D.I. 100, at ¶ 13. After determining that regional vice presidents and branch managers were engaged in non allowable marketing activities, PGBA disallowed 25% of branch manager and 100% of regional vice president salaries. D.I. 106, at 168.

increase utilization of services.[407] In addition to these PRM references, plaintiffs rely upon the testimony of Mr. Curtis who opined that FIs required providers to support their allocation of salary costs with documentation that demonstrated that the employee was engaged in allowable activities, and that the failure to maintain such documentation violates Medicare Law.[408]

To succeed on their claim that seeking reimbursement for branch manager and regional vice president salaries violated the Law, plaintiffs bore the burden of proving that these Interim employees engaged in improper, non reimbursable marketing activity. To sustain this burden, plaintiffs produced expense reports that indicated that a branch manager may have taken a dozen donuts along to a meeting at a medical provider's office.[409] Plaintiffs also introduced job descriptions for the regional vice-president and branch manager positions, both of which indicate that the positions involved some level of "marketing" and/or sales.[410] On the other hand, the Interim executives who testified at trial indicated that, in fact, neither the regional vice-presidents nor the branch managers actually engaged in significant marketing

or sales activities. They simply did not have time to do so given their other responsibilities.[411]

Plaintiffs correctly observe that certain branch managers acknowledged during field interviews that they were engaged in some "small amount of marketing." [412] But Interim also "[self]-disallowed some regional sales managers" and did not seek reimbursement for these costs.[413] That is as far as the evidence will take the plaintiffs on this claim. The fact that a branch manager or regional vice-president may have brought donuts to a meeting is not competent proof that these employees were involved in disallowed marketing activity, and is certainly not proof that Interim violated the Law when it allocated a portion of these costs to Medicare.

Finally, the Court cannot help but take notice once again that the Interim cost reports for 1992 and 1994 were reviewed by the FI and the allowance for regional vice-president and branch manager salaries was never questioned. Indeed, Aetna discouraged Interim from utilizing the very time studies that both PGBA and Aetna (and now Mr. Curtis) maintain

**407.** The PRM, at Section 2136.1, provides:

Costs of activities involving professional contacts with physicians, hospitals, public health agencies, nurses associations, state and county medical societies, and similar groups and institutions, to apprise them of the availability of the provider's covered services are allowable. Such contacts make known what facilities are available to persons who require such information and providing for patient care, and serve other purposes related to patient care, e.g., exchange of medical information on patients and the provider's facility, administrative and medical policy, utilization review, etc. Section 2136.2, on the other hand, provides:

Costs of advertising to the general public which seeks to increase patient utilization of the provider's facilities are not allowable.

Situations may occur where advertising which appears to be in the nature of the provider's public relations activity is, in fact, an effort to attract more patients.

**408.** D.I. 106, at 220 (incorrectly referenced in the plaintiffs' opening brief (at p. 26–27) as an admission from Interim's Mary B. Sneed; actually testimony from plaintiffs' expert, Thomas Curtis). *See also* D.I. 136, at 26–27.

**409.** PX 604.

**410.** PX 602; PX 603.

**411.** *See* D.I. 123, at 59–60; D.I. 101, at 105–10.

**412.** D.I. 118, at 53–54; D.I. 101, at 105–06.

**413.** D.I. 101, at 105–06.

should have been prepared in order to support the allocation of these executive-level costs.[414] The absence of these time studies was cited as a primary basis for the audit adjustments.[415] But, according to Mr. Simione, HCFA traditionally has not required time studies for senior executive positions within healthcare entities.[416]

One can readily glean from the PRM's less than definitive guidance that providers walked a fine line between "education" and "marketing." Given this fine line, and the paucity of record evidence demonstrating that the Interim executives in question were engaged in significant non-allowable activities, the Court concludes that plaintiffs have not carried their burden of proving a material breach of Section 3.17 with respect to this issue.

### 9. The Failure to Adjust Visits to the Provider's Statistical and Reimbursement Report

Interim's FI would process its requests for PIP throughout the course of a year and, from time to time, would reject requests that were improperly submitted for various reasons.[417] The FI would prepare a running tally of disallowed requests for reimbursement called the Provider Statistical and Reimbursement Report ("PS & R"). Needless to say, the provider is not entitled to be reimbursed for costs associated with rejected visits.[418] Plaintiffs allege that Interim failed to reconcile its year-end cost reports with the PS & R to ensure that it was not seeking reimbursement for costs associated with disallowed visits. According to the plaintiffs, this constituted a violation of Law.[419]

Interim's own billing records reflected disallowed visits.[420] Yet plaintiffs have failed to identify any Law that would require Interim to compare its own records to a PS & R to ensure that its own records captured all disallowed visits. Nor have plaintiffs demonstrated that Interim's records were somehow deficient in capturing disallowed visits, or that Interim did not review its own records prior to submitting its year-end cost reports. In any event, HCFA's own instructions to providers suggest that cost reports can be submitted without reconciling them to the PS & R.[421]

414. "Time studies" are employee surveys that breakdown how the employee spends his/her time during the workday. *See* DX 87, Ex. 14 (Interim writes to Aetna: "You cautioned us on the use of time studies to allocate common salaries."). *See also* DX 4 (Agenda for 12/18/98 meeting indicating that "time study requirements is new"); DX 119 (Agenda for August 14, 2000 meeting noting "PGBA & Aetna have different opinions of time studies/time records"); DX 17 (notes from September 30, 1998 meeting: "... we were told by Aetna that time studies would not be accepted as documentation for the cost report. Now it's hard to be told that a time study is the only thing that would save us when Aetna originally told us that time studies would not be accepted.").

415. PX 739, at 11.

416. D.I. 119, at 122 (no manual instruction and he has never seen a FI require time studies to support salaries of senior executives).

417. *See* D.I. 101, at 109–11 (Ms. Watson testified that reasons a bill might be rejected include "if they ask for documentation and we did not have it—there was not documentation of a visit or if orders were not signed or if it wasn't reasonable and necessary."); PX 739, at 12.

418. *Id.*

419. D.I. 121, at 43 (According to Mr. Curtis, "[Interim wasn't] in compliance with law because they made a claim for visits that they knew were not paid or going to be paid by Medicare.").

420. D.I. 109, at 212–13.

421. *See* PRM Pub. 15–2 § 1102–3 N; PRM Pub. 15–1 § 2408.2.

Moreover, the fact that the detailed PS & R is available from the FI only "on request" belies the suggestion that HCFA, as a matter of law, requires the provider to reconcile its cost report with the PS & R.[422]

In sum, while it may have been prudent for Interim to attempt some reconciliation of its cost report with a PS & R, plaintiffs have failed in their burden of proving that the failure to do so constituted a material violation of Law.

### 10. The Miscellaneous Violations of Law

Plaintiffs contend that Spherion did not contest plaintiffs' allegation that Interim's 1996 and 1997 cost reports violated applicable Law in several additional respects, including the failure to allocate costs associated with routine medical supplies between reimbursable skilled intermittent services and non-reimbursable services, and the attempt to classify Interim's special billing department as "benefitting both the skilled intermittent and private duty nursing."[423] After reviewing these claims, the Court cannot conclude that plaintiffs have carried their burden of proving that the adjustments for medical equipment and billing department allowances constitute material violations of any Laws. As Mr. Curtis acknowledged, ninety percent of cost reports are adjusted by the FI in some manner or another.[424] When adjust-

ments are made, the FI has determined that the cost report is "incorrect" in some respect.[425] The fact that a cost report contains "incorrect" information does not, however, equate to a violation of Law.[426]

### 11. Causation and Damages

 The Court has concluded that plaintiffs have not proven that any of Interim's cost reports were submitted to HCFA in violation of the Agreement's Medicare representations and warranties. Yet even if plaintiffs had proven a breach, they still could not recover under the indemnification provisions of the Agreement because they have not proven their damages with the requisite specificity. As Professor Williston has observed:

> [D]amages which are considered too remote and speculative are not recoverable. Where actual pecuniary damages are sought, there must be evidence of their existence and extent, and some data from which they may be computed: The amount of damages must be established with reasonable, not absolute, certainty. . . . It is sufficient if a reasonable basis for computation of damages is afforded, even though the result will only be approximate.[427]

In this case, Interim (as acquired) seeks indemnification for amounts paid to CMS in global settlement of all adjustments made to Interim cost reports from 1994

---

**422.** *See* Medicare Intermediary Manual CMS Pub. 13–2 §§ 2242, 2243. To the extent that Medicare Law required the provider to reconcile to the PS & R, one would think that HCFA would regularly supply the required information to the provider to ensure compliance. As stated, under current practice, if the provider wants a PS & R, they have to ask for it.

**423.** D.I. 136, at 28.

**424.** D.I. 121, at 106.

**425.** *Id.*

**426.** *Id.* at 106–07. Having found that Interim's cost reporting methodologies did not breach the Agreement, the Court need not address plaintiffs' argument that Interim improperly certified the accuracy of its cost reports or improperly failed to submit its cost reports under protest. *See* D.I. 136, at 33.

**427.** 24 WILLISTON ON CONTRACTS, § 64:8 (4th Ed. 2002).

through 1999. The total settlement was approximately $5.2 million, and plaintiffs seek the entirety of this amount.[428]

The claim for indemnification damages is flawed for two reasons. First, the representations and warranties to which the right to indemnification attaches are expressly limited to pre-Sale cost reports, and to liabilities not disclosed in the Schedules to the Agreement.[429] Yet the global settlement included post-Sale cost reports and the 1994 cost reports, the potential liability for which was disclosed in the Schedules. Plaintiffs made no effort to secure a breakdown or itemization of the specific claims that were part of the global settlement or the specific dollar amounts attributed to each claim.

Plaintiffs were well aware of the limitations of Spherion's express warranties and should have been aware, therefore, of the need to specify those damages attributable to conduct that was not warranted. Plaintiffs elected not to do that, however, and have declined in this litigation to explain or justify the manner in which the Medicare claims were settled. Instead, they have proffered various reasons why the Court should award the entire settlement amount as Damages, or suggested various formulas the Court might employ to extract from the global settlement the parties' intent with respect to the settlement of claims subject to warranty.[430] As fact-finder, the Court declines to attempt the extraction. The damages are too speculative and are not subject to "a reasonable basis for com-

putation." The Medicare indemnification claim fails for this reason as well.

## C. The Interim Financial Statements

### 1. The Parties' Contentions

 Plaintiffs contend that Interim maintained its financial records in a manner that violated Sections 3.7 and 3.29 of the Agreement. In Section 3.7, Spherion represents and warrants that Interim's financial statements were "prepared in accordance in GAAP" and that they "present[ed] fairly in all materials respects the consolidated financial position and results of operations of [Interim]—as of and for the periods indicated—and are consistent with the books and records of [Interim] for such periods."[431] In Section 3.29, Spherion represented and warranted "that the Transferred Entities do not have any accrued, absolute, contingent or other liability except as disclosed."[432] According to the plaintiffs, these representations were inaccurate because Spherion did not maintain adequate reserves for Medicare liability, did not account for the impact of "segment reporting," and did not adequately disclose the liability to Medicare created by Interim's improper cost shifting methodologies.[433] Spherion denies that Interim's financial statements were prepared improperly, were inaccurate, or otherwise breached any provision of the Agreement.

Neither party disputes that a healthcare provider participating in the Medicare program must set reserves to account for cost

---

**428.** D.I. 100, at ¶ 121; D.I. 125, at 29–31; DX 276.

**429.** PX 172, at §§ 3.16(a) & (b), 3.17.

**430.** *See* D.I. 136, at 65–68.

**431.** PX 172, at § 3.7.

**432.** *Id.* at § 3.29.

**433.** The plaintiffs' criticism focuses on the adequacy of the reserves carried by Interim for Medicare accounts receivable. They contend that Interim's Medicare reserves were too low and that, consequently, the earnings attributed to Medicare receivables were too high. This, of course, skewed plaintiffs' valuation of Interim which was the product of a multiple of Interim's EBITDA.

report adjustments.[434] Beyond acknowledging this basic notion of corporate responsibility, the parties take very different views regarding the adequacy of the reserves Interim carried on its books for cost report adjustments. Indeed, the parties cannot even agree on the actual amount of reserves that Interim carried at any given point in time or where in Interim's financial statements the Court should look to find the actual reserves. Plaintiffs contend that as a result of inexplicable "reversals" in the reserve for cost report settlements made near the end of 1996 at the direction of Mr. Haggard, Interim closed 1996 with only $15,000 booked as reserves for Medicare losses as reflected in Interim's income statement.[435] According to the plaintiffs, this amount was as little as $585,000, and as much as $3.6 million short of the amount required to address probable Medicare losses identified (or identifiable) by Interim as of the end of 1996.[436]

Spherion's argument regarding the adequacy of the Medicare reserves focuses on Interim's balance sheet. According to Spherion, Interim's balance sheet reflects a 1996 year-end reserve for cost report settlements of $707,795.[437] This balance incorporates the $300,000 reversal authorized by Mr. Haggard in November, 1996, and the $250,000 reversal authorized by Mr. Haggard in December, 1996.[438] As of the time of the Sale in September, 1997, Spherion's balance sheet reflects that reserves for cost report settlements rose to

$3,088,129.[439] Spherion contends that these reserves were more than adequate, were set in compliance with GAAP, and were accurately reflected in Interim's financial statements.

## 2. The Adequacy of Interim's Reserves

The balance sheet reflects a "snapshot" of a firm's financial state at a given time, and reveals a cumulative picture.[440] In this case, the Court finds that the cumulative picture depicted in Interim's balance sheet offers the most accurate and appropriate measure of the adequacy of Interim's reserves to address contingent liabilities. The income statement simply does not provide a complete and accurate image of the reserve picture.[441] The cumulative reserve on the balance sheet reflected Interim's ongoing assessment of its exposure to Medicare adjustments, not only for the current year but also for past years for which Interim may still be liable.[442] This was an appropriate means by which to account for reserves on receivables and contingent liabilities.[443]

Having determined that the balance sheet is the appropriate source from which to determine whether Interim carried adequate reserves, the Court must determine whether Interim's reserves were sufficient to address Medicare adjustments that Interim management knew its FI and/or HCFA probably would make to the as-filed cost report. Plaintiffs advance two argu-

434. D.I. 111, at 36–37; D.I. 130, at 125–28.

435. PX 102; D.I. 111, at 51–52.

436. D.I. 111, at 51.

437. DX 56.

438. *Id.*

439. DX 57; DX 122, at 40.

440. D.I. 111, at 42; D.I. 130, at 125.

441. Even plaintiffs' own accounting expert acknowledged that "the balance sheet reserve is going to be reflective of reserves throughout ownership of an organization, whereas the income statement is strictly looking at a reserve for a given point in time—for that current year." D.I. 111, at 42.

442. D.I. 109, at 197–200.

443. D.I. 130, at 125–30.

ments in support of their contention that the balance sheet reserves were inadequate. First, they challenge the *bona fides* of the reserve number reflected in the balance sheet. Second, they contend that Interim's own "Medicare group" advised Spherion senior management that Interim's likely liability to Medicare far exceeded its established cost report reserves. The Court will address these arguments in turn.

Plaintiffs contend that the increase in the amount of reimbursable costs reflected in the 1996 year-end cost report resulted from Spherion's allocation to Medicare of additional home office costs that were generated after Spherion acquired a commercial staffing business in 1996.[444] Plaintiffs note that this newly acquired business was not involved in providing covered services to Medicare beneficiaries. Nevertheless, Interim allocated some of these costs to Medicare in its 1996 year-end cost report.[445] Without any citation to the record, plaintiffs then summarily conclude that the allocation of such costs was improper because they were not reimbursable.[446] The Court has searched for testimony in the record, either from fact witnesses or expert witnesses, specifically addressing the impropriety of this allocation. The Court has found no such testimony. Moreover, contrary to plaintiffs' suggestion, Mr. Krause did not acknowledge that all of the

increase in costs reflected in the 1996 year-end cost report arose from the newly acquired business. Instead, he testified: "Those were parts of it. I don't know if that was all or the primary cost, but the whole headquarters cost had increased in '96 as the company got substantially bigger."[447]

The Court cannot conclude that the increase in Interim's Medicare reimbursable costs, as reflected in the 1996 year-end costs report, and the resulting increase in reserves booked by Interim as a result of the increased reimbursable costs, amounted to the recognition of "baseless revenues," as plaintiffs contend.[448] The evidence simply does not support this conclusion.

As to the contention that Interim's "Medicare Group" told Spherion management to increase the cost report reserves, plaintiffs rely principally upon three documents in the record. The first document, prepared by the Medicare group, considered potential issues that could lead to cost report adjustments, but did so in a format that was not preferred by Interim senior management. According to Ms. Watson and Ms. Snead, they were directed to discard that document and to prepare new documents that separated the issues in one document on the basis of adjustments likely to occur, and in another document on

444. D.I. 136, at 36. The sharp increase in Interim's year-end reserves is explained, in substantial part, by the difference between the Medicare revenues Interim projected it would receive as a result of its PIPs and the final amount of Medicare reimbursement sought in the as-filed year-end cost reports. Rather than record the approximately $3 million difference as additional revenue, Interim chose not to make a journal entry for the additional revenue and to carry the amount as a Medicare cost report reserve. DX 57; D.I. 118, at 26–27, 33. This practice was consistent with GAAP, which requires that adjustments to the financial records occur at the time the new

information justifying the adjustment is discovered (as opposed to going back to adjust previously prepared financial statements). *See* D.I. 131, at 17; D.I. 137, Ex. 3, Haggard Dep. at 327.

445. D.I. 119, at 108–10.

446. D.I. 136, at 36.

447. D.I. 119, at 108.

448. *See* D.I. 147, at 145–46 (Plaintiffs' counsel's characterization during oral argument).

the basis of adjustments not likely to occur.[449] All of the information presented in the first document was included in the two later-prepared separate documents.[450] As Ms. Watson testified:

> I think I went in with here's all the issues, and some of them I felt really were ridiculous and should not need to be reserved for. But given the fact that the intermediary can do what they want to do, we put them all on.
>
> * * *
>
> Then they [senior management] would have made the determination of how much the reserve would be. Then we would go back and kind of fit it in to the two saying, well, these we're going to reserve for, and these weren't reserved for, but we didn't want to disregard the fact they were still an issue.[451]

The two documents that were prepared to reflect potential issues for adjustment, although not expressly phrased in terms of "probability," presented the issues of concern in a manner that would allow senior management to assess the need for reserves.[452] The document entitled "Issues Most Likely to Occur Requiring Reserve,"

in essence, reflects the Medicare group's assessment that adjustments were "probable" (hence, the conclusion that reserves were appropriate.)[453] The corresponding document, "Issues Not Likely to Occur, therefore, Not Reserved," reflects the Medicare group's assessment that adjustments related to the issues identified therein were not "probable."[454] These documents were prepared in April, 1997. At that time, Interim carried a total reserve on its balance sheet of approximately $4,574,281.[455] The Medicare group recommended that reserves be set at $4,612,497.[456] According to the Medicare group, then, Interim was under-reserved by $38,216 as of April, 1997.[457] The difference is not significant in the context of the ongoing assessment of reserves and certainly not, in and of itself, evidence of a breach of Section 3.7.[458]

The Court's factual consideration of this claim recognizes that the process of setting reserves requires management to perform a series of ongoing estimates using its best judgment.[459] Indeed, as Mr. Krause testified:

> Q. Now, with respect to the reserve, whether on the profit and loss state-

---

449. *See* PX 21; PX 122; D.I. 106, at 55–57, 59.

450. D.I. 106, at 56–57.

451. D.I. 101, at 61, 67.

452. Management must determine, on the basis of "probability," the "net realizable value" of the accounts receivable. D.I. 130, at 126, 129. In other words, the firm bills for an amount it believes that it is entitled to receive, but then assesses the amount it will probably receive. The difference represents the amount reserved against accounts receivable. *Id.* at 125–29.

453. PX 121; D.I. 130, at 125 (Reserves against receivables reflect what will probably be realized in the judgment of management).

454. PX 122.

455. PX 121.

456. *Id.*

457. *Id.*

458. *See* DX 122, at 44 (concluding that reserves were set in accordance with GAAP and were adequate to address potential cost report adjustments). Obviously, the Court's finding that Interim did not breach any of the Medicare representations and warranties has influenced its analysis of whether Interim management properly assessed the likelihood of adjustments to Interim's requests for reimbursement from Medicare.

459. D.I. 111, at 83 (Dugan); D.I. 130, at 125 (Wright); D.I. 109, at 193–94 (Krause).

ment or on the balance sheet, to what extent does management's judgment or estimates come into play with regard to any of these reserve items?

A. Well, they're all estimates because, when you establish a reserve account, you're looking at the probability of something happening differently than what you have recorded on the general ledger. So, you are making an estimate and a judgment, and you need to consider it probable and accruable at that point in time, and you make an adjustment for that.[460]

At times, Interim senior management would rely upon the information received from the Medicare group in evaluating the adequacy of Interim's reserves. At other times, however, senior management made the determination that the Medicare group was not being reasonable and would ask them to consider other factors in reassessing their conclusions.[461] This is precisely the process contemplated by GAAP, and there is no compelling evidence in the record that Interim management varied from this accepted practice.[462] The fact that Interim made significant year-end adjustments to its reserve account is not unusual given the fact that management had acquired more information upon which to base its estimates.[463]

Finally, the Court addresses plaintiffs' argument that the financial statements violated the Agreement because they did not account for the impact of "segment reporting"—a process whereby the financial statements would reflect the impact on Interim's revenue of separating the healthcare business from Spherion's other business segments. The Court must reject this argument for the simple reason that it ignores the very documents upon which it purports to be based. First, the audited historical financial statements themselves warn:

> Principally due to the use of estimates in allocations, the financial information included herein may not reflect the financial position and results of operations [of Interim] in the future or what the financial position and results of operation [of Interim] would have been had it been a separate, stand-alone entity during the periods presented. Management does not consider it practical to estimate what the results of operation would have been had the Company operated as a separate stand-alone entity.[464]

**460.** D.I. 109, at 194.

**461.** D.I. 137, Ex. 3, Haggard Dep. at 42.

**462.** D.I. 131, at 15, 17. It should be noted that D & T raised no concerns regarding the adequacy of Interim's reserves, an opinion implicitly echoed by E & Y when it later concluded that D & T's audit reflected "adequate" procedures and "consistent" application of "accounting principles." DX 147. *See also* DX 9 (D & T audit report).

**463.** D.I. 131, at 11–12. *See also*, D.I. 130, at 127–28 ("The setting of reserves is—is a process of estimate—of making estimates. Information that a company ... has access to constantly changes. And as such, it is—it is imperative upon management to make the appropriate estimates as one passes through the course of the year" to reevaluate what is expected to be collected as information becomes—new information becomes available.). In this regard, it is important to note that Interim's audited historical financial statements are dated December 23, 1996. DX 9, Attach. A, at 5. To the extent additional information was developed after these documents were prepared, the adjustments would be recorded in the cumulative balance sheet, not by making retroactive adjustments to the income statements. D.I. 131, at 17.

**464.** DX 9, Attach. A, at 7. Alex.Brown also made it clear in the Offering Memorandum that "[e]ach recipient is responsible for conducting its own independent analysis of [In-

Then, in the Agreement's provision relating specifically to financial statements, the parties agreed:

The Healthcare Financial statements have been prepared from the separate records maintained by [Interim] and may not necessarily be indicative of the conditions that would have existed or the results of operations if [Interim] had been operated as an unaffiliated company. Portions of certain income and expenses represent allegations from corporate headquarters items applicable to [Interim] as a whole.[465]

In view of these multiple disclaimers, which appear throughout the relevant documents, it is difficult to conceive how plaintiffs can suggest that Spherion violated the Agreement by failing to account for "segment reporting." Spherion did not account for the impact of "segment reporting" because it determined that it was not practical to do so under the circumstances.[466] It then advised all potential purchasers of the limitations of the financial statements in the documents themselves and in Alex.Brown's Descriptive Memorandum, and then reiterated this disclaimer specifically to the plaintiffs in Section 3.7 of the Agreement. If plaintiffs had wanted to analyze the impact of "segment reporting," they could have attempted to do so with the information supplied by Spherion during due diligence.[467] The fact that

this analysis apparently was not undertaken by either party cannot now be manufactured into a claim of breach.

## D. The Remaining Section 10.1 Indemnification Claims

The Agreement contains two indemnification provisions relevant to this dispute, a general Seller's indemnification provision and a "Special Indemnity" provision.[468] The general provision is subject to the "Limitations" provision; the Special Indemnity contains its own limitations.[469] The "Limitations" provision sets a $2 million aggregate deductible and a $25 million aggregate cap on recoverable indemnification damages. The Court will address the remaining claims that are subject to the indemnification Limitations first, and then will address the one remaining special indemnity claim. After addressing each of the remaining claims of breach, the Court will give its final word on the plaintiffs' expectancy damages claim.

### 1. The Burns and Black Franchise Loans

 Plaintiffs allege that at the time of the Sale, the franchise loans extended to the Black Franchise and the Burns Franchise were impaired and should have been written down or reserved against in the amount of $230,000 for the Burns loan and $130,00 for the Black loan.[470] Spherion dis-

---

terim] in connection with any proposed acquisition and for independently verifying the information contained herein." DX 72 at SPH012134.

**465.** PX 172, § 3.7.

**466.** DX 9, Attach. 5. Moreover, neither the audited historical financial statements nor the *pro forma* financial statements purport to analyze the effect or impact upon Interim's revenues of Interim's separation from Spherion. D.I. 109, at 229–30, 231. While certain adjustments were made in the *pro forma* finan-

cial statements, any adjustments to revenues appeared in the midst of multiple prominent disclaimers. *Id.* at 236.

**467.** *See* D.I. 121, at 102–04.

**468.** PX 172, at §§ 10.1, 10.4.

**469.** *Id.* at § 10.3.

**470.** D.I. 111, at 62–64, 72–73. The franchise loan portfolio was transferred from Spherion to Interim as part of the Sale. PX 174, at § 1.38.

agrees, noting that the Black loan, while delinquent, was adequately collateralized, and the Burns loan was only two months in arrears at the time of the Sale, with no portion of the principal being due.[471] Once again, the Court is called upon to determine whether Interim's management exercised appropriate judgment in setting reserves and accounting for potential losses. And, once again, the parties' experts are diametrically opposed in their view on this issue.

To prove a breach of the Agreement, the plaintiffs must establish that Interim's accounting treatment of the Burns and Black franchise loans did not comply with GAAP,[472] or that the impaired loans represented a "liability" that should have been disclosed in the schedules to the Agreement.[473] They have not met their burden of proof on either front.

The Burns and Black franchise loans both were backed by the personal guarantees of the franchise owners and were collateralized by accounts receivable, tangible property and the franchise territories.[474] And, although both franchises were struggling in their start-up phases, this quite common phenomenon does not, in and of itself, indicate a probability of ultimate failure.[475] The financial condition of both franchises appear to have been improving in the months leading up to the sale.[476] The indications that the franchises were facing financial difficulties were not such that Interim should have concluded that it would not eventually collect all amounts due, including any interest accrued during the periods when payments were interrupted.[477] Indeed, Interim's success with franchise loans was quite impressive; it had not written off a franchise note in any of the five years preceding the Sale.[478]

Interim's decision not to write-off or reserve for the Black and Burns franchise loans was supported by its auditor, D & T, who concluded:

> The Franchise notes are collateralized by the Franchise's receivables. Further, the amount to be borrowed cannot exceed 90% of the outstanding receivable balance. There are other covenants that must be met by the Franchisees, such as certain debt to equity ratios, timely financial statements, timely Medicare reimbursement cost reports, etc. . . . Based on the above, there does not appear to be a need for an allowance regarding the Franchise Notes Receivable.[479]

E & Y likewise raised no concerns regarding the viability of franchise loans in its review of Interim's operations.[480] Aside from the opinion of their accounting expert—an opinion the Court has found to be

471. DX 122; DX 288.

472. PX 172, at § 3.7.

473. *Id.* at § 3.29.

474. PX 8–12; PX 87–89, PX 93–94.

475. D.I. 131, at 27–29.

476. DX 122; D.I. 100, at ¶ 165.

477. *See* DX 122, at 52 (citing paragraph 8 of FASB Statement 114; "A loan is not impaired during a period of delay in payment if the creditor expects to collect all amounts due including interest accrued at the contractual interest rate for the period of delay. Thus, a demand loan or other loan with no stated maturity is not impaired if the creditor expects to collect all amounts due including interest accrued at the contractual interest rate during the period the loan is outstanding.").

478. D.I. 131 at 31; DX 122, at 51.

479. DX 134.

480. DX 75.

less persuasive than Spherion's accounting expert's opinion—plaintiffs have failed to offer any evidence to advance their claim that GAAP required Interim (pre-Sale) either to write-off or reserve against the Burns and/or Black franchise loans or that the loans qualified as liabilities that should have been disclosed under the Agreement. Consequently, the claim fails.

### 2. The Huff Litigation

■■■ Spherion contends that it is not required to indemnify plaintiffs for the costs associated with the litigation initiated by Interim (post-Sale) to obtain insurance coverage for *Huff II* on three grounds: (1) because the liability in *Huff I* was covered by insurance, it was an "Excluded Liability" under the Agreement not subject to disclosure;[481] (2) Spherion reasonably determined that Interim was not liable for the claims made in *Huff II*;[482] and (3) the named defendant in *Huff II*, IHS, was not a "Transferred Entity" as defined in the Agreement.[483] The Court rejects each of these contentions, and finds in favor of the plaintiffs on this claim.

In Section 3.20 of the Agreement, Spherion warranted: "except as set forth in Schedule 3.20, there is no claim, action, suit, litigation, proceeding, or arbitration … ("Actions") pending or …. threatened against Seller related to [Interim] [or] any of the Transferred Entities…." [484] Unlike Section 3.29, which provides that any liability covered by liability insurance need not be disclosed, Section 3.20 makes no reference to the presence of insurance at all, and certainly does not excuse disclosure when the claims alleged in the "Actions" are covered by insurance.[485] *Huff I*, therefore, should have been disclosed to the plaintiffs in Schedule 3.20.

Although negotiations to settle *Huff I* began prior to the Sale, the actual settlement agreement was not consummated until June 2, 2000.[486] The litigation was voluntarily dismissed without prejudice in February, 1998.[487] Six months later, Mr. and Mrs. Huff initiated *Huff II* in which they made claims nearly identical to those raised in *Huff I*, and sought in excess of $15 million dollars compensatory and $25 million dollars in punitive damages.[488] Mr. and Mrs. Huff named IHS, a general partnership in which Interim was a general partner, as a defendant in *Huff II* and claimed that IHS was jointly and severally liable for all damages along with the other defendants.[489] IHS forwarded the complaint in *Huff II* to Spherion so that Spherion could seek coverage from its liability carrier.[490] The carrier denied coverage.[491] Spherion then rejected Interim's claim for indemnification, and further advised that it would not seek to compel coverage from its insurance carrier.[492]

The settlement agreement reached in *Huff I* left Interim, as a general partner in IHS, exposed to further liability in *Huff II*. Spherion knew that the plaintiffs had

481. PX 172, at § 1.30; PX 174, at Sch. 1.44.

482. D.I. 109, at 91–92.

483. *Id.* at 93.

484. PX 172, at § 3.20.

485. *Id.*

486. DX 295.

487. D.I. 100, at ¶ 141.

488. *Id.* at ¶¶ 142–45.

489. *Id.*

490. *Id.* at ¶ 146.

491. *Id.* at ¶ 147.

492. *Id.* at ¶¶ 147–48.

not released IHS,[493] knew that its insurance coverage, if any, for further claims was limited to $5.5 million,[494] and knew that the $50,000 settlement proceeds paid to Mr. and Mrs. Huff in *Huff I* was hardly satisfactory compensation for the catastrophic brain injuries suffered by their son.[495] Under these circumstances, the Court is satisfied that plaintiffs have carried their burden of proving a breach of Section 3.20 of the Agreement, and have further carried their burden of establishing a right to indemnification under Section 10.1 of the Agreement. The Damages incurred by plaintiffs to coerce Spherion's carrier to provide coverage for *Huff II* "arose out of" Spherion's failure properly to disclose *Huff I* in the schedules to the Agreement.[496] The Court also is satisfied that Spherion received timely notice of the claim.[497]

Interim incurred $91,180.26 in legal fees and expenses in its prosecution of the coverage action.[498] AIG paid $50,000 of these legal expenses as part of the settlement with Interim, leaving $41,180.26 to be indemnified by Spherion.[499] This claim is below the $2 million deductible, however, and is not compensable on its own. It will count towards plaintiffs' aggregate recoverable claim for indemnification under Sections 10.1 and 10.3.[500]

### 3. The Williams Litigation

■ The Court already has determined on summary judgment that Spherion breached Section 3.20 of the Agreement by failing to disclose the persistent pre-Sale threats of litigation against Interim made by the Williams franchise.[501] Specifically, the Court determined that Section 3.20 required Spherion to identify all threats of litigation, whether or not the litigation would result in a "material" loss as defined in the Agreement.[502] The Court concluded that the undisputed evidence of record demonstrated that the Williams franchise had threatened to sue Spherion on several occasions for territorial infringement and other claims. These claims ultimately formed the bases of the litigation initiated by the Williams franchise against Interim after the Sale.[503] Nevertheless, the Court declined to grant summary judgment to plaintiffs on their claim for indemnification upon concluding that the plaintiffs had not established causation as a matter of law. The causation issue, therefore, was the only remaining issue to be litigated at trial with respect to the Williams franchise litigation.

The Court finds that the plaintiffs carried their burden of proving causation at trial. A review of the schedules attached to the Agreement demonstrates that the parties were quite thorough in identifying potential liabilities and incorporating such liabilities within the detailed representations and warranties in the Agreement.[504] Had Spherion disclosed Ms. Williams' persistent threats of litigation to the plaintiffs, as well as the Williams' franchise regular defaults on its franchise responsibilities, it

493. DX 295.

494. PX 276.

495. DX 295.

496. PX 172, at § 10.1.

497. *See* PX 692.

498. D.I. 100, at ¶ 151.

499. *Id.*

500. PX 172, at §§ 10.1, 10.3.

501. D.I. 94, at 34.

502. *Id.*

503. D.I. 100, at ¶ 153.

504. PX 174.

is probable that the plaintiffs would either have sought specific indemnification protection from the Williams franchise claims or, at least, demanded that appropriate reserves be set for the contingent liability. Moreover, there can be no reasonable question that Interim's (as acquired) exposure to the Williams litigation Damages "arose out of" the inaccuracy of Spherion's representation that it had disclosed all threatened litigation.[505]

Contrary to Spherion's suggestion, the plaintiffs did not improperly prompt the Williams franchise to initiate litigation. Rather, to the extent Ms. Williams' motivation for filing suit can be gleaned from the record at all, it appears most likely that it was the plaintiffs' insistence that she comply with her franchise responsibilities (not routinely enforced by Spherion pre-Sale) that caused Ms. Williams to pull the litigation trigger. The litigation gun, however, had been pointed at Interim many times starting long before the Sale was even contemplated.

Based on the foregoing, the Court concludes that the Damages incurred by the plaintiffs in connection with the Williams litigation are indemnifiable.[506] The parties have stipulated that the fees and costs incurred by Interim to defend the Williams litigation were $290,717.25, and that these fees and costs were reasonable and necessary.[507] Interim paid the Williams franchise $100,000 to settle the claims that remained after dispositive motion practice.[508] Both the settlement proceeds and attorney's fees and costs are "Damages" as defined under Sections 1.19 and 1.65 of the Agreement.[509] Accordingly, the total Dam-

ages recoverable for the breach of Section 3.20 with respect to the Williams' litigation is $390,717.25, subject to the limitations provisions of Section 10.3 of the Agreement.[510]

## 4. Plaintiffs Are Not Entitled To Indemnification For Any Damages Indemnifiable Under Section 10.1

The aggregate of plaintiffs' Damages from Spherion's breaches of its Seller's representations and warranties that are indemnifiable under Section 10.1 is less than $2 million. Consequently, pursuant to Section 10.3, plaintiffs are not entitled to indemnification for these Damages.

## E. The Therapy Student Claims

 The claim for indemnification arising from the Therapy Student liabilities is not subject to the limitation provisions of Section 10.3. The parties anticipated that Interim would face claims from Therapy Students and other liabilities arising from the failed Therapy Student program so they negotiated special indemnification provisions to address these liabilities. These provisions, and the plaintiffs' entitlement to indemnification Damages thereunder, will be discussed below.

At the time of the Agreement, several matters relating to the Therapy Student program were either already in litigation, or soon to be in litigation.[511] Spherion was in the process of addressing these various claims prior to the Sale and, accordingly, the claims became a subject of certain indemnification provisions in the Agree-

**505.** PX 172, at § 10.1(ii).

**506.** PX 172, at §§ 3.20, 10.1(a).

**507.** PX 335.

**508.** PX 312; D.I. 155.

**509.** PX 172, at §§ 1.9, 1.65.

**510.** *Id.* at § 10.3.

**511.** *See* DX 112; PX 225; PX 223; PX 225; PX 239; PX 253. *See also* DX 174, at § 3.20.

ment.[512] The parties have stipulated regarding the universe of Therapy Student claims for which plaintiffs seek indemnification.[513] They have also stipulated regarding the amounts of claims paid by Interim in settlement of Therapy Student claims, and the amount of outstanding Therapy Student loans written off by Interim.[514] Finally, the parties have stipulated that plaintiffs are entitled to indemnification as to settlements paid to, or loans written off on behalf of, certain Therapy Students.[515]

As to the remaining Therapy Student claims or Therapy Student loan write-offs, Spherion contends that plaintiffs are not entitled to indemnification because: (1) the claims or loan write-offs identified by the plaintiffs do not relate to "Therapy Students" as that term is defined in the Agreement; and/or (2) any claims or loan write-offs for which plaintiffs seek indemnification are subject to a "bad debt reserve" provided for in the Agreement and, therefore, are not recoverable in this litigation; and/or (3) plaintiffs failed to provide timely notice of the claim(s) as required by the Agreement. The Court will address these arguments *seriatim.*

### 1. The Definition of Therapy Student In the Agreement

At Section 1.96, the Agreement defines "Therapy Students" as follows:

> 'Therapy Students' means those individuals who have signed an agreement with any of the Transferred Entities whereby they receive loans and partial advances

of tuition from such Transferred Entity for their education in physical therapy in exchange for their agreement to remain employed by such Transferred Entity for a specified period following licensure in the United States.[516]

Spherion contends that to qualify as a Therapy Student under the Agreement, one actually must have received a loan pursuant to a signed agreement. Under plaintiffs likely view of the Agreement, a participant in the Therapy Student program qualifies as a "Therapy Student" if the individual signed an agreement that provided for the individual to receive a loan, *vel non* the individual actually received it.

The parties have identified in their stipulation those individuals who did, and those who did not actually receive a Therapy Student loan.[517] As to those students who received loans from Interim or its affiliates, the parties appear to agree that these individuals are Therapy Students as that term is defined in the Agreement. The parties also have stipulated that, as to those students who did not actually receive a loan, each of them signed an employment agreement which required them to work for Interim, or its predecessor, TSS, "for a specified period following licensure in the United States."[518] Pursuant to the TSS Employment Agreement, students received a commitment that TSS would contribute $7,500 toward the student's "tuition" and would make a loan available to

---

**512.** PX 172 at §§ 1.96, 10.4.

**513.** D.I. 96; D.I. 132.

**514.** *Id.;* PX 336.

**515.** D.I. 96, at ¶¶ 11–15; D.I. 100, at ¶¶ 130–35; DX 74; PX 705.

**516.** PX 172, at § 1.96.

**517.** D.I. 132, at ¶¶ 1–2.

**518.** D.I. 96, at ¶ 10 ("Each student entered into an Employment Agreement in connection with his or her physical therapy education in the Netherlands identical to the Employment Agreements marked as plaintiffs' exhibits 704 and/or 705"); PX 704; PX 705.

the student for incidental expenses.[519] Whether the student accepted the loan was up to the student.

After a careful review of the operative language, the Court concludes that the only reasonable interpretation of the Agreement's definition of Therapy Student must focus on whether the individual signed an agreement that *provided for* loans and tuition assistance from either Interim or its predecessor, not whether the student actually received both a loan and tuition assistance. The definition of Therapy Student describes the requisite provisions of the employment agreement but does not specify whether the student must elect all of the benefits of the employment agreement to fall within the definition. Moreover, Spherion has failed to offer any meaningful justification—either in the tenets of contract construction or in the practical consequences of the competing constructions—for an interpretation of the definition that would allow Interim (as acquired) to seek indemnification for claims made by students who received loans, but would prohibit indemnification for claims made by those students who elected not to accept a loan. Like blue on black, the distinction makes no difference when considered in the context of the liability exposure to Interim that the parties intended Section 10.4 to address.[520]

## 2. The Therapy Student Reserve

Section 10.4(a) of Agreement provides, in pertinent part:

Seller shall indemnify Buyer Group with respect to Damages resulting from (i) the failure to collect on notes receivable from the Therapy Students, to the extent that such failure to collect exceeds the amount specifically reserved therefore ["the Therapy Student Reserve"] as of the Closing Date on the books and records [of Interim], as set forth on Schedule 10.4(a), (ii) claims by Therapy Students against the Seller Group with respect to obligations to Seller or the transferred Entities under those certain contracts concerning the education of the Therapy Students, ("Specified Damages").[521]

Spherion contends that the Therapy Student Reserve must be applied to reduce its obligation to indemnify plaintiffs with respect to all Therapy Student loans that were written-off, even those that were subject to "claims by Therapy Students against the Seller Group" as referenced in Section 10.4(a)(ii). Plaintiffs counter that the Therapy Student Reserve is referenced only in Section 10.4(a)(i) and, therefore, it is not applicable to the claims that are the subject of Section 10.4(a)(ii), even if such claims include Therapy Student loans written-off by Interim. Stated differently, plaintiffs contend that the Therapy Student Reserve does not apply to settlements of litigation or threatened litigation, even if the consideration for the settlement includes, in whole or in part, a write-off of a Therapy Student loan.

The Court will follow the interpretation of the Agreement proffered by the plain-

519. *See e.g.* PX 354; PX 355; PX 388; PX 392; PX 412; PX 451; PX 466; PX 474; PX 491; and PX 501.

520. The parties' course of conduct prior to this litigation supports the Court's interpretation of the clear language of the Agreement. D.I. 115, at 68–69 ("—at no time [prior to the litigation] did Spherion—ever take the position that a Therapy Student without a loan

was not a Therapy Student under the definition in the Stock Purchase Agreement.").

521. PX 172, § 10.4(a). "Seller Group" includes Interim (pre-sale) and Spherion. *Id.* at § 1.85. "Transferred Entities" includes Interim and its subsidiaries. *Id.* at §§ 1.100, 1.101, 1.103.

tiffs. Section 10.4(a) contemplates separate bases for indemnification. First, in those instances where Interim has determined to write-off Therapy Student loans without the threat of litigation because the loans are uncollectible, the parties agreed to a designated reserve amount to address those situations and to reduce the Seller's indemnity liability. On the other hand, where Therapy Students have made claims, either in threatened or actual litigation, against Interim or its predecessors based on allegations, *inter alia*, of breach of contract, misrepresentation or fraud, the consideration offered by Interim to resolve those claims—including, if appropriate, the forgiveness of outstanding loan obligations—is not subject to the Therapy Student Reserve. The write-off of the loan, under these circumstances, is tantamount to, and an integral part of, a payment of "Damages resulting from [a] claim by [a] Therapy Student."[522] There is simply no canon of contract construction reasonably applied to the text of the Agreement that would justify applying the Therapy Student Reserve to payments made under such circumstances.

### 3. Notice of Therapy Student Claims

Spherion next contends that plaintiffs may not seek indemnification for any of the Therapy Student claims because plaintiffs did not submit their demand for indemnification in accordance with the notice provisions of the Agreement. In addition to the adequacy of plaintiffs' notice of the claims, the parties dispute whether loan write-offs constitute "Third Party Claims" as defined in the Agreement.

The first applicable provision of the Agreement is Section 10.1(b), which provides, in pertinent part:

The representations and warranties of Seller set forth in Section 3 shall survive the Closing. The representations and warranties set forth in Sections 3.3, 3.4, 3.5, 3.7 and subsequent sections of Section 3 shall expire and be of no further force and effect eighteen months after the initial closing date, except with respect to—(ii) claims that Buyer has previously asserted against Seller in writing, setting forth with reasonable specificity the nature of such claims.[523]

The second provision, at Section 10.4(f), specifies that the eighteen-month survival period set forth in Section 10.1 applies to Therapy Student claims.[524] At Section 10.5, the Agreement requires "prompt" and "reasonably detailed notice of Third Party Claims."[525] The Agreement defines "Third Party Claim" as "any and all claims, demands, suits, actions or proceedings by any person or entity, other than members of the Buyer Group or the Seller Group, that could give rise to a right of indemnification under Section 10."[526]

Spherion contends that plaintiffs failed to comply with the notice provisions because they either failed to deliver timely notice, failed to deliver the notice in writing, or failed to deliver notice that set forth the claim for indemnification with the requisite specificity contemplated by the Agreement. Plaintiffs challenge Spherion's interpretation of Section 10.1 and argue that their written notice of the Therapy Student claims complied with a

522. *Id.* at § 10.4(a)(ii). *See also Id.* at § 1.19 (" 'Damages' means claims, *losses,* penalties, fines, damages, *liabilities* and *expenses* . . . .")(emphasis supplied).

523. *Id.* at § 10.1.

524. *Id.* at § 10.4(f).

525. *Id.* at § 10.5.

526. *Id.* at § 1.97.

reasonable interpretation of the Agreement's notice provisions.

The Agreement does not define "reasonable specificity," yet this appears to be the focus of the parties' dispute with respect to this issue. The parties agree that plaintiffs did provide written notice to Spherion regarding several of the Therapy Student claims within the prescribed time period.[527] They also appear to agree that the written notices to Spherion did not identify by name all of the Therapy Students for which plaintiffs demanded indemnification.[528]

Given that Spherion was well aware of the complete fiasco its Therapy Student program had become prior to the Sale, and knew well that most if not all of the Therapy Students had not received what they were promised (an ability to seek an education abroad and then licensure and employment in the United States), the Court is disinclined to follow Spherion's narrow construction of the Agreement's notice provision with respect to the Therapy Student claims.[529] Spherion knew specifically the universe of students who participated in the Therapy Student program. Each of the students, in one form or another, signed an agreement with Interim (pre-Sale) or its predecessor.[530] And each of these Therapy Students possessed a potential claim against Interim from the moment the Therapy Student program failed to deliver what Interim or its predecessor

had promised. Under these circumstances, the Court finds that plaintiffs' written notification regarding the future Therapy Student claims was sufficient to satisfy the "reasonable specificity" requirement of Section 10.1(b)(ii), and the "reasonably detailed" requirement of Section 10.5.[531] Spherion knew full well who these potential claimants were and what its likely exposure to such claims would be.

The Court also shares plaintiffs' view that loan write-offs are not "Third Party Claims" as defined in the Agreement, at least to the extent that the write-off did not occur in consideration for the release of a Third Party Claim. Because the Therapy Student program was a total failure, Interim was forced to write-off several loans deemed uncollectible. The assessment of the viability of the loans, and the decision to write them off, had nothing to do with a "claim, demand, suit, action or proceeding."[532] The loan write-offs, therefore, were not subject to the notice requirements of Section 10.5.[533]

### 4. Indemnification for the Therapy Student Claims

The Agreement provides that the parties are to share the losses associated with the Therapy Student program. Specifically, the Agreement provides that Interim would pay the first $100,000 without any contribution from Spherion. Thereafter, the parties agreed to pay 50% of "Speci-

---

527. D.I. 109, at 134–36; PX 225; PX 229; PX 235; PX 239.

528. See e.g. PX 239 ("[Interim] and Buyer take the position that other Therapy Students making allegations in the future, similar to the allegations previously disclosed to you, would be covered by the Special Indemnity provision of Section 10.4(a) of the Agreement.").

529. See PX 112; PX 233; PX 234; PX 253; PX 174, SCH. 3.20.

530. D.I. 96, at ¶ 10.

531. PX 172, at §§ 10.1(b)(ii), 10.5.

532. See Id. at § 1.97.

533. Id. at § 10.5 ("any Indemnified Party that seeks indemnification with respect to *a third party claim* from the other party ... must provide written notice to the Indemnifying Party ....")(emphasis supplied).

fied Damages."[534] As to the loan write-offs, Spherion was obliged to pay 50% of the amount written off over and above the Therapy Student Reserve ($578,463.00), plus the fees associated with collection.[535] Based on the parties' stipulations, and the Court's factual and legal conclusions regarding the proper construction of the Agreement, the Court is satisfied that the plaintiffs are entitled to the full amount of indemnification they seek for losses associated with the Therapy Student program. Specifically, plaintiffs are entitled to:

| | |
|---|---|
| Alford Action: | $ 467,722.88 |
| Abrajano Action: | $ 420,086.12 |
| Stecker Action: | $ 255,443.89 |
| Other asserted claims: | $ 444,700.54 |
| Loan write-offs in access Therapy Student reserve: | $ 322,051.31 |
| Probable additional loan write-offs: | $ 331,434.21 |
| Total: | $ 2,241,438.95 |
| Less: | $ 100,000.00 |
| Interim share: | $ 1,070,719.48 |
| Spherion share: | $ 1,070,719.47 [536] |

## F. Plaintiffs Are Not Entitled to Expectancy Damages

The Court already has concluded that plaintiffs' recovery of expectancy damages must be tied to their ability to prove a breach of the express promises made to them in the Agreement. Thus, for instance, had plaintiffs proven a breach of the Medicare representations and warranties, or the financial statement representations and warranties, plaintiffs could reasonably argue that their valuation of Interim was skewed as a result of these breaches and that expectancy damages, therefore, are appropriate. Plaintiffs failed to meet their burden of proof on these breach claims, however, and the breaches that they have proven are not such that the Court can conclude that plaintiffs' reasonable expectations for this transaction have been frustrated. Indemnification, under the circumstances, is the appropriate (and exclusive) remedy.

## III.

For the foregoing reasons, the Court has found in favor of the plaintiffs on Counts I and II of their Amended Complaint. The Court has found in favor of Spherion on Count III of the Superior Court Complaint and Count I of the Court of Chancery Complaint, which claim was transferred to this Court prior to trial. The Court also has found in favor of Spherion on plaintiffs' claim for expectancy damages.

Plaintiffs are awarded $1,070.719.47 with respect to Count II of the Superior Court Amended Complaint, plus pre and post judgment interest at the statutory rate, and reasonable attorney's fees and costs in accordance with Sections 1.19, 1.65 and 10.1 of the Agreement. Because the plaintiffs' Damages with respect to Count I of the Superior Court Amended Complaint, in the aggregate, do not meet the $2 million deductible set forth in Section 10.3 of the Agreement, plaintiffs are not awarded their otherwise recoverable Damages as to these claims.

534. *Id.* at § 10.4(a)(iii).

535. *Id.* at § 10.4(a)(i).

536. The following evidence relates to each element of the Therapy Student indemnification Damages: (1) Alford action—PX 112; PX 329; PX 336; D.I. 132, ¶ 9.(2) Abrajano action—PX 233; PX 329; PX 336; PX 716; D.I. 96, ¶ 1; D.I. 132, at ¶ 9.(3) Stecker action—PX 253; PX 254; PX 336; D.I. 132, ¶ 9.(4) Other asserted claims—PX 239; PX 329; PX 336; D.I. 132, at ¶ 9.(5) Loan write-offs—PX 329; PX 336; D.I. 132, at ¶ 11; D.I. 96, at ¶ ¶ 6, 7, 8.

The parties shall present a stipulation to the Court within fourteen days of this Order setting forth the means and timing by which they propose to address the attorney's fees issues under Sections 1.9, 1.65 and 10.1 of the Agreement. Upon resolution of this issue, the Court will enter its final judgment and verdict on the docket.

**IT IS SO ORDERED.**

